# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

NELSON GONZALES,                          )
                                          )
                    Plaintiff,            )
                                          )
          vs.                             )
                                          )  No. CV 07-04720 CRB
                                          )
MICHAEL NOVOSEL, R. CARLINO,              )
S. CURMI, A. BORDIGON, J.                 )
FUKUSHIMA, and DOES 1025,                 )
inclusive,                                )
                                          )
                    Defendants.           )
                                          )
_____)

DEPOSITION OF MICHAEL NOVOSEL

April 17, 2008

REPORTED BY:  A. MAGGI SAUNDERS,

C.S.R. No. 2755

**A. Maggi Saunders & Associates**
**Certified Shorthand Reporters**

57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

```
                          )
STATE OF CALIFORNIA )        ss.
                          )
```

## CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 1st day of May, 2008.

_A. Maggi Saunders CSR_

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE NORTHERN DISTRICT OF CALIFORNIA
3   ---oOo---
4   NELSON GONZALES,                    )
5            Plaintiff,                 )
6      vs.                              )
7                                       ) No. CV 07-04720 CRB
8   MICHAEL NOVOSEL, R. CARLINO,        )
    S. CURMI, A. BORDIGON, J.           )
9   FUKUSHIMA, and DOES 1025,           )
    inclusive,                          )
10           Defendants.                )
11                                      )

16   DEPOSITION OF MICHAEL NOVOSEL
17        April 17, 2008

24   REPORTED BY: A. MAGGI SAUNDERS,
25       C.S.R. No. 2755

**Page 2**

## I N D E X

Page

Examination by MR. DAAR                    6
Examination Resumed by MR. DAAR          136

## E X H I B I T S

FOR PLAINTIFF                      Page
1   Atherton Police Department,       222
    Supplement 10, 8/29/06

**Page 3**

1   BE IT REMEMBERED that, pursuant to Notice
2   of Taking Deposition, and continued by Stipulation,
3   and on Thursday, the 17th day of April, 2008,
4   commencing at the hour of 9:30 o'clock a.m. thereof,
5   at the SCOTT LAW FIRM, 1375 Sutter Street, Suite 222,
6   San Francisco, California 94109, (415) 561-9600,
7   before me, A. MAGGI SAUNDERS, a Certified Shorthand
8   Reporter in and for the State of California, there
9   personally appeared

11       MICHAEL NOVOSEL,

13   called as a witness by the Plaintiff NELSON GONZALES,
14   who, being by me first duly sworn, was thereupon
15   examined and interrogated as hereinafter set forth.

17       ---oOo---

20       LAW OFFICES OF RANDOLPH E. DAAR, 506
21   Broadway, San Francisco, California 94133, (415)
22   986-5591, represented by RANDOLPH E. DAAR, ESQ.,
23   appeared as counsel on behalf of Defendant MICHAEL
24   NOVOSEL.

**Page 4**

1       SCOTT LAW FIRM, 1375 Sutter Street, Suite
2   222, San Francisco, California 94109, (415) 561-9600,
3   represented by JOHN SCOTT, ESQ., appeared as
4   co-counsel on behalf of the PLAINTIFF, NELSON
5   GONZALES.

7       STATE OF CALIFORNIA, DEPARTMENT OF JUSTICE,
8   OFFICE OF THE ATTORNEY GENERAL, 455 Golden Gate
9   Avenue, Suite 11000, San Francisco, California 94102,
10   (415) 703-5522, represented by JOHN P. DEVINE, DEPUTY
11   ATTORNEY GENERAL, appeared as counsel on behalf of
12   Defendant MICHAEL NOVOSEL.

14       LAW OFFICES OF MEYERS, NAVE, RIBACK, SILVER
15   & WILSON, 555 - 12th Street, Suite 1500, Oakland,
16   California 94607, (510) 808-2000, represented by
17   KIMBERLY E. COLWELL, ESQ., appeared as counsel on
18   behalf of Defendants OFFICERS CARLINO, CURMI,
19   BORDIGON AND FUKUSHIMA.

21       LEGAL VIDEOS, 4340 Redwood Highway, Suite
22   150, San Rafael, California 94903, (415) 459-7672,
23   represented by GABE ABENDROTH, PRINCIPAL
24   VIDEOGRAPHER, appeared to videotape the proceedings
25   on behalf of the Plaintiff, NELSON GONZALES.

**Page 5**

1    ---oOo---
2        THE VIDEOGRAPHER: Today's date is
3    April 17th, 2008 -- May 17th, 2008 -- Sorry.
4        The time on the monitor --
5        MS. COLWELL: No.
6        MR. DAAR: No.
7        THE VIDEOGRAPHER: Oh, yeah. I'm sorry.
8        MR. DAAR: That's all right.
9        THE VIDEOGRAPHER: April 17th, 2008. The
10   time on the video monitor is 9:28 a.m.
11       This is Tape I, Volume I in the deposition
12   of Michael Novosel, in the United States District
13   Court, Northern District of California, In The Matter
14   of Gonzales versus Novosel, et al., Case No.
15   CV-07-04720 CRB.
16       We are at the Scott Law Firm. The address
17   is 1375 Sutter Street, Suite 222, San Francisco,
18   California.
19       My name is Gabe Abendroth, contracted by
20   Legal Videos.
21       Today's Court Reporter is Maggi
22   Saunders.
23       Counsel, please voice-identify yourselves,
24   and state whom you represent for the record.
25       MR. DEVINE: John Divine, representing

**Page 6**

1    Defendant CHP Officer Michael Novosel.
2        MS. COLWELL: Kim Colwell, representing
3    the South San Francisco Defendants.
4        MR. DAAR: Randolph Daar, representing
5    Plaintiff, Nelson Gonzales.
6        THE VIDEOGRAPHER: Would the Court
7    Reporter please swear in the witness.
8
9
10       ---oOo---
11       MICHAEL NOVOSEL,
12   called as a witness herein, being first duly sworn by
13   the Certified Shorthand Reporter to tell the truth,
14   the whole truth, and nothing but the truth, testified
15   as follows:
16   EXAMINATION BY MR. DAAR:
17       Q.   Good morning, Officer.
18       A.   Good morning.
19       Q.   We're here today to conduct your
20   deposition. And during the process of this deposition,
21   I'll be asking you a series of questions, which you'll
22   be answering.
23       The Court Reporter, just like in a regular
24   Court, is going to be taking down everybody's words;
25   so, it's important that we only speak one at a time,

**Page 7**

1    and not speak over each other because that will create
2    difficulties.
3        A.   Okay.
4        Q.   There is no Judge here. This is a
5    "Discovery" process, by which I just ask you questions
6    and discover information.
7        You have your attorney here. You have to
8    answer all of my questions, unless your attorney
9    instructs you not to answer, okay?
10       A.   Okay.
11       Q.   If your attorney instructs you not to
12   answer, I advise you to follow his advice and not
13   answer, but you still could answer, if you so chose,
14   okay?
15       A.   Okay.
16       Q.   If you don't understand a question, please
17   ask me to clarify the question, and I will do my best
18   to ask you a clear question, so I can get a clear
19   answer.
20       A.   Okay.
21       Q.   There may be times that your attorney
22   makes objections to the questions. Those objections
23   are for purposes of the Court, and doesn't impact
24   whether or not you have to answer the question. You
25   still will have to answer the question.

**Page 8**

1        A.   Okay.
2        Q.   When the process is completed, the Court
3    Reporter will prepare a book, which is basically a
4    transcript of everything that was said here.
5        You'll get a copy of that transcript.
6    You'll have an opportunity to comment, if you feel
7    that any of the words taken down were taken down
8    improperly or incorrectly.
9        A.   Okay.
10       Q.   Do you have any questions?
11       A.   I do not.
12       Q.   Okay.
13       The first question would be, have you
14   ever had your deposition taken previous to today?
15       A.   Regarding this matter?
16       Q.   At all, in any case.
17       A.   One other time.
18       Q.   Okay. And what was that time?
19       A.   I don't recall the date. It was -- it was
20   in regards to a traffic collision.
21       Q.   I'm sorry?
22       A.   It was in regards to a traffic collision.
23       Q.   Traffic collision?
24       A.   Yes.
25       Q.   Okay. Was it a civil case, between two

**Page 9**

1 people involved in an accident?
2   A.   Yes.
3   Q.   Were you a witness to that?
4   A.   I was an investigating officer.
5   Q.   Okay.  About how long ago did that occur?
6   A.   Maybe two years ago, three years ago.
7   Q.   Okay.  How old are you today?
8   A.   31.
9   Q.   What's your date of birth?
10  A.   September 3rd, 1976.
11  Q.   And how tall are you?
12  A.   5'6".
13  Q.   And what do you weigh?
14  A.   165.
15  Q.   Okay.  Going back, what year did you
16 graduate high school?
17  A.   1995.
18  Q.   And what high school did you graduate
19 from?
20  A.   Serra High School.
21  Q.   I'm sorry?
22  A.   Serra High School.
23  Q.   Sarah?  And where is that located?
24  A.   San Mateo.
25  Q.   Is that a public school?

**Page 10**

1   A.   Private.
2   Q.   Sarah, like the woman's -- Could you spell
3 it for the record?
4   A.   S-e-r-r-a.
5   Q.   Okay.  Upon graduation, did you go to
6 college?
7   A.   I did.
8   Q.   Where did you go?
9   A.   Skyline College.
10  Q.   Where is that located?
11  A.   San Bruno.
12  Q.   Did you go immediately from high school to
13 college?
14  A.   I did.
15  Q.   Okay.  Did you graduate college?
16  A.   AA degree.
17  Q.   Okay.  What year did you obtain your AA
18 degree?
19  A.   I'm trying to think.  Approximately 1998.
20  Q.   And what was it in?
21  A.   Liberal Arts.
22  Q.   After obtaining your AA degree, did you
23 pursue your education further?
24  A.   I did not.
25  Q.   Okay.  Going back to high school, did

**Page 11**

1 you -- were you -- did you belong to any teams in high
2 school, sporting teams?
3   A.   I did.
4   Q.   What teams did you belong to?
5   A.   Football and wrestling.
6   Q.   Okay.  Any clubs?
7   A.   No.
8   Q.   Okay.  How about in Skyline College, did
9 you participate in college sports there?
10  A.   I did not.
11  Q.   Okay.  Were there any clubs you belonged
12 to on campus there?
13  A.   No.
14  Q.   Okay.  How were your grades?
15        MR. DEVINE:  Objection.  I'm going to
16 start objecting to this on relevance --
17        MR. DAAR:  Okay.
18        MR. DEVINE:  -- and also on privacy
19 grounds.  You don't have to answer that.
20        MR. DAAR:  I'll withdraw that question.
21  Q.   Upon graduating Skyline, did you seek --
22 did you obtain employment?
23  A.   I did.
24  Q.   Okay.  What was your first job after you
25 graduated from Skyline?

**Page 12**

1   A.   Pretty much joined the CHP Academy.
2   Q.   Okay.  So that immediately upon graduating
3 Skyline College, you entered the CHP Academy.
4   A.   Not immediately.  I think I worked at
5 Coors West before.
6   Q.   I'm sorry?
7   A.   Coors West.
8   Q.   Okay.  Is that a --
9   A.   That was a distributor.  I shipped for
10 Coors Beer.
11  Q.   Oh, okay.  What did you do there?
12  A.   A merchandiser.
13  Q.   Okay.  How long were you employed there?
14  A.   A year, year and a half.
15  Q.   Okay.  During your time there, did you
16 apply to the California Highway Patrol?
17  A.   I did.
18  Q.   Okay.  Do you remember when you actually
19 applied?
20  A.   No, I do not.
21  Q.   Okay.  Did you submit an application to a
22 State agency?
23  A.   Yes.
24  Q.   Okay.  And after submitting that
25 application, at some point you were interviewed?

**Page 13**

1    A.    Yes.
2    Q.    Okay.  And you have to give them a bunch
3 of documents about your life, and so forth?
4    A.    Correct.
5    Q.    Okay.  And prior to going to the Academy,
6 had they offered you a job?
7    A.    No.
8    Q.    Okay.  Did you know whether or not you
9 were going to be employed by the CHP when you entered
10 the Academy?
11    A.    **Well, when you enter, you are employed by**
12 **the CHP.**
13    Q.    Okay.  Maybe you can just explain that to
14 me.  There is an application process.
15    They say, "You are hired; now you got to
16 go to the Academy, or -- "
17    A.    Yes.
18    Q.    Okay.  So, prior to going to the Academy,
19 they informed you that, if you passed the Academy, you
20 would have a job as a CHP Officer.
21    A.    Yes.
22    Q.    Okay.  Where is the Academy that you
23 attended located?
24    A.    **West Sacramento.**
25    Q.    Okay.  And how long was that Academy?

**Page 14**

1    A.    **Approximately six months.**
2    Q.    You graduated the program?
3    A.    **I did.**
4    Q.    Okay.  And when was it that you graduated?
5    A.    **October of 1999.**
6    Q.    I'm sorry?
7    A.    **October 1999.**
8    Q.    Okay.  And then you immediately started
9 your work as a CHP Officer.
10    A.    **Yes.**
11    Q.    Okay.  Outside of your -- Strike that.
12    Do you -- Are you issued a weapon as part
13 of your duties as a CHP Officer?
14    A.    **Yes.**
15    Q.    Okay.  And is it called a duty weapon, or
16 is there a particular term I should use when talking
17 about it?
18    A.    **Duty weapon, yeah.**
19    Q.    Okay.  And are you issued one duty weapon,
20 or more than one duty weapon?
21    A.    **Just one.**
22    Q.    Okay.  And what is the duty weapon you
23 were issued when you began as a CHP Officer?
24    A.    **Smith & Wesson .40 caliber.**
25    Q.    Prior to being issued that weapon, had you

**Page 15**

1 owned any weapons yourself?
2    A.    **I did not, no.**
3    Q.    Do you presently own any weapons other
4 than your duty weapon?
5    A.    **I do.**
6    Q.    [MARKED QUESTION]  Okay.
7    And what are those weapons --
8    MR. DEVINE:  I'm going to object to this
9 on relevance grounds, and also on privacy grounds.
10    I instruct you not to answer that.
11    THE WITNESS:  Okay.
12    MR. DAAR:  Would you mark that question
13 for me?
14    Q.    And since becoming a CHP Officer, do you
15 belong to any organizations related to hunting or
16 gun-ownership?
17    A.    **No.**
18    Q.    Since joining the CHP have you engaged in
19 the recreational use of guns?
20    A.    **No.**
21    Q.    Other than in practice, have you ever --
22 and other than the incident which we're talking about
23 today, have you ever discharged your weapon as a CHP
24 Officer?
25    A.    **I have not.**

**Page 16**

1    Q.    [MARKED QUESTION]  And during your duties
2 as a CHP Officer, have you ever taken your weapon out
3 of its holster, and pointed it at a suspect, and
4 threatened to use the weapon, unless the suspect
5 complied with your orders?
6    MR. DEVINE:  I'm going to object right
7 now.
8    These are all -- goes into the privacy,
9 the personnel issues.
10    I think there is a -- You can make a --
11    Well, I'll object formally that it
12 violates the Evidence Code, the Government Code and
13 also Penal Code, and instruct not to answer.
14    I think it's going into his personnel
15 records.
16    I mean, I've allowed you some latitude,
17 but I think, if you are going to continue on that
18 way, essentially go through what his prior actions as
19 a CHP Officer are, it's an inappropriate line of
20 questioning in this forum.
21    MR. DAAR:  Well, I'm not asking the
22 contents of the personnel records.  I'm asking, you
23 know, what --
24    MR. DEVINE:  Well, you know, what prior
25 incidents, and things like that, I mean, you know,

**Page 17**

1  that's subject to a Pitches Motion in a criminal trial,
2  and subject to safeguards in a civil lawsuit as well.
3          MR. DAAR: Well, if you want to instruct
4  him not to answer on that question --
5          MR. DEVINE: I do.
6          MR. DAAR: Okay. And I assume that --
7  Okay, I guess, mark that question, too, please.
8     Q.  Have you ever been in the military?
9     A.  **No.**
10    Q.  Have you ever been fired from any job?
11    A.  **No.**
12    Q.  Have you ever applied and been rejected to
13 any other job?
14    A.  **I don't recall.**
15    Q.  Okay. Have you applied to any departments
16 other than the CHP?
17    A.  **I did.**
18    Q.  Were you accepted in those other
19 departments?
20    A.  **I was not.**
21    Q.  Okay. What other departments did you
22 apply to?
23    A.  **San Mateo County Sheriff's Department.**
24    Q.  Okay. Anything else?
25    A.  **That's it.**

**Page 18**

1     Q.  Okay. Do you know why they rejected you?
2     A.  **I do not.**
3     Q.  Did you make that application around the
4  same time as you applied to the CHP?
5     A.  **I think it was after.**
6     Q.  The CHP not your first choice?
7     A.  **It was.**
8     Q.  Okay. If it was your first choice, then,
9  why did you make a subsequent application to San Mateo?
10    A.  **You don't want to put your eggs in one**
11 **basket.**
12    Q.  I'm sorry?
13    A.  **I don't want to put my eggs in one basket.**
14    Q.  Okay. You hadn't found out yet about the
15 CHP, so --
16    A.  **Correct.**
17    Q.  -- it was a backup choice.
18    A.  **Yes.**
19    Q.  Okay. Do you have any health conditions
20 that affect your eyesight?
21    A.  **No.**
22    Q.  Okay. Your hearing?
23    A.  **No.**
24    Q.  [MARKED QUESTION] Okay. Have you ever
25 seen a doctor or health professional for any

**Page 19**

1  stress-related illnesses?
2          MR. DEVINE: I'm going to object to that
3  also on privacy grounds. Instruct you not to answer.
4          THE WITNESS: Okay.
5          MR. DAAR: Could you mark that one.
6     Q.  Have you ever applied for Workman's
7  Compensation?
8     A.  **No.**
9     Q.  [MARKED QUESTION] Are you presently under
10 treatment for any condition that affects your ability
11 to be an Officer?
12         MR. DEVINE: I'm going to object to that
13 question also on privacy grounds.
14         Are you referring to a medical
15 condition?
16         MR. DAAR: Yeah. I'm sorry, a medical
17 condition.
18         MR. DEVINE: Yeah, I'll object to that on
19 privacy grounds as well.
20         MR. DAAR: Q. When did you obtain, first
21 obtain your driver's license?
22    A.  **When I was 16.**
23    Q.  Have you ever been involved in any traffic
24 accidents as a driver?
25    A.  **I have.**

**Page 20**

1     Q.  Okay. How many?
2     A.  **I think approximately three.**
3     Q.  Okay. When was the first one?
4     A.  **I think it was when I was 18.**
5     Q.  Okay. And what occurred?
6     A.  **I rear-ended somebody.**
7     Q.  Was anybody hurt?
8     A.  **No.**
9     Q.  Were you given a citation for the driving?
10    A.  **I was not.**
11    Q.  Okay. And did you or your insurance
12 company compensate the other party?
13    A.  **I don't recall.**
14    Q.  Okay. The second incident was what?
15    A.  **I got rear-ended.**
16    Q.  Karma.
17    A.  **Yes, I guess.**
18    Q.  Were you hurt?
19    A.  **I was not.**
20    Q.  There was no citation issued in that case
21 against you, correct?
22    A.  **No.**
23    Q.  Okay. How old were you when that
24 happened?
25    A.  **That was approximately two years ago, so**

1  28, 29.
2  Q.  Were you off-duty?
3  A.  Working.
4  Q.  Oh, on-duty.
5  The third one?
6  A.  I -- I knocked somebody's mirror off their
7  car.
8  Q.  Were you on-duty?
9  A.  I was.
10  Q.  And what were the circumstances?
11  A.  It was during a pursuit.
12  Q.  And what occurred?
13  A.  Traffic was stopped in the left lanes, and
14  I was going down the center median, and the median was
15  kind of getting smaller.
16  Q.  Mm-hmm.
17  A.  And it was either hit the wall, or hit the
18  car; and my passenger-side mirror hit the driver's-side
19  mirror of the person's vehicle.
20  Q.  Did you have to stop at that time, or did
21  you continue with the pursuit --
22  A.  Continued -- Continued with the pursuit.
23  Q.  What was the outcome of that pursuit?
24  A.  The subject was arrested.
25  Q.  How did the pursuit end?

Page 21

1  A.  The subject crashed.
2  Q.  Were you the primary vehicle in the
3  pursuit?
4  A.  I was.
5  Q.  Were there additional units behind you?
6  A.  There were.
7  Q.  How many?
8  A.  Approximately two.
9  Q.  Would you call it a high-speed chase?
10  A.  It was.
11  Q.  When did this occur?
12  A.  2006.
13  Q.  Where?
14  A.  101 southbound.
15  Q.  Can you give me a county?
16  A.  San Mateo County.
17  Q.  You are familiar with San Mateo County,
18  because you have spent a lot of time in this area?
19  A.  Correct.
20  Q.  Okay.  How long did this chase last?
21  A.  Approximately five minutes.
22  Q.  What was the highest speed reached during
23  the chase?
24  A.  I don't recall.
25  Q.  Do you have an estimate?

Page 22

1  A.  No.
2  Q.  You said it was a high-speed chase.  Does
3  that -- When you use the word "high-speed chase," does
4  that connotate at least exceeding the applicable speed
5  limits?
6  A.  Yes.
7  Q.  And since it was on the freeway, that
8  would, in your mind, be greater than -- What's the
9  speed limit on 101?
10  A.  65.
11  Q.  So, it would be greater than 65.
12  A.  It was.
13  Q.  But not so much greater, that it's
14  noteworthy that you remember it.
15  A.  I don't remember it.
16  Q.  Okay.
17  And why was the subject being pursued?
18  A.  Stolen vehicle.
19  Q.  Had there been a traffic stop from which
20  the suspect had fled?
21  A.  I initiated a traffic stop, and he didn't
22  stop.
23  Q.  Okay.
24  And so, you had initiated a procedure to
25  get the vehicle to pull over by activating your

Page 23

1  lights?
2  A.  Yes.
3  Q.  And the vehicle didn't respond.
4  A.  Correct.
5  Q.  Okay.
6  What were the circumstances of the
7  vehicle crashing?
8  A.  He lost control.
9  Q.  What did he crash into?
10  A.  The roadway.
11  Q.  When you say "the roadway," you are
12  referring to --
13  A.  The freeway.
14  Q.  Okay.  The freeway is flat.  I mean, did
15  he crash into a fence, or a guard rail, or did he
16  spin-out?  I mean, how. . .
17  A.  He just lost control, and hit the road,
18  the asphalt.
19  Q.  He was in a car, or a motorcycle?
20  A.  A motorcycle.
21  Q.  Ah.  Thank you.  Okay.  That's what we're
22  missing from the picture.
23  How did you know the motorcycle was
24  stolen?
25  A.  I ran the license plate.

Page 24

## Page 25

1  Q.  After the motorcycle spun-out, then the
2  driver and the motorcycle spilled down the asphalt?
3  A.  **Correct.**
4  Q.  Okay.  What did you do after that occurred
5  to arrest the suspect?
6  A.  **Put handcuffs on him.**
7  Q.  Did the subject resist at all?
8  A.  **He did not.**
9  Q.  And did you have your weapon out when you
10 approached the suspect in this situation?
11 A.  **I did not.**
12 Q.  I'm sorry?
13 A.  **No.**
14 Q.  Okay.
15     Did you have any information as to who
16 was driving the motorcycle?
17 A.  **I did not.**
18 Q.  Okay.  Was the suspect conscious and
19 moving after the incident?
20 A.  **He was.**
21 Q.  Was he severely injured, or moderately
22 injured, or not injured at all?
23     MR. DEVINE:  Objection.  Calls for
24 speculation.  You can answer, if you can answer.
25     THE WITNESS:  Okay.  Minor injuries.

## Page 26

1     MR. DAAR:  Q.  Minor injuries?
2  A.  **Yes.**
3  Q.  Your vehicle never struck the motorcycle?
4  A.  **Never.**
5  Q.  Have you been involved in any other
6  high-speed pursuits?
7  A.  **I have.**
8  Q.  Okay.  How many?
9  A.  **I can't give you an exact number.**
10 Q.  Can you give me an estimate?
11 A.  **Oh, 15 to 20.**
12 Q.  Okay.  What is the exact date you became a
13 CHP Officer?
14 A.  **23.**
15 Q.  The date, I'm sorry?
16 A.  **Oh, the date?**
17 Q.  Yeah.
18 A.  **October of '99.**
19 Q.  Okay.
20     What was your initial assignment after you
21 first became an Officer, what was your first
22 assignment?
23 A.  **Redwood City.**
24 Q.  And were you a solo officer in the
25 vehicle, or did you have a partner?

## Page 27

1  A.  **You have a Training Officer.**
2  Q.  Okay.  A Field Training Officer?
3  A.  **(Nodding head.)**
4  Q.  And how long did that training period
5  last?
6  A.  **Approximately four months.**
7  Q.  Okay.  What did you do after that?  What
8  was your assignment?  What was your first assignment
9  after that?
10 A.  **Road patrol.**
11 Q.  What?
12 A.  **Road patrol.**
13 Q.  Road patrol, okay.
14     And where were you assigned to do road
15 patrol?
16 A.  **Redwood City.**
17 Q.  And were you single at that point, a
18 single officer in the car, or were you with a partner?
19 A.  **I was --**
20 Q.  This is after you had completed training.
21 A.  **Solo.**
22 Q.  Solo, okay.
23     And how long did you remain in that
24 capacity for the CHP:  Solo, Redwood City area,
25 patrol?

## Page 28

1  A.  **I think I worked graveyards, maybe three**
2  **or four months.**
3  Q.  Okay.
4  A.  **And you have a partner when you work**
5  **graveyards.**
6  Q.  Okay.  Do you have a -- You said you have
7  a partner when you work graveyards?
8  A.  **Yes.**
9  Q.  Okay.  Is this --
10     Let me just make it simple:  Did you
11 stay in this capacity up until the incident, that you
12 were Redwood City Patrol?
13 A.  **I was in Redwood City for one year.**
14 Q.  Okay.
15     You were in Redwood City for one year.
16 What happened -- What did you do after that?
17 A.  **I went to the Santa Barbara CHP.**
18 Q.  Okay.  Santa Barbara?
19 A.  **Yes.**
20 Q.  How long were you down there?
21 A.  **Six months.**
22 Q.  Did you work with a partner there, or were
23 you solo?
24 A.  **Both.**
25 Q.  And where did you go after Santa Barbara?

Deposition of MICHAEL NOVOSEL          NELSON-GONZALES VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008                         USDC, NORTHERN DIST. OF CA, No. CV07-04720 CRB

Case 3:07-cv-04720-CRB     Document 52-3     Filed 09/11/2008     Page 11 of 63

| | |
|---|---|
| 1   A.  Back to Redwood City. | 1   Q.  It was somebody else? |
| 2   Q.  How long did you stay in Redwood City? | 2   A.  Correct. |
| 3   A.  I've been there since. | 3   Q.  Did there come a time when Officer Walsh |
| 4   Q.  Okay. So, looks to me to be about two | 4  was no longer your partner? |
| 5  years or so after you started, you wound up back in | 5   A.  Yes. |
| 6  Redwood City, and you remained there until the present; | 6   Q.  Okay. When did that occur? |
| 7  is that fair? Have I got it right, or. . . | 7   A.  Oh, jeez. I think, beginning of that |
| 8   A.  Approximately, yeah. | 8  month. |
| 9   Q.  Okay. | 9   Q.  What? |
| 10       Since returning to Redwood City from | 10   A.  In August of '06. |
| 11  Santa Barbara, what shift did you begin working? | 11   Q.  August of '06, okay. You got a new |
| 12   A.  Afternoon shift. | 12  partner in August of '06? |
| 13   Q.  Afternoon, okay. And that's from what | 13   A.  Yes. |
| 14  time to what time? | 14   Q.  And who was that? |
| 15   A.  I think it's 1:30 p.m. to 10:00 o'clock | 15   A.  Officer Torr, T-o-r-r. |
| 16  p.m. | 16   Q.  Okay. And Officer Torr was your partner |
| 17   Q.  And did you work with a partner, or solo? | 17  up until this incident? |
| 18   A.  Solo. | 18   A.  No, it was just for one month. |
| 19   Q.  Solo. And how long did you have that | 19   Q.  Okay. It was only for one month. |
| 20  shift upon returning to Redwood City? | 20   A.  Yes. |
| 21   A.  Approximately five years. | 21   Q.  And what occurred after the month? |
| 22   Q.  Okay. And then, what was the next | 22   A.  Um. . . |
| 23  assignment? | 23   Q.  Did your shift change, or did you get a |
| 24   A.  Graveyard shift. | 24  new partner, or what? How did it change? |
| 25   Q.  And can you help me by giving me a | 25   A.  Well, I stayed on graveyards, but I took a |
| Page 29 | Page 31 |
| 1  rough -- Can you give me the year you went to graveyard | 1  month off. |
| 2  in Redwood City? | 2   Q.  Okay. And when did you take a month off? |
| 3   A.  2006. | 3   A.  From the night of the incident to October |
| 4   Q.  Okay. And the graveyard shift went from | 4  of '06. |
| 5  when to when? | 5   Q.  And after taking the month off, in what |
| 6   A.  9:00 p.m. to 5:30 a.m. | 6  capacity did you return? What was your job when you |
| 7   Q.  And did you work with a -- now work with a | 7  returned? |
| 8  partner because you were on graveyard? | 8   A.  I went back to graveyards. |
| 9   A.  Yes. | 9   Q.  And who was your partner? |
| 10   Q.  And who was your partner? | 10   A.  Officer Hiatt. |
| 11   A.  Mainly, it's been Officer Walsh. | 11   Q.  Could you spell that, please? |
| 12   Q.  Officer. . . | 12   A.  H-i-a-t-t. |
| 13   A.  Walsh. | 13   Q.  And his badge? |
| 14   Q.  Walsh? Could you spell it for me? | 14   A.  15231. |
| 15   A.  W-a-l-s-h. | 15   Q.  Okay. And does that assignment bring us |
| 16   Q.  Do you have a badge number, do you know? | 16  up to the present, or were there other changes since |
| 17   A.  It's 16721. | 17  then? |
| 18   Q.  16721? | 18   A.  No, I've been on graveyard since. |
| 19   A.  Yes. | 19   Q.  Okay. And you are still working with |
| 20   Q.  Okay. And this is the shift that you were | 20  Officer Hiatt. |
| 21  working when this incident occurred. | 21   A.  No. |
| 22   A.  Yes. | 22   Q.  Okay. You've got a different partner? |
| 23   Q.  However, it was not Officer Walsh with you | 23   A.  And then I went back to Officer Walsh. |
| 24  that night, correct? | 24   Q.  And when did that occur? |
| 25   A.  Correct. | 25   A.  November of '06. |
| Page 30 | Page 32 |

**Page 33**

1  Q.  And you are with Officer Walsh now?
2  A.  **Starting -- Not right now, no.**
3  Q.  Okay.  Who are you working with now?
4  A.  **Officer Joyner.**
5  Q.  J-o-r-d-a-n?  Officer. . .
6  A.  **J-o-y-n-e-r.**
7  Q.  And when did that occur?
8  A.  **March of this year.**
9  Q.  [MARKED QUESTION]  Okay.  Prior to the
10 incident that we're here about, what was the most
11 recent high-speed pursuit that you can --
12       MR. DEVINE:  I'm going to object to all
13 these questions.  You are getting into his personnel
14 issue again.  I kind of let you have leeway on the
15 first one.  Are you going to go through all 15 of his
16 pursuits?
17       MR. DAAR:  The best I can.
18       MR. DEVINE:  No.  It's objectionable:  On
19 evidence grounds; on the Evidence Code, through the
20 Penal Code, and through the Government Code.
21       MR. DAAR:  Well, I'm not asking him for
22 names, addresses or witnesses, I'm asking for what
23 events occur, which --
24       MR. DEVINE:  I'm interposing the
25 objection, and instructing you not to answer.

**Page 34**

1       MR. DAAR:  Just so the record is clear,
2  you are going to instruct him not to answer any
3  questions about any other pursuits that he's been in,
4  on the grounds that it is privileged?
5       MR. DEVINE:  Correct.
6       MR. DAAR:  Okay.  So, mark that.
7  Q.  [MARKED QUESTION]  Have you ever been
8  injured by somebody that you were trying to arrest in
9  your capacity as a CHP Officer?
10      MR. DEVINE:  I'm going to object to that
11 on the same grounds.
12      MR. DAAR:  Are you going to instruct him
13 not to answer?
14      MR. DEVINE:  Yeah, I am going to instruct
15 him not to answer.
16      MR. DAAR:  And that's to any question --
17      MR. DEVINE:  Right --
18      MR. DAAR:  -- where we are dealing with --
19      MR. DEVINE:  -- you are trying to get into
20 the per- -- essentially, a verbal look at his personnel
21 file, in my view --
22      MR. DAAR:  No --
23      MR. DEVINE:  -- and to see what's there,
24 and what's not there.  And I think that's
25 inappropriate.  So I just want to give you a sense of

**Page 35**

1  why I'm objecting, and I'm going to interpose the
2  objection.
3       MR. DAAR:  And I understand that.
4       And my view of it is, just because
5  someone wrote it in the personnel file doesn't create
6  a privileged --
7       MR. DEVINE:  I don't know whether it's
8  there or not in the personnel file --
9       MR. DAAR:  Okay --
10      MR. DEVINE:  -- but I don't think you get
11 a verbal -- a verbal inquiry into whether it's there or
12 not.
13      MR. DAAR:  Okay.  So, you are going to
14 instruct him not to answer, if I ask if he's ever been
15 injured by a, we'll call it, a suspect or a defendant.
16      And then, the next question would be
17 whether he's ever been shot-at by a suspect or a
18 defendant.
19      And there would be a question as to has
20 anyone ever used a vehicle to assault him:  That
21 would be the same --
22      MR. DEVINE:  Correct.
23      MR. DAAR:  -- objection?
24      Okay.
25      MR. DEVINE:  I'd also object on relevancy

**Page 36**

1  grounds.
2       MR. DAAR:  Okay.  Well, that's for later.
3       MR. DEVINE:  Right.
4       MR. DAAR:  Q.  Do you have any other
5  family members that are in the CHP?
6  A.  No.
7  Q.  Do you have any other close friends that
8  are in the CHP?
9  A.  I do not.
10 Q.  Do you have any family members in law
11 enforcement?
12 A.  I do not.
13 Q.  Why did you decide to become a police
14 officer?
15 A.  **It's a good job.  You know, it has good**
16 **pay, good benefits, good retirement; and, at the same**
17 **time, you are helping the public.**
18      MR. DAAR:  Okay.  I think I'd like to take
19 about a ten-minute break at this point.  I want to look
20 at what I've done, and move on to a new and interesting
21 area when we get back.
22      MR. DEVINE:  Okay.
23      THE VIDEOGRAPHER:  Going off the record,
24 the time is 10:04 a.m.
25      (Brief recess taken.)

Case 3:07-cv-04720-CRB      Document 52-2      Filed 09/11/2008      Page 13 of 63

**Page 37**

1    (John Scott, co-counsel for Plaintiff,
2    enters the deposition room)
3    THE VIDEOGRAPHER: Coming back on the
4    record, the time is 10:14 a.m.. Counsel, please
5    continue.
6    MR. DAAR: Back on the record.
7    Q.  Drawing your attention now to the period
8    of time around August 19th of 2006, at that time you
9    were working the graveyard shift, correct?
10   **A.  Correct.**
11   Q.  And how many days a week did you work?
12   **A.  Five days a week.**
13   Q.  And what were the days that you were
14   working for the five days?
15   **A.  Tuesday through Saturday.**
16   Q.  Tuesdays through Saturdays.
17   Is overtime common or not common, in terms
18   of your usual duties?
19   **A.  It just -- it depends.**
20   Q.  Okay.  Going back to that week in August
21   on the 19th, did you work any overtime that week?
22   **A.  I don't recall.**
23   Q.  Okay.  What does the overtime depend upon,
24   whether you get overtime or not?  What are the
25   circumstances that cause you to work overtime?

**Page 38**

1    **A.  Maybe a late crash; late arrest.**
2    Q.  Prior to the incident involving Mr.
3    Gonzales, do you recall anything that occurred that
4    week that could cause you to work longer hours than
5    your schedule?
6    **A.  I don't.**
7    Q.  Did you have any knowledge of Nelson
8    Gonzales prior to the time you began pursuing the
9    vehicle?
10   **A.  No.**
11   Q.  Okay.  Prior to your pursuing the vehicle,
12   where had you been patrolling that day?  This is now on
13   August 19th, '06:  What was the area that you were
14   patrolling?
15   **A.  101.**
16   Q.  Okay.  And when you are patrolling 101,
17   how do you perform your duties?  In other words, do you
18   drive back-and-forth on 101?  Do you park?  How do you
19   determine what to do?
20   **A.  Usually, you drive back-and-forth.**
21   Q.  Okay.  So, most of the time you are
22   driving back-and-forth?
23   **A.  Mainly, yes.**
24   Q.  Okay.  What other things might you do as
25   part of your patrol duties besides driving

**Page 39**

1    back-and-forth?
2    **A.  Make traffic stops; assist disabled**
3    **motorists.**
4    Q.  Well, other than -- I mean, other than
5    things that occur, either a traffic stop or a motorist,
6    is it your general practice just to be driving sort of
7    back-and-forth, waiting for a dispatch, or waiting for
8    something to occur?
9    **A.  Mainly, yes.**
10   Q.  Okay.  Are there situations where you park
11   and perform your duties from a stationary location?
12   **A.  If you hear a BOL.**
13   Q.  I don't know what a -- Help me:  BOL?
14   **A.  "Be on the look-out".**
15   Q.  What is that?
16   **A.  Our dispatch may broadcast a call of,**
17   **like, a possible DUI driver.**
18   Q.  Okay.  And when you get such a call, a BOL
19   what do you do, as a result of that BOL call?
20   **A.  You may park on the shoulder, or exit the**
21   **freeway, if you are in the area of the call.**
22   Q.  Again, why is it, when you get a BOL, do
23   you choose to stop, as opposed to continue driving
24   back-and-forth?  What's the strategy behind that?
25   **A.  Well, if the -- If you are ahead of the**

**Page 40**

1    location, you have to stop and wait for the BOL to come
2    into your area.
3    Q.  Okay.  So, then, the dispatch would give
4    you a location that the BOL is suspected to be at or
5    going towards?
6    **A.  Correct.**
7    Q.  And then, you drive your vehicle towards
8    that location?
9    **A.  Yes.**
10   Q.  Okay.  And then, when you get to the
11   location, what do you do then?
12   **A.  Just look for it.**
13   Q.  Okay.
14   And does the CHP receive calls from
15   local, like county or city agencies on these BOLs?
16   **A.  Sometimes.**
17   Q.  Well, so, does it come through your
18   dispatch, or does it go directly to you?
19   **A.  Through our dispatch.**
20   Q.  It goes through your dispatch.
21   So, all of your communication would be
22   directly with your dispatch, not with individual units
23   of City or County police; is that correct?
24   **A.  Mainly, yes.**
25   Q.  Mainly.

**Page 41**

1    A.    Yes.
2    Q.    And what's the exception?
3    A.    Well, if you have a County radio in the
4 car.
5    Q.    Okay.  They are on different frequencies,
6 CHP and County?
7    A.    Yes.
8    Q.    And to your knowledge, are they on
9 different frequency with the City agencies also?
10    A.    I'm not sure about that.
11    Q.    Okay.
12        Did you have a County radio in your
13 cruiser?
14    A.    I did.
15    Q.    Okay.  How do you know -- Well, no, strike
16 that.
17        How is it that you have a County radio in
18 your cruiser?
19    A.    The Sheriff's Department loaned our office
20 I think six or eight radios, portable radios.
21    Q.    Okay.  And what was -- Do you know what
22 the purpose was that the CHP was giving these portable
23 radios?
24    A.    Just so we can hear what the Sheriff's
25 Department is doing, if they need any assistance.

**Page 42**

1    Q.    And were you instructed by the CHP as to
2 how you should respond, if you heard something on the
3 County radio system?
4    A.    I don't recall, no.
5    Q.    Do you -- Did you have discretion as an
6 Officer in determining whether or not to assist the
7 County in any particular situation?
8    A.    You do.
9    Q.    Okay.  Does --
10        To your knowledge, does Dispatch receive
11 the same information that you do on the County radio?
12    A.    I'm not sure.
13    Q.    Okay.  So, if you receive information on
14 the County radio about some ongoing incident or event,
15 you make a discretionary decision as an officer whether
16 to participate or assist or not?
17    A.    Yes.
18    Q.    Okay.  And what criteria do you use to
19 determine whether or not to assist the County, when you
20 hear something on the radio?
21    A.    Well, I don't have any criteria, just...
22    Q.    Okay.  Maybe I'm not fully understanding
23 how this all works.
24        When you are listening to the County
25 radio, do they call up and say, "Hey, is there a CHP

**Page 43**

1 guy out there; we need your help," and then you
2 respond?  Is that how it works?  I mean, maybe not
3 that language, but. . .
4    A.    If we hear on the radio that they need our
5 help, we're going to respond; or they'll call our
6 Dispatch --
7    Q.    Okay.
8    A.    -- and ask for our assistance.
9    Q.    Okay.  So, I understand it, would they
10 broadcast actually to the CHP, knowing that you have
11 the County radio?  In other words, does the CH- -- does
12 the County officer say, "I need some CHP help.  Are any
13 of you guys listening"?
14    A.    No.
15    Q.    Okay.  Do you hear something that's not
16 directed at you, and then determine whether you are
17 going to respond or not?  Is that how it works, when
18 you listen to the County radio traffic?
19    A.    Correct.
20    Q.    Okay.  So you are listening to the various
21 County officers and Dispatch talking to each other --
22    A.    Yes.
23    Q.    -- about an incident.
24    A.    Yes.
25    Q.    Okay.  And then, in listening to that, you

**Page 44**

1 make a decision as to whether to participate or not in
2 whatever it is that they are talking about?
3    A.    Correct.
4    Q.    That's one way.
5    A.    Yes.
6    Q.    And the other way is that you are actually
7 contacted by your Dispatch --
8    A.    Correct.
9    Q.    -- and told, "There is something going on
10 with the County."
11        And are you then instructed to do
12 something by Dispatch?
13    A.    Not instructed; but, I mean, if they need
14 our assistance, we're going to respond.
15    Q.    Okay.  So, Dispatch tells you what's going
16 on, and then you respond.
17    A.    Correct.
18    Q.    You don't have a choice, though, do you?
19 If they say, "Please, respond to such-and-such," you
20 say, "Okay".
21    A.    Correct.
22    Q.    Okay.
23        Going back to the other situation, where
24 you are, in a sense, listening to the other agency's
25 radio traffic, the CHP is normally assigned to patrol

Deposition of MICHAEL NOVOSEL    IN RE: GONZALES VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008    USDC, NORTHERN DIST. OF CA, No. CV07-04720 CRB

Case 3:07-cv-04720-CRB    Document 52-2    Filed 09/11/2008    Page 15 of 63

**Page 45**

1 what areas of the County, is your normal assignment?
2    A.  Freeways, highways, and unincorporated
3 areas of the county.
4    Q.  Freeways, highways and unincorporated
5 areas of the County.
6    A.  Correct.
7    Q.  So, there would be --
8      And what are the unincorporated areas in
9 the Redwood City area that you guys were covering, as
10 part of your beat?
11    A.  My beat that night?
12    Q.  Yeah.
13    A.  I think we were covering unincorporated
14 area of Redwood City.
15    Q.  Okay. And these areas, these are small
16 areas that -- I'm not -- How big are the unincorporated
17 areas that you are responsible for?
18    A.  I don't know.
19    Q.  Well, are they one-block square, ten-block
20 square?
21    A.  I can't give you a specific number.
22    Q.  Okay. I respect that you can't give me a
23 specific number. Can you give me some sense of the
24 size, perhaps compared to Redwood City as a whole, of
25 the unincorporated areas that the CHP was responsible

**Page 46**

1 for?
2    A.  That area is probably just a little
3 pocket.
4    Q.  All right. So, in your patrol area, that
5 was the unincorporated area that you were responsible
6 for, in addition to the highway, freeways?
7    A.  Correct.
8    Q.  And how is it -- Well, strike that.
9      When you hear -- There is regular County
10 traffic all night; isn't that correct?
11    A.  Correct.
12    Q.  They are arresting people, they are --
13 crimes are occurring, and so forth; is that correct?
14    A.  Yes.
15    Q.  And you are listening to that, correct?
16    A.  Correct.
17    Q.  What would cause you to say, "I want to
18 involve the CHP in this incident that's going on"?
19    A.  It's your discretion.
20    Q.  Okay. So, what are the kinds of things
21 that you would hear on the radio which would cause you
22 to involve yourself with the local agencies?
23    A.  Maybe a possible DUI driver; maybe a
24 pursuit.
25    Q.  Okay.

**Page 47**

1    A.  You know, there are various crimes.
2      I guess that's it.
3    Q.  All right. Well, the pursuit and the
4 DUI-involved vehicles, so is that, in part, one of the
5 criteria, that it involves vehicles?
6    A.  Mainly, yes.
7    Q.  Okay.
8    A.  Yes.
9    Q.  And when deciding to -- I don't know what
10 the word is -- engage or to join a pursuit that you
11 hear about on the County radio, what factors do you
12 look at to determine whether your unit is going to be
13 involved or not in that pursuit?
14    A.  With a pursuit, if they ask for our
15 assistance, then, we'll join. If they don't ask for
16 assistance, we're not going to join the pursuit.
17    Q.  Okay. So, for a pursuit they'd have to
18 have -- the County would actually have to attempt to
19 contact the CHP, and ask for help.
20    A.  Correct.
21    Q.  Okay. And does that contact occur through
22 your Dispatch, or does that contact occur through the
23 County radio?
24    A.  Through the Dispatch.
25    Q.  Okay. So you would not join a pursuit,

**Page 48**

1 unless you received word through your Dispatch to join
2 them.
3    A.  Correct.
4    Q.  Okay.
5      So, going back now to 8/19/06, do you
6 recall whether anything unusual had occurred up until
7 the point that you received information about the
8 pursuit that evening.
9      I mean, prior to this incident, do you
10 recall anything else that occurred that night as part
11 of you performing your duties as a CHP?
12    A.  I do.
13    Q.  What do you remember from before that
14 incident?
15    A.  I heard on the Sheriff's radio that one of
16 our Deputies was attempting to catch a high-speed
17 vehicle on Page Street, and. . .
18    Q.  Okay. And that later turns into this
19 incident, or. . .
20    A.  Correct.
21    Q.  Okay. I didn't word the question well
22 enough.
23    A.  (Nodding head.)
24    Q.  Other than this incident and the words
25 leading up to this, about that which you just

Page 49

1  described, any other incidents occur that night that
2  you remember unrelated to this?
3      A.  No.
4      Q.  Okay.  So, as far as you can recall, it
5  was an uneventful night up until that?
6      A.  Correct.
7      Q.  Okay.  At that time did you have any
8  medical conditions that affected your ability to do
9  your duties?
10     A.  I did not.
11     Q.  For just as an example, even something
12 like a cold, that may have affected your hearing, or
13 anything of that nature?
14         Hay fever, where your eyes were
15 watering, anything that -- not that rendered you
16 incapable of performing your duty, but something that
17 may have impacted on your ability to do your duty.
18     A.  No.
19     Q.  Okay.  You don't, then, use any devices to
20 assist your senses, such as glasses, or hearing aids?
21     A.  I do not.
22     Q.  And do you recall where you were when you
23 first heard the traffic about the pursuit?
24     A.  101 southbound.
25     Q.  Okay.  Where on 101 southbound?

Page 50

1      A.  Near Willow Road.
2      Q.  Okay.  And you are with Officer Torr?
3      A.  Correct.
4      Q.  And you have on your CHP radio?
5      A.  Yes.
6      Q.  And you also have on the County radio.
7      A.  Yes.
8      Q.  Okay.  And what is the first thing with
9  respect to this incident that you hear?
10     A.  The Deputy attempting to catch a
11 high-speed vehicle.
12     Q.  Okay.  And can you be more specific, in
13 terms of what was said when you . . .
14     A.  I can't recall exactly, but I think that
15 he was attempting to catch a high-speed vehicle on Page
16 Street, lost visual, and may have gone onto southbound
17 101.
18     Q.  Okay.  And this is a Deputy that's
19 broadcasting to his or her dispatch that you are
20 listening to; is that correct?
21     A.  Correct.
22     Q.  Okay.  And was your vehicle moving at the
23 time, or were you parked, when this was over -- was
24 heard on the County radio?
25     A.  Moving at the time.

Page 51

1      Q.  Okay.  And you said it was a hand-held
2  radio?
3      A.  Correct.
4      Q.  And between you and your partner, did one
5  of you have the duty to monitor that, or both of you,
6  or how did you handle that?
7      A.  Both of us listening to it.
8      Q.  You were driving?
9      A.  Yes.
10     Q.  Okay.  And was the radio -- Is it a
11 hand-held walkie-talkie?
12     A.  Correct.
13     Q.  Any earpieces, or just the speaker?
14     A.  It's a hand-held radio.
15     Q.  Okay.  So you both listened through the
16 speaker of that radio.
17     A.  Yes.
18     Q.  Okay.
19         Do you recall the name of the Deputy?
20     A.  Deputy Bouja.  I think it's B-o-u-j-a.
21     Q.  Did you know this Deputy --
22     A.  Yes.
23     Q.  -- prior to this incident?
24     A.  Yes.
25     Q.  How did you know this Deputy?

Page 52

1      A.  Just through work.
2      Q.  Did you ever socialize with him?
3      A.  No.
4      Q.  Okay.  Do you have a close working
5  relationship with the local law enforcement Redwood
6  City San Mateo Sheriff's, et cetera?
7      A.  Pretty close with the Sheriff's
8  Department.
9      Q.  Okay.  The initial broadcast said that
10 they were in-pursuit, is that correct?
11     A.  No.
12     Q.  Okay.  Repeat, then, what you recall you
13 first heard on the radio?
14     A.  He was attempting to catch a -- catch up
15 to a high-speed vehicle.
16     Q.  He was attempting to catch high-speed
17 vehicles.  Okay.  That was all you initially heard?
18     A.  And that the vehicle may have travelled
19 onto southbound 101, and that he was not in pursuit of
20 the vehicle.
21     Q.  And he was now in pursuit of the vehicle?
22     A.  He was not in pursuit of the vehicle.
23     Q.  No description of the vehicle in
24 that initial -- I'm just talking about the initial
25 thing that you overhear.

Deposition of MICHAEL NOVOSEL    NELSON-GONZALES VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008                    USDC, NORTHERN DIST OF CA, No. CV07-04720 CRB

Case 3:07-cv-04720-CRB    Document 52-3    Filed 09/11/2008    Page 17 of 63

**Page 53**

1    A.   If I recall, I think he said it was a
2 white vehicle. I'm not sure if he was specific by make
3 or model.
4    Q.   Okay. So, you don't recall now whether
5 there was a vehicle identifying information, or not, in
6 the initial thing that you overheard?
7    A.   I think it is -- If I recall correctly, I
8 think it was a white vehicle, or a white Honda, he
9 said.
10    Q.   Okay. A white vehicle, or a white Honda.
11       And what's the difference, in your mind,
12 between attempting to pursue, attempting to catch,
13 and pursuing? What does that mean?
14    A.   Attempting to catch, you are trying to
15 catch the vehicle to initiate a traffic stop.
16    Q.   Okay.
17    A.   And then, pursuing, you are -- you know,
18 you activated your red lights and siren, and the
19 vehicle is not coming to a stop.
20    Q.   Okay. And so I understand, you, the
21 "catch" part refers to a vehicle -- a police vehicle
22 trying to catch up and initiate a -- attempt a traffic
23 stop on another vehicle --
24    A.   Correct.
25    Q.   -- that's what "catch" means.

**Page 54**

1    A.   To me, yes.
2    Q.   Okay. To you.
3       And "pursuit" means you have initiate --
4 or attempted to initiate a traffic stop and, for some
5 reason, it's not occurred, and you are now pursuing;
6 is that correct?
7    A.   Correct.
8    Q.   Okay. So, this first broadcast you get --
9       And also, I think you had indicated
10 that, in the "pursuit," your lights would be on, and
11 so forth; and, "catch," not necessarily the case.
12    A.   Correct.
13    Q.   Okay. So, in the first broadcast you
14 learned that there is a Honda that is going at
15 high-speed, and that the Deputy is attempting to catch
16 the Honda; is that fair? Is that what you first
17 learned?
18    A.   Yes.
19    Q.   Okay. And then the additional information
20 is that the vehicle may be on 101 south.
21    A.   Correct.
22    Q.   And any other information about location
23 at that first broadcast?
24    A.   No.
25    Q.   Okay. What's the next thing that you

**Page 55**

1 heard after this -- after you overheard this initial
2 broadcast on the County radio?
3    A.   That was it.
4    Q.   All right. So you didn't hear any other
5 further radio traffic about this incident on the County
6 radio?
7    A.   No.
8    Q.   Okay. So that's the last you heard on
9 that radio, is that he's trying to catch this person.
10    A.   Yes.
11    Q.   Okay. Did you then receive anything from
12 CHP Dispatch?
13    A.   I did not.
14    Q.   I'm sorry?
15    A.   No.
16    Q.   Okay. What was the next thing that
17 occurred relative to this incident?
18    A.   I came to a stop on the right shoulder of
19 101 southbound at Willow Road.
20    Q.   Why?
21    A.   Because the Deputy said that the vehicle
22 may have travelled onto Southbound 101.
23    Q.   Okay. And what was your intention?
24    A.   To see if the vehicle was going to
25 approach our location.

**Page 56**

1    Q.   And if the vehicle did approach your
2 location, what were you intending to do?
3       MR. DEVINE: Objection. Calls for
4 speculation.
5       MR. DAAR: Q. Well, all right. What was
6 your plan, if you sighted the vehicle?
7       THE WITNESS: Just to observe it.
8       MR. DAAR: Q. Okay. Observe it for what
9 purpose?
10    A.   Observe it, and to confirm with the
11 Sheriff's Department that it was the correct vehicle.
12    Q.   Okay. And after you determined it was the
13 correct vehicle, what were you going to then do?
14    A.   Make a traffic stop.
15    Q.   And what was the probable cause of the
16 traffic stop?
17    A.   The vehicle didn't have any lights on.
18    Q.   So prior to seeing the vehicle, you had no
19 information that the vehicle had committed any traffic
20 violations.
21    A.   Just that it was traveling at a high-speed
22 on Page Street.
23    Q.   Okay. But it wasn't specific as to
24 whether the vehicle was speeding, or not.
25    A.   I'm just going on what the Deputy said.

**Page 57**

1    Q.   Right.  But the Deputy, if I understand
2  your words, said that the vehicle is at a high rate of
3  speed, but didn't say whether it was exceeding the
4  speed limit or not on Page Road.
5    A.   Correct.
6    Q.   So you didn't have information prior to
7  seeing the vehicle, as to whether or not the vehicle
8  had, in fact, committed a traffic violation at that
9  time.
10    A.   Correct.
11    Q.   Okay.  And you are not certain now whether
12  the words "white" or "Honda" were in that original
13  broadcast.
14    A.   I know "white" was.
15    Q.   Okay.  So, you are certain "white" was;
16  you are not certain about "Honda".
17    A.   Correct.
18    Q.   Okay.
19         How long between the time you overheard
20  this broadcast on the County radio until the time you
21  pulled over?
22    A.   Probably within seconds.
23    Q.   Okay.  And how long between the time that
24  you pulled over did you have -- see a vehicle without
25  its lights on?

**Page 58**

1    A.   Approximately ten seconds.
2    Q.   Okay.  What did you observe about that
3  vehicle as it came into your vision?
4    A.   The vehicle was traveling at a high rate
5  of speed, and it didn't have any lights on.
6    Q.   What time was this?
7    A.   Approximately 1:00 a.m.
8    Q.   Was there any traffic immediately around
9  the vehicle when you observed it?
10    A.   Just other freeway traffic.
11    Q.   Okay.  Was the vehicle changing lanes, or
12  proceeding in a straight path?
13    A.   Straight path.
14    Q.   Okay.  From the time you first saw the
15  vehicle until the time -- but at some point you did
16  initiate a pursuit of the vehicle.
17    A.   Correct.
18    Q.   Okay.
19         From the time you first saw the vehicle
20  until the time you initiate your pursuit, was the
21  vehicle driving in one lane in a southerly direction
22  on 101?
23    A.   Yes.
24    Q.   Okay.  Did it force any other vehicles off
25  the road during this period of time?

**Page 59**

1    A.   While on the freeway?
2    Q.   Yes.
3    A.   No.
4    Q.   Okay.  And how did -- did you use your
5  radar gun, or something, to determine the vehicle's
6  speed?
7    A.   I did not.
8    Q.   I'm sorry?
9    A.   I did not.
10    Q.   You did not.  Okay.
11         And you say the vehicle was proceeding
12  at a high rate of speed.  Do you have an estimate as
13  to its speed?
14    A.   Approximately 80 miles an hour.
15    Q.   And you were stationary, correct --
16    A.   Correct.
17    Q.   -- when you observed him?
18    A.   Correct.
19    Q.   And as a police officer, do you feel you
20  have the experience to determine the difference between
21  60 and 80 miles an hour from a stationary position on
22  the side of the road?
23    A.   I do.
24    Q.   And you noticed that its lights were off.
25    A.   Correct.

**Page 60**

1    Q.   Okay.  What did you do after observing
2  this vehicle?
3    A.   The vehicle passed us, at which time I
4  proceeded to follow it.
5    Q.   Prior to, or in conjunction with your
6  pulling out to follow the vehicle, did you or your
7  partner broadcast any information to Dispatch or
8  anybody else?
9    A.   No.
10    Q.   Okay.  Did you remain on the shoulder of
11  the road long enough -- No, strike that.
12         You pulled your vehicle out from the
13  shoulder and entered the freeway.  At that point, how
14  far was the Honda from where your vehicle was?
15    A.   Well, I don't recall exactly how far.
16    Q.   Car lengths:  10, 20. . .
17    A.   No.  When it exited at Willow Road
18  westbound --
19    Q.   I'm sorry?
20    A.   When I exited -- or when the vehicle
21  exited at Willow Road westbound --
22    Q.   Yeah?
23    A.   -- it went through the turn at a high rate
24  of speed, and it was completely sideways, the car.
25    Q.   Okay.

Deposition of MICHAEL NOVOSEL    NELSON-GONZALES VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008    USDC, NORTHERN DIST. OF CA, No. CV07-04720 CRB

Case 3:07-cv-04720-CRB    Document 52-2    Filed 09/11/2008    Page 19 of 63

**Page 61**

1    A.   So, I was kind of traveling slow through
2    the turn, expecting it to crash.
3    Q.   Okay.
4    A.   So, kind of going through a turn, I did
5    lose sight of it going through the turn there.
6    Q.   Okay.  All right.  Let's back up a little
7    bit in time.
8         You, after you see this car go by, you
9    pull your cruiser onto the freeway, correct?
10   A.   I do.
11   Q.   And the vehicle's lights are off, correct?
12   A.   Correct.
13   Q.   So, when you first get onto the traffic
14   lane on 101, can you even see the vehicle?
15   A.   Correct.  Yes.
16   Q.   You can see the vehicle.
17   A.   Yes.
18   Q.   Okay.  What I'm trying to ascertain is,
19   when you first begin your pursuit, when you first pull
20   off the shoulder and first get on the highway, how --
21   what's the distance between your two vehicles when the
22   pursuit begins?
23   A.   Well, the actual pursuit isn't beginning
24   til Willow Road.
25   Q.   You are attempting to catch; is that the

**Page 62**

1    better word?
2    A.   Yes.
3    Q.   Okay.  Your attempt to catch the vehicle
4    begins as you pull onto the freeway.
5         What's the distance that your attempt to
6    catch begins from, the gap between your vehicle and
7    the vehicle you are trying to catch when the catch
8    begins?
9    A.   Maybe two car lengths.
10   Q.   Two car lengths.
11        Your vehicle was stationary, correct?
12   A.   Correct.
13   Q.   You didn't pull out --
14        Did you pull out before or after the
15   subject vehicle passed you?
16   A.   After.
17   Q.   And the subject vehicle is going 80 miles
18   an hour.
19   A.   Correct.
20   Q.   Okay.  And when you pulled onto the
21   freeway, you were two car lengths behind him?
22   A.   Approximately, yes.
23   Q.   From that position, two car lengths behind
24   him, did you maintain that position for a period of
25   time?

**Page 63**

1    A.   I did not, no.
2    Q.   Okay.  What happened next?
3         Well, let me stop.  I'm sorry.
4         Did you have your lights on?
5    A.   Headlights, or --
6    Q.   I'm sorry.  My bad.
7         Your headlights, were your headlights
8    on?
9    A.   Yes, they were.
10   Q.   Okay.  Were your emergency lights on?
11   A.   They were not, no.
12   Q.   Okay.  Was the siren on?
13   A.   No.
14   Q.   So you pulled on with just your
15   headlights.
16   A.   Yes.
17   Q.   Okay.  Why didn't you put your emergency
18   lights on at that point?
19   A.   I don't know.
20   Q.   Okay.
21        All right.  So you are two car lengths
22   behind the vehicle.  Its lights are off.  Your lights
23   are on.  Emergency lights are not on.
24        What's the next thing that happens?
25   A.   The vehicle exits at Willow Road

**Page 64**

1    westbound.  And the --
2         It's at a high rate of speed, so I --
3    the car is completely sideways, going through an "S"
4    turn.  So, I kind of slow the patrol vehicle down,
5    thinking that the vehicle had crashed in that area.
6    Q.   Okay.  Don't go too far.
7         What's the distance between the location
8    at which you first entered the freeway from the
9    shoulder and the exit?
10   A.   (Thinking)  20 feet.
11   Q.   I'm sorry?
12   A.   20 feet.
13   Q.   20 feet.
14   A.   Yeah.
15   Q.   Okay.  When you enter the roadway, is the
16   vehicle in the exit, or is the vehicle on 101?
17   A.   In the exit.
18   Q.   Okay.
19        So, after you entered the roadway, if I
20   understand your testimony, you are two car lengths
21   back; but then you slowed up, because you felt the
22   subject vehicle might crash in the exit curve.
23   A.   Correct.
24   Q.   Okay.  Did you see brake lights at that
25   time?

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

NELSON GONZALES VS. MICHAEL NOVOSEL, ET AL.          Deposition of MICHAEL NOVOSEL
USDC - NORTHERN DIST OF CA - No. CV 07-4220 CRB          April 17, 2008

Case 3:07-cv-04220-CRB    Document 75-4    Filed 09/11/2008    Page 20 of 63

| | |
|---|---|
| 1 A. I did. | 1 Q. Okay. And after the car fishtailed twice |
| 2 Q. Okay. Did the brake lights occur before | 2 in the exit curve, what happened next? |
| 3 the exit? | 3 A. Then it travelled across the westbound |
| 4 A. During the exit. | 4 lanes of Willow Road; it travelled over the center |
| 5 Q. During the exit, okay. | 5 divider and into the eastbound lanes. |
| 6 As the vehicle went by, were you able to | 6 Q. So I can understand this: If the car had |
| 7 observe whether -- how many occupants were in the | 7 legally exited, it would have a choice at Willow to go |
| 8 vehicle? | 8 eastbound and westbound? |
| 9 A. Yes. | 9 A. No, just westbound. |
| 10 Q. And what did you observe? | 10 Q. Okay. |
| 11 A. One occupant. | 11 So, the exit only leads westbound. |
| 12 Q. Okay. And did you notice anything else | 12 A. Correct. |
| 13 unusual or particular about the vehicle, other than its | 13 Q. Okay. So, when the vehicle takes the |
| 14 lights being off? | 14 exit, it's going in a westbound direction, by design. |
| 15 A. No. | 15 A. Correct. |
| 16 Q. Okay. The vehicle entered, you called it | 16 Q. And then, you see it go over the center |
| 17 an "S" curve, is that -- did I hear you right, on the | 17 divider and go in the eastbound? |
| 18 exit? There is an "S" curve, did you say? | 18 A. Correct. |
| 19 A. Correct. | 19 Q. What's the center divider look like in |
| 20 Q. Okay. And what exactly did the vehicle do | 20 that location? |
| 21 in the "S" curve? | 21 A. It was kind of like a "V," you know, it |
| 22 A. Pretty much the whole way through, it was | 22 widens. |
| 23 going sideways. | 23 Q. Okay. Is it raised? |
| 24 Q. Okay. The back end of the car was coming | 24 A. A little. |
| 25 around, or the front end of the car? In what manner | 25 Q. Curb height? |
| Page 65 | Page 67 |

| | |
|---|---|
| 1 was it going sideways? | 1 A. Approximately, yes. |
| 2 A. Fishtailing. | 2 Q. Any other -- Other than the raised curb |
| 3 Q. Okay. And when you say fishtail, does | 3 height, is there any other vertical fencing, or |
| 4 that mean the back end coming out, or does it mean the | 4 anything else, to indicate that it's a divider? |
| 5 front end coming out? | 5 A. No. |
| 6 A. The back. | 6 Q. Okay. And what's the width of the |
| 7 Q. Okay. And so, that when you are referring | 7 divider? |
| 8 to the back end coming towards the front end? | 8 A. At that location, maybe 15 feet. |
| 9 A. Correct. | 9 Q. Okay. And did you observe the vehicle go |
| 10 Q. Okay. And did it fishtail in one | 10 over the divider? |
| 11 direction, or two directions? | 11 A. I did. |
| 12 A. Two directions. | 12 Q. Okay. Did it appear to sustain any damage |
| 13 Q. Because of the "S" -- Because there are | 13 at that time? |
| 14 two different curves in the "S," is that why it went in | 14 A. I couldn't tell. |
| 15 two directions? | 15 Q. Okay. What did you do after you went |
| 16 A. I'm not sure why. | 16 through the "S" curve, what did you do with the CPH |
| 17 Q. Okay. You saw it fishtail, come up one | 17 vehicle, where did you go? |
| 18 side, and then you saw it fishtail to the other side. | 18 A. In the westbound lanes. |
| 19 A. Correct. | 19 Q. Okay. And what did you do from entering |
| 20 Q. Were the brakes on the whole time through | 20 the westbound lane? |
| 21 the curve, the exit curve? | 21 A. Activated my emergency lights. |
| 22 A. Off and on. | 22 Q. Okay. Why is it that you now decide to |
| 23 Q. The brakes were off and on during this -- | 23 activate your emergency lights? |
| 24 the fishtail? | 24 A. I was going to try to stop him now. |
| 25 A. Correct. | 25 Q. Weren't you trying to stop him when you |
| Page 66 | Page 68 |

| | |
|---|---|
| 1 originally pulled on the freeway? | 1 control of his vehicle. |
| 2 **A. I was not, no.** | 2 Q. Okay. Are the lights on or off? |
| 3 Q. You were not trying to stop him. | 3 **A. They were still off.** |
| 4 **A. No.** | 4 Q. Okay. And so, just so my picture is |
| 5 Q. What were you trying to do? | 5 clear, there is a divider separating where you are and |
| 6 **A. Just follow him off the freeway.** | 6 where he is, but you are both going in the same |
| 7 Q. Okay. So your original intention, when he | 7 direction. |
| 8 went by at 80 with no lights on, was not to stop him, | 8 **A. Correct.** |
| 9 but to follow him. | 9 Q. Okay. How far behind him were you on |
| 10 **A. My intention was to stop him, but I was** | 10 Willow at this point? |
| 11 **going slow through the turn, so I thought he was going** | 11 **A. Approximately one car length.** |
| 12 **to crash into trees in that area.** | 12 Q. Okay. And how fast was your vehicle |
| 13 Q. Okay. And the reason you didn't put your | 13 going? |
| 14 lights on is why, initially? | 14 **A. Not very fast.** |
| 15 **A. I just felt -- I don't know; I don't know** | 15 Q. Just 35? |
| 16 **why.** | 16 **A. Maybe 15 or 20.** |
| 17 Q. Okay. | 17 Q. What's the next thing that happens after |
| 18 All right. So, now, he's on the | 18 you are both proceeding -- I guess you are going 15 to |
| 19 eastbound side, the vehicle? | 19 20, you are one car length behind, you are separated by |
| 20 **A. Correct.** | 20 a divider on Willow. |
| 21 Q. Correct? And he's going in an eastbound | 21 **A. He continues west in the eastbound lanes.** |
| 22 direction? | 22 Q. Okay. At what rate of speed? |
| 23 **A. Correct.** | 23 **A. He starts accelerating at that point.** |
| 24 Q. Okay. And you are on the westbound side. | 24 Q. All right. And what do you do? |
| 25 **A. Correct.** | 25 **A. Tried to have my lights on. You know,** |
| Page 69 | Page 71 |

| | |
|---|---|
| 1 Q. Going in a westbound direction. | 1 **when he accelerates, activate the siren.** |
| 2 **A. Correct.** | 2 Q. Okay. Before you just had your lights on; |
| 3 Q. So what did you do next? | 3 now you are putting the siren on, if I understand you? |
| 4 **A. Activated my four red lights.** | 4 **A. Correct, yes.** |
| 5 Q. Okay. And what did you do after that? | 5 Q. Okay. So the lights go on after you get |
| 6 **A. Proceeded in the westbound lanes.** | 6 off on the exit? |
| 7 Q. Okay. All right. | 7 **A. Correct.** |
| 8 Oh, he's going eastbound; so, you | 8 Q. And then the siren goes on as you are |
| 9 proceed in the westbound lane. | 9 proceeding westbound. |
| 10 **A. He's going westbound in the eastbound** | 10 **A. Correct.** |
| 11 **lanes.** | 11 Q. Okay. And he begins to accelerate. |
| 12 Q. Ah, okay. I'm sorry, I didn't get that. | 12 **A. Yes.** |
| 13 He jumps the divider, but then ends up | 13 Q. Okay. What happens next? What's the next |
| 14 going westbound in the eastbound lane. | 14 thing that happens? |
| 15 **A. Correct.** | 15 **A. The vehicle does not stop.** |
| 16 Q. Okay. And you were attempting to follow | 16 Q. The vehicle does not stop, okay. |
| 17 him on the westbound side going west. | 17 **A. No.** |
| 18 **A. Correct.** | 18 Q. You've been going 15 to 20. What speed |
| 19 Q. Okay. How fast was the vehicle going at | 19 are you going now? |
| 20 this point? This is on Willow: How fast is the | 20 **A. I think he got up to approximately** |
| 21 vehicle going on Willow, his vehicle, the suspect | 21 **60 miles per hour.** |
| 22 vehicle? | 22 Q. Okay. Have you or your partner radioed |
| 23 **A. At that point?** | 23 anyone else about what your activities have been up |
| 24 Q. Yeah. | 24 until this point? |
| 25 **A. Not fast, because he was trying to regain** | 25 **A. My partner did.** |
| Page 70 | Page 72 |

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

| | |
|---|---|
| 1 Q. Okay. And when did that occur? | 1 A. One in each direction. |
| 2 A. **Pretty much when the siren was activated.** | 2 Q. Okay. A shoulder? |
| 3 Q. And what did your partner broadcast, and | 3 A. **I'm not sure. I don't recall now.** |
| 4 to whom? | 4 Q. You observed two vehicles coming eastbound |
| 5 A. **Broadcast to our Dispatch, and advised him** | 5 towards the suspect vehicle. |
| 6 **that we are in-pursuit.** | 6 A. **Correct.** |
| 7 Q. So, your partner calls the CHP Dispatch, | 7 Q. Okay. What did you observe the suspect |
| 8 and says that you are in-pursuit of a vehicle? | 8 vehicle do, if anything, in response to the presence of |
| 9 A. **Correct.** | 9 the two vehicles coming towards it? |
| 10 Q. Were you able to see a license plate -- | 10 A. **Nothing.** |
| 11 A. **Yes.** | 11 Q. No response. |
| 12 Q. -- at that time? | 12 A. **No response.** |
| 13 A. **Yes.** | 13 Q. Okay. What did the two vehicles do? |
| 14 Q. And did you broadcast the license plate? | 14 A. **Swerved out of the way.** |
| 15 A. **I am not sure if my partner did.** | 15 Q. Okay. And were they able to do that? |
| 16 Q. Okay. But you had the license plate. | 16 A. **Yes.** |
| 17 A. **Yeah.** | 17 Q. Did you or Officer Torr broadcast anything |
| 18 Q. Okay. At what point did you make the | 18 at this point regarding what was occurring? |
| 19 license plate? | 19 A. **I don't recall.** |
| 20 A. **I guess, right at the beginning of the** | 20 Q. Okay. No contact between you and any of |
| 21 **pursuit.** | 21 the County agencies at this point. |
| 22 Q. While you are still on the freeway. | 22 A. **No. My main thing is just to drive, yeah.** |
| 23 A. **No.** | 23 Q. But you don't hear anything with Officer |
| 24 Q. When you exit, or when you were on Willow? | 24 Torr in relationship to him talking to County agencies |
| 25 A. **On Willow.** | 25 at this point. |
| Page 73 | Page 75 |

| | |
|---|---|
| 1 Q. Okay. And you believe that Officer Torr | 1 A. He didn't -- No, he was talking to our |
| 2 may or may not have broadcast the license at that time; | 2 Dispatch. |
| 3 is that correct? | 3 Q. Okay. All right. |
| 4 A. **Yeah, I don't recall.** | 4 After the incident in which the two |
| 5 Q. Okay. Did Dispatch respond to Torr's | 5 vehicles pull off, what happens next? |
| 6 broadcast in any manner, that you are aware of? | 6 A. **He's still traveling westbound in the** |
| 7 A. **I'm sure they did.** | 7 **eastbound lanes.** |
| 8 Q. Do you recall? | 8 Q. Okay. At approximately the same speed, 60 |
| 9 A. **I do not.** | 9 miles an hour? |
| 10 Q. Okay. Were you -- | 10 A. **Approximately, yes.** |
| 11 Did you still have the County radio on | 11 Q. Okay. Do you receive any information from |
| 12 at this time? | 12 your Dispatch regarding whether the car is stolen or |
| 13 A. **Yeah, it was still on.** | 13 not, or license plate, or anything like that? |
| 14 Q. Okay. Did you receive any information on | 14 A. **I don't recall hearing anything, no.** |
| 15 the County radio relative to this chase? | 15 Q. Okay. You don't recall any information at |
| 16 A. **I did not, no.** | 16 this point you have received from Dispatch regarding |
| 17 Q. I'm sorry? | 17 this vehicle? |
| 18 A. **No.** | 18 A. **No.** |
| 19 Q. No, okay. | 19 Q. Okay. Going down Willow, 60. You are on |
| 20 Going down Willow, side-by-side, divider | 20 the other side. Are you parallel to him? |
| 21 between you, he accelerates up to 60. | 21 A. **No.** |
| 22 What happens next? | 22 Q. You are a little behind him? |
| 23 A. **He was -- goes head-on with two vehicles** | 23 A. **Correct, yes.** |
| 24 **that were traveling eastbound.** | 24 Q. There is nothing preventing you from being |
| 25 Q. How many lanes is Willow? | 25 parallel, but is there a tactical reason you are |
| Page 74 | Page 76 |

1  slightly behind?
2     **A.  Yes.**
3     Q.  What is that reason?
4     **A.  Just in case he decides to make a turn on**
5  **another street.**
6     Q.  What happens next?
7     MR. DEVINE:  Can we just take a
8  five-minute break?
9     MR. DAAR:  Sure.
10     THE VIDEOGRAPHER:  Here marks the end of
11  Videotape No. 1, Volume No. I in the deposition of
12  Michael Novosel.  Going off the record, the time is
13  11:01 a.m.
14     (Brief recess taken.)
15     THE VIDEOGRAPHER:  Here begins Videotape
16  No. 2, Volume No. I in the deposition of Michael
17  Novosel.
18     Back on the record.  The time is
19  11:11 a.m.  Counsel, please continue.
20     MR. DAAR:  Q.  Did you have discretion to
21  call off your pursuit or chase of this vehicle?
22     **A.  Yes.**
23     Q.  Okay.  Now, at this point in your mind,
24  the vehicle had committed a series of traffic
25  violations, correct?

Page 77

1  intersection, even though the light is against you.
2     **A.  I slow down, look left, look right, look**
3  **left, make sure it's clear, and then proceed.**
4     Q.  Okay.  When determining whether or not to
5  continue a chase or call it off, what are the factors
6  that you use to make that decision?
7     **A.  Depends if there is a lot of vehicle**
8  **traffic, pedestrian traffic, or if you know the**
9  **identity of the suspect becomes known, or if your**
10  **supervisor tells you to cancel, or -- or if an allied**
11  **agency joins the pursuit, which, you know, we have our**
12  **policies, and we try and maintain them. . .**
13     Q.  Okay.
14     **A.  And that's pretty much it.**
15     Q.  What about the violation that is the cause
16  of the chase, is that a factor?
17     **A.  It could be, yes.**
18     Q.  And how could that be a factor, in your
19  mind?
20     **A.  To cancel a pursuit?**
21     Q.  Or to continue it.  Either one.
22     **A.  Well, the factors to cancel a pursuit are**
23  **pretty much if it gets -- you know, that the risk**
24  **outweighs the gain.**
25     Q.  Okay.  The risk outweighs the gain.

Page 79

1     MR. DEVINE:  Objection.  Vague.  Could we
2  just say at what point we're at.
3     MR. DAAR:  Okay, let's go back.
4     Q.  At the point that you are on the westbound
5  and he's on the eastbound side and you are shooting
6  down Willow Street:  At that point in time, in your
7  mind, the vehicle had committed a -- the driver of the
8  vehicle, rather, had committed a series of traffic
9  violations; is that correct?
10     **A.  Correct.**
11     Q.  And you were pursuing that vehicle to
12  arrest the person and to stop him from violating
13  traffic laws, correct?
14     **A.  Correct.**
15     Q.  Okay.  All right.  You are proceeding down
16  parallel past on Willow, going about 60 miles an hour,
17  sirens on, lights on.
18     What happens next?
19     **A.  The vehicle goes through a red light.**
20     Q.  Okay.
21     **A.  At Middlefield Road.**
22     Q.  Okay.  What do you do with respect to that
23  light?
24     **A.  Slow.**
25     Q.  You slow down, but you proceed through the

Page 78

1     The "gain" would be what?
2     **A.  To hopefully apprehend the suspect.**
3     Q.  Okay.  And does it matter in that
4  determining weighing the risk versus the gain, what the
5  suspect is suspected of doing?
6     **A.  Yes.**
7     Q.  Okay.  And what, within that range,
8  explain how you make this decision?
9     **A.  It's the Officer's discretion.**
10     Q.  Okay.  No, I understand that.
11     For example, a minor infraction would be
12  one end of your scale; and what would the other end be?
13     **A.  Chasing a murderer.**
14     Q.  Okay.  So, just to understand you, when --
15  you have a gain-versus-risk analysis in determining
16  whether to call off a chase or not, in part.
17     **A.  Okay.**
18     Q.  Is that what you are telling me?  Yes?
19     **A.  Yes.**
20     Q.  Okay.  And then the "gain" part, one of
21  the things you look at is the seriousness of the
22  underlying violation; is that correct?
23     **A.  It's one of the things you look at, yeah.**
24     Q.  Okay.  And the risk is the risk to whom?
25     **A.  The public and yourself or your partner.**

Page 80

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

Q. Okay. And at this point, as you are
proceeding down Willow after the suspect vehicle runs a
red light, were you weighing these criteria while you
were driving, to try to think about what the right
thing to do would be?

A. Yes.

Q. Did you discuss this at all with your
partner while you were driving?

A. I don't recall.

Q. Can you share any of your thinking process
with me now that was going on then about whether or not
to continue this pursuit after you saw him run that
light on Middlefield?

A. I felt that he needed to be stopped then
and there.

Q. Okay. And what about the risk factor,
what was your analysis about the risk factor?

A. The traffic was light, and I was pretty
much maintaining my distance with the suspect. And,
you know, the capabilities of my training, I felt like
it's -- I could, you know, stay with the vehicle at all
times.

Q. Okay. So you felt the public would be
better protected at that point by your continuing the
chase than by stopping it.

Page 81

A. Correct.

Q. Okay. And is that a decision you make one
time in the incident, or is that a decision which was
subject to rethinking as the events unfold?

A. During the whole pursuit, you are
constantly evaluating the circumstances.

Q. Okay. So, as the evening progressed, as
the different events occurred, you put that into your
calculus as to whether or not to proceed.

A. Correct.

Q. Okay. After going through the red light,
do you know the name of that street that the red light
was on?

A. Middlefield Road.

Q. Okay. What occurred next?

A. And then the vehicle travelled into the
westbound lanes.

Q. What was the speed going through the
light? Your -- What was the vehicle, the subject
vehicle's speed going through the light at Middlefield?

A. I would say approximately 60 miles per
hour.

Q. Okay. Did you fall further behind the
vehicle, because you slowed for the light, and he
didn't?

Page 82

A. Yes.

Q. Okay. How far behind the vehicle were you
when the vehicle crossed from eastbound to westbound?

A. I don't recall.

Q. Okay. Was there a divider present between
eastbound and westbound lanes when the vehicle crossed?

A. I think, at that location, it's a
double-yellow line.

Q. Since exiting the freeway, this is the
first time you have seen the vehicle change its
direction in any way, since getting onto Willow; is
that correct?

A. Correct.

Q. Okay. Once it's in front of you, how
far -- Once it gets onto the westbound side, you are
now behind the vehicle, correct?

A. (Nodding head.)

Q. How far back are you when you find that
the vehicle arrives on the westbound side?

A. I don't recall.

Q. Okay. What happens next?

A. The vehicle maintains its speed, traveling
through stop signs and/or speed bumps.

Q. Any other vehicles present?

A. Um. . .

Page 83

Q. We're now just talking about from the red
light of Middlefield to where you are now, going
through the stop signs and the speed bumps.

A. I don't recall any other vehicles.

Q. Okay. Any radio traffic from County?

A. Possibly. I didn't hear it, if there was.

Q. Okay. And any CHP information coming to
you or your partner at this time?

A. My partner is still updating our Dispatch
on our location and what was occurring.

Q. Okay. Is the link -- I don't know,
whatever the term is -- the link between Officer Torr
and Dispatch, is that constant during the chase?

A. Yes.

Q. Okay. So he's broadcasting, or ready to
broadcast, the whole time.

A. Yes.

Q. And they are listening or broadcast the
whole time?

A. Yes.

Q. And Officer Torr is providing updates as
to your location; is that correct?

A. Correct.

Q. Is he providing descriptions of what the
vehicle is doing and the speed to Dispatch?

Page 84

**Page 85**

```
 1    A.   I'm sure he is.
 2    Q.   Okay.  At any point, to your knowledge,
 3  does any kind of supervisory personnel at CHP monitor
 4  the situation to Dispatch?
 5    A.   I don't recall that the Sergeant got on
 6  the air --
 7    Q.   Okay.
 8    A.   -- but I'm sure they were listening.
 9    Q.   Okay.  But you don't really remember much,
10  because you are focused on the driving.
11    A.   Correct.
12    Q.   Okay.
13         The speed through the stop signs and the
14  bumps of the subject vehicle, does that continue to
15  be about 60?
16    A.   Correct.
17    Q.   Okay.  Lights on or off at this point,
18  his, the subject vehicle's lights.
19    A.   I don't recall if they came on at that
20  point.
21    Q.   Okay.  You recall they come on at some
22  point later in the chase?
23    A.   I'm not sure exactly when they came on.
24    Q.   Okay.  But you have some recollection of
25  them coming on at some point later, or not?  You tell
```

**Page 86**

```
 1  me.
 2    A.   I don't recall.
 3    Q.   Okay.
 4         What happens?  He goes through some stop
 5  signs?  Goes over speed bumps?  Does -- Did he lose
 6  control at all on the vehicle, the subject vehicle?
 7    A.   Each time he hit a speed bump, the back
 8  end would fishtail.
 9    Q.   Okay.  Were you able to figure out what
10  kind of vehicle it was at this point?
11    A.   Yes.
12    Q.   What kind of vehicle did you observe it to
13  be?
14    A.   A white Honda Civic.
15    Q.   Okay.  Approximate year?
16    A.   '90s.
17    Q.   Approximate condition?
18    A.   Fair.
19    Q.   Okay.  And what happens:  You go through
20  the bumps; you go through the stop signs; he's on
21  Willow; you are following.
22         What's the next event that occurs?
23    A.   Then we approach Alma Street.
24    Q.   Can you spell that for the Reporter.
25    A.   A-l-m-a.
```

**Page 87**

```
 1    Q.   And is that a major intersection, or
 2  anything, or just another residential street, or. . .
 3    A.   Just another street.
 4    Q.   Okay.
 5         You are familiar with the streets that
 6  you are driving on there?
 7    A.   Somewhat.
 8    Q.   Okay.  Did the vehicle make a right or a
 9  left onto the street?
10    A.   A right turn.
11    Q.   It's a 90-degree intersection?
12    A.   It's a "T" intersection.
13    Q.   A "T" intersection, okay.
14         What speed did you observe the vehicle
15  slow to make the right turn?
16    A.   I'm not sure; but, when it made the right
17  turn, the back end fishtailed towards the driver's
18  side.
19    Q.   You followed the vehicle and made a right
20  turn also?
21    A.   Yes.
22    Q.   Okay.  What was your distance --
23         And the name of the street?  I'm sorry,
24  my hearing is a little off.
25    A.   Alma Street.
```

**Page 88**

```
 1    Q.   Alma.  A-l-m-a?
 2    A.   Correct.
 3    Q.   Okay.
 4         Once you get onto Alma, how far in front
 5  of you is the vehicle?
 6    A.   One to two car lengths.
 7    Q.   One or two car lengths?
 8    A.   Yes.
 9    Q.   So, you are very close.
10    A.   Very close.
11    Q.   Okay.  I know it's at night, and you are
12  driving quickly.  Were you able to make any visual on
13  the driver at this point?  Looking, I guess, at the
14  rear view mirror, or anything, are you able to see a
15  face, or anything like that?
16    A.   I don't recall.
17    Q.   Okay.  How fast is the car going on Alma?
18    A.   I'm not quite sure what speed it got up
19  to.
20    Q.   Were you 20 miles an hour, 50 miles an
21  hour?
22    A.   A high rate of speed.
23    Q.   No other vehicles present on Alma as you
24  were proceeding?
25    A.   No other vehicles.
```

| | |
|---|---|
| 1   Q.· What kind of neighborhood is this now, | 1   when he gets off Alma, what's the next turn or incident |
| 2   what would you describe it as? | 2   that occurs? |
| 3      A.   Some office buildings, and there is a park | 3      A.   Well, while on Alma, there were speed |
| 4   in the area. | 4   bumps. |
| 5         Then there is train tracks that border | 5      Q.   Okay. |
| 6   it to the west. | 6      A.   And each time he went over a speed bump, |
| 7      Q.   Okay. And this is in Redwood City? | 7   he would lose control, go into the other lane, and come |
| 8      A.   Menlo Park. | 8   back. And he did that pretty much time each he went |
| 9      Q.   Menlo Park, okay. | 9   over a speed bump. |
| 10         How far does the car proceed on Alma? | 10      Q.   How many bumps were there on Alma? |
| 11      A.   I'm not quite sure of the exact distance, | 11      A.   I'm not quite sure. |
| 12   but  . . . | 12      Q.   Half a dozen? Two or three? |
| 13      Q.   In blocks: Can you give me the number of | 13      A.   I'm not quite sure. |
| 14   blocks, or portions of a mile? | 14      Q.   Okay. Are you staying one, two |
| 15      A.   One to 2 miles. | 15   car-lengths behind? |
| 16      Q.   Okay. Quite a distance. | 16      A.   At this time I've kind of increased my |
| 17      A.   Yes. | 17   distance because of his driving, so I'm -- |
| 18      Q.   Just to have a sense, how -- what was the | 18      Q.   You increased your distance now because |
| 19   distance on Willow from getting off the freeway until | 19   his driving was getting worse? |
| 20   he turns? | 20      A.   Correct. |
| 21      A.   Maybe a couple miles. | 21      Q.   Okay. And what is it about his driving |
| 22      Q.   2 miles? | 22   that had gotten worse at this point, that triggered |
| 23      A.   Yeah. | 23   your decision to create a greater distance between you |
| 24      Q.   Okay. And the distance on Alma again, you | 24   and him? |
| 25   have said was one to two miles? | 25      A.   Each time he hit the speed bumps, he would |
| Page 89 | Page 91 |

| | |
|---|---|
| 1      A.   Correct. | 1   lose control briefly. |
| 2      Q.   Okay. Alma is two lanes, one in each | 2      Q.   Okay. So you dropped back how many car |
| 3   direction? | 3   lengths? |
| 4      A.   Correct. | 4      A.   Maybe six to seven. |
| 5      Q.   Okay. And he's in the appropriate lane, | 5      Q.   Okay. He stays on until what occurs? |
| 6   you are in the appropriate lane on Alma? | 6      A.   On Alma, he hits a speed bump as it loses |
| 7      A.   When he made the right turn, he went into | 7   control, and gets stuck on this curb, raised mound of |
| 8   the wrong lane. | 8   dirt and flowers. |
| 9      Q.   Okay. And did he stay in the wrong lane? | 9      Q.   He hits a speed bump and the rear-end |
| 10      A.   For a couple seconds. | 10   fishtails? |
| 11      Q.   All right. But then returned to the | 11      A.   Yes. |
| 12   correct lane. | 12      Q.   And does the car actually go into a full |
| 13      A.   Yes. | 13   spin? |
| 14      Q.   Okay. And your lights and siren are still | 14      A.   I don't think full spin. Just pretty much |
| 15   on? | 15   completely sideways, to where he ends up traveling in |
| 16      A.   Still on. | 16   an easterly direction. |
| 17      Q.   Okay. One or two miles off Alma. | 17      Q.   Previously he was traveling in a -- |
| 18         What's his speed on Alma, of the white | 18      A.   Northbound direction. |
| 19   Honda? | 19      Q.   Okay, thank you. So, he's northbound on |
| 20      A.   I'm not quite sure. It was a high rate of | 20   Alma. He spins out, and winds up facing eastbound |
| 21   speed. | 21   direction? |
| 22      Q.   Were you able to safely drive your patrol | 22      A.   Correct. |
| 23   vehicle at this speed on this -- at this location? | 23      Q.   Okay. And what is it that the vehicle |
| 24      A.   Yes. | 24   impacts that you see? |
| 25      Q.   Okay. All right. What happens at the -- | 25      A.   Kind of like a curb, with a raised mound |
| Page 90 | Page 92 |

**Page 93**

1 of dirt, and there is flowers in it.
2    Q.   In the curb separating the street from the
3 sidewalk?
4    A.   I think so; I'm not quite sure what it's
5 separating, but there is parking stalls there.
6    Q.   Okay.  Well, I'm just trying to get a --
7 you know, you've got a -- maybe a curve in the middle
8 for the [medium]; and then you have a -- and there is a
9 street on the other side, and there is a curb there.
10    A.   Not on Alma Street.
11    Q.   Okay.  So, what is the curb delineating, I
12 guess?  How does it -- What is it separating from the
13 roadway?
14    A.   I think it's maybe the parking stalls and
15 the buildings that are nearby.
16    Q.   Okay.  And is there anything -- and then
17 there is no sidewalk there?
18    A.   I'm not quite sure.
19    Q.   Okay.  Could you perhaps draw Alma, and --
20       MR. DEVINE:  Well, we're not going do
21 diagrams.  If you've got one, he can comment on it.
22       MR. DAAR:  Okay.  I'm just trying to get
23 an -- an easy way to get a picture, instead of spending
24 a lot of time talking about it.  All right, we can
25 spend a lot of time talking about it.  All right.

Page 93

**Page 94**

1       MR. DEVINE:  I'm not trying to make you
2 spend more time on it.  Why don't you ask him to
3 describe the area, or something.
4       MR. DAAR:  Yeah, I'm trying.
5    Q.   Could you try to just give me a
6 description, to save you from drawing this map, so we
7 have a picture of what this mound of parking spots look
8 like.
9    A.   There is two lanes Alma,
10 northbound/southbound.
11    Q.   Okay.
12    A.   On the northbound lane, or east of the
13 northbound lane, there is parking stalls.
14    Q.   Would that be on the side closest to where
15 there would be a sidewalk, if there would be?  Maybe
16 that --
17    A.   Correct.
18    Q.   Okay.  There is parking spots that would
19 be on the right side of the street as you are heading
20 north.
21    A.   Correct.
22    Q.   Okay.  And there is a -- is it the kind of
23 curb that comes out to the length of the parking spot,
24 and then goes back in, and the spots are there, and
25 then comes back out again?  Sort of a border on the

Page 94

**Page 95**

1 parking spots separating them from the roadway?
2    A.   It is a border, yes.
3    Q.   Okay.  So, its function appears to be to
4 separate the parking spots from the roadway itself?
5    A.   Not from the roadway.  From what's-ever on
6 the other side of the border.
7    Q.   Okay.
8    A.   Maybe a sidewalk --
9    Q.   Okay.
10    A.   -- or a lawn area.  I'm not quite sure
11 what's there.
12    Q.   All right.
13       And when the subject vehicle spins out,
14 it winds up on top of this border --
15    A.   Correct.
16    Q.   -- is that correct?
17    A.   Yes.
18    Q.   And the part that's on top, is it raised
19 the same height as a normal curve, or is it higher?
20    A.   It's higher.
21    Q.   How high is the part that. . .
22    A.   Maybe one to 2 feet.
23    Q.   Okay.  And what is its width and length,
24 the portion of the border or curb that the vehicle is
25 resting on?

Page 95

**Page 96**

1    A.   Maybe the width is 3 to 4 feet.
2    Q.   Okay.
3    A.   And the length is -- it's pretty long --
4    Q.   All right.
5    A.   -- there is a lot of sparking stalls
6 there.
7    Q.   Okay.  It's 3 or 4 feet wide.  It's 1 or
8 2 feet high.  Is it a uniform height, or is it
9 something where the border's at one height and the
10 middle's at another height?
11    A.   It appeared uniform.
12    Q.   Okay.  And the subject vehicle is resting
13 on this border area, correct?
14    A.   The front of the vehicle is, yes.
15    Q.   I'm sorry?
16    A.   The front of the vehicle.
17    Q.   The front of the vehicle is.
18    A.   Yes.
19    Q.   Okay.  And meaning that the front -- that
20 both the vehicle's front tires were on this -- top of
21 this -- Could we call it a "berm"?  Is the word "berm"
22 appropriate?  Does that fit what we're talking about?
23    A.   Border, berm.
24    Q.   Okay.  Is the --
25       Are the front wheels of the vehicle on

Page 96

**Page 97**

```
 1  top of this border?
 2      A.  It appeared so, yes.
 3      Q.  Both front wheels.
 4      A.  Yes.
 5      Q.  And how much of the vehicle is on the
 6  border?
 7      A.  It's pretty much the front wheels and
 8  forward.
 9      Q.  Front wheels and front door, did you say
10  that?
11      A.  No, in the forward part of the car.
12      Q.  The forward for what?  Half-and-half?
13      A.  No.
14      Q.  Okay.  What percent of the car would you
15  estimate was on the berm?
16      A.  Maybe just pretty much from the front
17  tires on.
18      Q.  From the front tires?
19      A.  And forward.
20      Q.  And forward, okay.
21      A.  Yes.
22      Q.  Okay.  The back end of the car would be
23  pointing east?
24      A.  West.
25      Q.  West.  I'll draw my own diagrams, so I can
```

**Page 98**

```
 1  see this.  Don't comment on my drawing.
 2      Was the car perpendicular to the flow of
 3  traffic?
 4      A.  Yes.
 5      Q.  When you saw the vehicle spin out, what
 6  did you do with your patrol vehicle?
 7      A.  I parked it sideways behind the vehicle.
 8      Q.  Sideways.  When you say "sideways," do you
 9  mean you parked it north/south, so that your front end
10  was pointing north, and your back end was pointing
11  south?
12      A.  Correct.
13      Q.  And when you say "sideways," do you mean
14  that your vehicle was positioned --
15      Where was your vehicle positioned with
16  respect to the Honda?
17      A.  Maybe 10 to 20 feet behind it.
18      Q.  Okay.  So, when it spun out, you were 10
19  to 20 feet behind it, proceeding north?
20      A.  When it spun out?
21      Q.  Yes.
22      A.  No.  I was maybe four to five car lengths
23  behind it.
24      Q.  Okay.  So you -- it spins out, and you
25  close the distance to four or five car lengths.
```

**Page 99**

```
 1      A.  When it --
 2      Q.  I'm sorry.  Let me start again.
 3      You see him spin out.  And then you stop
 4  how far, 20 feet away?
 5      A.  About ten to 20 feet, yes.
 6      Q.  Ten to 20.
 7      So you are ten to 20 feet south of the
 8  vehicle's location when you stop your cruiser.
 9      A.  No, I'm directly behind it.
10      Q.  Directly behind the vehicle.
11      A.  Yes.
12      Q.  Okay.  Meaning, that you are -- pulled
13  your vehicle in so that your car is blocking it, is
14  that. . .
15      A.  Somewhat, yes.
16      Q.  Okay.  Did you put your vehicle in a
17  location designed to block in this vehicle, so it
18  couldn't escape?
19      A.  I was hoping to prevent it from escaping,
20  yes.
21      Q.  Okay.  So, you tried to choose the best
22  way to position your car to prevent the escape.
23      A.  Yes.
24      Q.  Okay.  Consistent with your safety, of
25  course.
```

**Page 100**

```
 1      A.  Correct.
 2      Q.  Okay.  And you positioned your vehicle so
 3  that -- How would you describe it in relationship to
 4  the other vehicle, where is it?
 5      A.  Ten to 20 feet behind it, facing north.
 6      Q.  When you say "behind it," are you
 7  referring to -- Are you perpendicular to it?  Is your
 8  vehicle and the subject vehicle perpendicular to each
 9  other?
10      A.  Yes.
11      Q.  And the distance between the passenger
12  door of your car and the rear bumper on the subject car
13  is the ten to 20 feet you are referring to?
14      A.  Correct.
15      Q.  Okay.  Got it.  Thank you.
16      Before you get out of your vehicle, is
17  Officer Torr still on the radio with Dispatch?
18      A.  I'm not quite sure.
19      Q.  Do you hear whether or not he informs
20  Dispatch:  "The car has spun-out.  We're getting out,
21  trying to stop it," or words to that effect?
22      A.  I don't recall if he said anything.
23      Q.  Okay.  Do you have a --
24      Did you and Officer Torr discuss how you
25  were going to approach this vehicle?
```

## Page 101

1   A.   We did not.
2   Q.   Do you have a --
3        Through your training, did you have an
4   expectation as to how Officer Torr was going to
5   handle his responsibilities in the situation?
6   A.   What do you mean?
7   Q.   In other words, because of your training,
8   because of working with Officer Torr --
9   A.   Mm-hmm.
10  Q.   -- since you didn't talk about it, did you
11  know where he was going to go and what he was going to
12  do --
13  A.   I did not.
14  Q.   -- now that this vehicle spun out. That's
15  the question.
16  A.   I did not.
17  Q.   Okay. And just -- You --
18       There is no discussion between you and
19  him as to where he's going to go, correct?
20  A.   Correct.
21  Q.   And based on your training, experience and
22  time with him, you don't really have an understanding
23  necessarily of where he's going to go?
24  A.   Correct.
25  Q.   Okay. What do you decide to do, once your

## Page 102

1   vehicle stops?
2   A.   I get out the driver's-side door --
3   Q.   Okay.
4   A.   -- and I kind of stay back maybe in the
5   area of the left front fender of the patrol vehicle,
6   and . . .
7   Q.   Okay. Did -- And so you are standing by
8   the left front fender of your vehicle.
9        Where is Officer Torr at this point,
10  when you first get out?
11  A.   Officer Torr ran towards the right rear
12  door of the white Honda.
13  Q.   You had a visual on him?
14  A.   Yes.
15  Q.   Okay. What's the Honda doing at this
16  point?
17  A.   Trying to get free.
18  Q.   Okay. And what is it you see that makes
19  you believe he's trying to get free?
20  A.   I see the vehicle jerking back and forth,
21  left and right, and the engine is being revved at a
22  high RPM.
23  Q.   Okay. The engine is being revved at a
24  high RPM. Is it revved up and down, or is it just
25  pinned to the floor and racing.

## Page 103

1   A.   It was steady.
2   Q.   Okay. So you didn't hear it go up and
3   down at all.
4   A.   I don't recall, no.
5   Q.   Okay. But you do recall, at least at some
6   point, did it appear that the vehicle was floored? The
7   expression meaning, did it sound like it was all the
8   way down to the floor?
9   A.   It was a steady, high RPM.
10  Q.   Steady, high RPMs. All right.
11       Could you see the driver doing anything
12  at this point --
13  A.   I don't --
14  Q.   I'm sorry, I interrupted you. This is
15  just in this time frame of your getting out of the car
16  into a run.
17  A.   The driver was turning the steering wheel
18  left and right.
19  Q.   Did you have a visual of the driver's arms
20  on the wheel?
21  A.   His left arm.
22  Q.   Okay. You observed the driver's arm on
23  the left wheel?
24  A.   Yes.
25  Q.   Did you observe the right arm?

## Page 104

1   A.   I did not.
2   Q.   Okay. You say the car was going side to
3   side?
4   A.   And back and forth.
5   Q.   And back and forth.
6   A.   (No audible response.)
7   Q.   Yes?
8   A.   Yes.
9   Q.   So, you observed the car move forward and
10  backwards on the berm?
11  A.   Correct.
12  Q.   And you observed -- You observed the
13  entire car move left and right, or the back, or the
14  front, or what did -- on the left-to-right motion, what
15  is it that you saw?
16  A.   With the left-and-right motion, it was
17  mainly the front of the vehicle, going left and right.
18       And then, with the back and forth, the
19  entire vehicle.
20  Q.   Did you observe anything else about the
21  vehicle: Was there any dirt being generated?
22  A.   There was.
23  Q.   Okay. What did you see in respect to
24  that?
25  A.   A cloud of dust.

| | |
|---|---|
| 1  Q.   Coming from where? | 1 counsel.  If you don't like the answer, that's tough |
| 2  A.   **The front of the vehicle.** | 2 luck; but he's answered your question. |
| 3  Q.   And the front of the vehicle, how much did | 3      MR. DAAR:  Q.  Okay.  What did you do |
| 4 it move from one side to the left?  I'm talking about | 4 next, after positioning yourself by the front door of |
| 5 the left/right motion. | 5 your patrol vehicle? |
| 6  A.   **I'm not quite sure.** | 6  A.   **I just maintained my location.** |
| 7  Q.   And how about the back-and-forth motion? | 7      **And I saw the car jerk left and jerk** |
| 8  A.   **I'm not quite sure.** | 8 **right.  And when it went right, it was -- went** |
| 9  Q.   Okay. | 9 **towards Officer Torr's location.** |
| 10     If the Honda had gone straight, if it | 10  Q.   All right.  Officer Torr is standing by |
| 11 had gone forward in the direction it was now | 11 the -- runs to the right rear passenger door of the |
| 12 pointing, you would be going into an area of grasses | 12 Honda? |
| 13 and buildings, and so forth, correct? | 13  A.   **In that area, yes.** |
| 14  A.   **Yes.** | 14  Q.   Officer Torr is not on the berm? |
| 15  Q.   And if it had gone backwards, it would | 15  A.   **No.** |
| 16 have hit your CHP vehicle. | 16  Q.   And you say that the vehicle going left to |
| 17  A.   **Possibly, yes.** | 17 right, you said, almost struck Officer Torr; is that |
| 18  Q.   Well, you positioned your CHP vehicle so | 18 correct? |
| 19 it couldn't back up and get away, correct? | 19  A.   **It got close to Officer Torr, yes.** |
| 20  A.   **There is a distance there where, if he did** | 20  Q.   How close did it get to Officer Torr? |
| 21 **back up and stopped, he probably could get out.** | 21  A.   **I'm not quite sure.** |
| 22  Q.   So you positioned your vehicle with enough | 22  Q.   Okay.  You saw the vehicle go forward and |
| 23 room that, if he could back up, he could get out? | 23 backwards; is that correct? |
| 24  A.   **Possibly, he could have, yes.** | 24  A.   **Correct.** |
| 25  Q.   Is there a reason why you left that extra | 25  Q.   How far backwards did it go? |
|             Page 105 |             Page 107 |

| | |
|---|---|
| 1 room, so he could back out? | 1  A.   **I don't recall.** |
| 2  A.   **No.** | 2  Q.   Did it go inches or feet? |
| 3  Q.   Was that a mistake tactically? | 3  A.   **I'm not quite sure.** |
| 4  A.   **I don't think so.** | 4  Q.   You are not sure whether it's inches or |
| 5  Q.   Not a mistake.  Left him room. | 5 feet? |
| 6     Your attention was to pin him, though, | 6  A.   **Yes.** |
| 7 so he didn't get out and continue the chase, right? | 7  Q.   Was it less than a yard? |
| 8  A.   **No, my intention was just to, you know,** | 8  A.   **I'm not quite sure.** |
| 9 **try to block him in.** | 9  Q.   So you are not sure whether it moved |
| 10  Q.   Right.  Okay. | 10 inches or a yard? |
| 11  A.   **My intention was to stop him right then** | 11  A.   **Correct.** |
| 12 **and there.** | 12  Q.   Are you certain it moved backwards? |
| 13  Q.   Okay.  So, given that your intention was | 13  A.   **It was going back and forth, yes.** |
| 14 to stop him right then and there, wasn't it a tactical | 14  Q.   So you are certain it moved backwards. |
| 15 error to leave room for him to back up and get away? | 15  A.   **Yes.** |
| 16      MR. DEVINE:  Objection.  It's been asked | 16  Q.   Okay.  And then the left-to-right motion |
| 17 and answered.  You don't have to answer. | 17 you say almost struck Officer Torr. |
| 18      MR. DAAR:  Are you instructing him not to | 18  A.   **Correct.** |
| 19 answer? | 19  Q.   Okay.  Did you have your gun out? |
| 20      MR. DEVINE:  Right.  He's already answered | 20  A.   **After it almost struck Officer Torr, yes.** |
| 21 it. | 21  Q.   You did have your gun out when you first |
| 22      MR. DAAR:  Well, you can tell him not to | 22 got out of the car. |
| 23 answer on privilege.  You can't stop him from answering | 23  A.   **No.** |
| 24 on asked and answered. | 24  Q.   Okay.  And Officer Torr did he have his |
| 25      MR. DEVINE:  He's already answered it, | 25 weapon out? |
|             Page 106 |             Page 108 |

Case 3:07-cv-04720-CRB    Document 52-2    Filed 09/11/2008    Page 31 of 63

**Page 109**

1    A.   I'm not quite sure.
2    Q.   Did Officer Torr have a flashlight?
3    A.   He did.
4    Q.   Does your car have a spotlight?
5    A.   Yes.
6    Q.   Spotlight on?
7    A.   I don't recall.
8    Q.   Okay. Visual on the driver, you can only
9 see his left hand, but you can't see his right hand --
10    A.   Correct.
11    Q.   -- is that correct?
12    A.   Yes.
13    Q.   And how far is the car from Torr when he
14 initially positions himself by the rear of that
15 vehicle, what's the distance between him and the
16 vehicle?
17    A.   Oh, a couple feet.
18    Q.   Okay. And at the point when the vehicle
19 going left to right almost hits him, how far, or how
20 close does the vehicle come to Torr?
21    A.   I'm not quite sure how close it got to
22 Officer Torr.
23    Q.   Okay. Did the distance between Officer
24 Torr and the vehicle change?
25    A.   I'm not quite sure.

**Page 110**

1    Q.   Officer Torr ran from your unit, and took
2 a position by the subject vehicle, correct?
3    A.   Correct.
4    Q.   Okay. Did you ever see the vehicle move
5 towards Officer Torr?
6    A.   Yes.
7    Q.   Okay. And if Officer Torr -- if I
8 understand your testimony, was originally several feet
9 away from the vehicle, is that correct, when he
10 originally took up the position?
11    A.   Um, I'm not sure how close, exactly how
12 close he was to the vehicle.
13    Q.   You are not sure how close he was to the
14 vehicle.
15    A.   No.
16    Q.   Because your -- most of your attention, I
17 assume, was on the driver?
18    A.   Correct.
19    Q.   Okay. Do you see Torr change his position
20 in response to the vehicle's movement?
21    A.   I did not, no.
22    Q.   No?
23    A.   No.
24    Q.   No. But you see the vehicle change its
25 position relative to Torr.

**Page 111**

1    A.   Correct.
2    Q.   And you see the vehicle get closer to
3 Torr.
4    A.   Correct.
5    Q.   And the vehicle was going left to right,
6 by your testimony, correct?
7    A.   And back and forth.
8    Q.   Okay. But it's the left-to-right motion
9 that is affecting Torr's safety, correct?
10    A.   Yes.
11    Q.   And since it's going left to right, you
12 also see the vehicle go further away from Torr.
13    A.   I don't recall.
14    Q.   Okay. So you only recall the vehicle
15 going closer to Torr.
16    A.   Yes.
17    Q.   Okay.
18      So at the point you saw the vehicle
19 going closer to Torr, you draw your service weapon.
20    A.   Yes.
21    Q.   Have you made any attempt to contact the
22 driver at this point?
23    A.   No.
24    Q.   Have you heard Officer Torr make any
25 attempt to contact the driver at this point?

**Page 112**

1    A.   I'm not quite sure what he said when he
2 approached the vehicle.
3    Q.   Okay. Do you know he said anything at the
4 -- This is just the point of time we're talking about
5 when the vehicle is going back and forth.
6    A.   I couldn't hear anything.
7    Q.   Okay. The engine-revving is loud?
8    A.   Yes.
9    Q.   It's dark, relatively dark?
10    A.   I think there were street lights in that
11 area, yeah.
12    Q.   Okay.
13      What do you do after pulling your
14 service revolver out of its holster, what do you do
15 next?
16    A.   Point it at the vehicle.
17    Q.   Point it at the vehicle.
18      What part of the vehicle do you point it
19 at?
20    A.   The driver's, driver's-side area.
21    Q.   Do you point it at the vehicle, or do you
22 point it at the driver?
23    A.   The driver.
24    Q.   Okay. So you point your service revolver
25 at the driver. The car is going back and forth.

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

| | |
|---|---|
| 1 Do you say anything at that point? | 1 MR. DAAR: Q. At this point have you |
| 2 A. I may have said, "Stop. Stop." | 2 observed any reaction to either your presence or Torr's |
| 3 Q. Do you have a megaphone thing in your car? | 3 presence by the driver? |
| 4 A. No. | 4 A. No, un-un. |
| 5 Q. Okay. So you -- The motor is pretty loud, | 5 Q. Okay. After pulling your revolver in your |
| 6 right? | 6 position from the front-door area of your patrol |
| 7 A. Yes. | 7 vehicle, what did you do? |
| 8 Q. Okay. Do you scream, or do you just say | 8 MR. DEVINE: I'm going to -- That assumes |
| 9 it, or do you have any expectation of being heard at | 9 facts not in evidence. Did you have a revolver, or an |
| 10 that point, or. . . | 10 automatic -- |
| 11 A. I screamed. | 11 THE WITNESS: Automatic. |
| 12 Q. Okay. You screamed words to the effect of | 12 MR. DEVINE: -- weapon? |
| 13 "Stop" at the vehicle. What else do you say? | 13 MR. DAAR: I'm sorry. I'm not a gun guy, |
| 14 A. That's about pretty much what I recall | 14 so. . . |
| 15 saying. | 15 Q. After pulling the weapon, what did you do |
| 16 Q. Okay. You can't hear Torr saying | 16 next? You said -- You indicated you said "Stop," or |
| 17 anything. | 17 words to that effect. |
| 18 A. No. | 18 What did you do after that? |
| 19 Q. The vehicle's going back and forth. | 19 A. Pointed the weapon at the driver as he |
| 20 A. Yes. | 20 drove off. |
| 21 Q. And left to right. | 21 Q. Okay. How did it occur that the car drove |
| 22 A. Yes. | 22 off? What were the events that you observed leading up |
| 23 Q. Can you tell whether the front tires are | 23 to the car driving off? |
| 24 actually spinning or not? | 24 A. The car went left, went right towards |
| 25 A. They were, yes. | 25 Officer Torr's location, and went back left, and drove |
| Page 113 | Page 115 |

| | |
|---|---|
| 1 Q. You can see that. | 1 off. |
| 2 A. Yes. | 2 Q. Okay. Previous to that moment, I guess |
| 3 Q. Okay. You can see the tires are spinning. | 3 the car had been going left to right and back and |
| 4 A. Yes. | 4 forth, but had been unsuccessful in unsticking itself, |
| 5 Q. And why is it that the vehicle is not | 5 is that correct? |
| 6 moving? | 6 A. Correct. |
| 7 A. I don't know. | 7 Q. So, all of its movement was confined to an |
| 8 Q. Okay. Does it appear that any part of the | 8 area somewhat around the vehicle. |
| 9 car is resting on the ground, interfering with the | 9 A. Yes. |
| 10 wheels' ability there, the traction, or do you have | 10 Q. Okay. |
| 11 some other opinion as to why the vehicle's not moving? | 11 Something changed in terms of that. |
| 12 A. The back tires were on the ground. | 12 What is the first thing you saw that changed? |
| 13 Q. Okay. So, you weren't certain when you | 13 A. The vehicle driving off. |
| 14 got out of your car why the vehicle was not able to | 14 Q. Okay. The vehicle at some point, wheels |
| 15 move. | 15 were able to move it off of that location, correct? |
| 16 A. Correct. | 16 Its wheels had enough traction, that the vehicle could |
| 17 Q. Okay. | 17 leave its location, yes? |
| 18 MR. DEVINE: Can we take another | 18 A. Correct, yes. |
| 19 five-minute break? | 19 Q. Okay. What is the first movement you saw |
| 20 THE VIDEOGRAPHER: Going off the record, | 20 in which the wheels had a sufficient traction to get |
| 21 the time is 11:54 a.m. | 21 the car unstuck? |
| 22 (Brief recess taken.) | 22 A. Driving off. |
| 23 THE VIDEOGRAPHER: Coming back on the | 23 Q. Did it drive off forward or backwards? |
| 24 record, the time is 12:01 p.m. Counsel, please | 24 A. It went left, and was able to drive off. |
| 25 continue. | 25 Q. Okay. When you say "it went left," does |
| Page 114 | Page 116 |

Deposition of MICHAEL NOVOSEL          NELSON-GONZALEZ VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008          USDC, NORTHERN DIST OF CA, No. CV07-04720 CRB

Case 3:07-cv-04720-CRB          Document 52-2          Filed 05/11/2008          Page 33 of 63

1 that mean the car drove in an easterly direction?
2     A.    **Northwesterly direction.**
3     Q.    The car was originally pointing east, the
4 front of the car; is that correct?
5     A.    **Correct.**
6     Q.    And as the front wheels gained traction,
7 it went forward on to the berm and then turned towards
8 the north; is that your testimony?  I'm just trying to
9 understand it.
10    A.    **I just recall seeing the car go left, and**
11 **drive off in a northwesterly direction.**
12    Q.    Northwesterly.  So, that it went back off
13 the berm, or whatever it was on, back on to the street,
14 and back in the direction that it was originally going;
15 is that what you observed?
16    A.    **Yes.**
17    Q.    So the car's ability to get off the berm
18 was in a forward direction.
19    A.    **I'm not quite sure how it got off the**
20 **berm.**
21    Q.    Okay.  So you don't know whether the car
22 backed off the berm, or pulled forward to get off the
23 berm.
24    A.    **I'm not quite sure when the exact moment**
25 **it was able to gain traction and drive off.**

Page 117

---

1     Q.    Okay.  Nor are you sure which direction it
2 occurred in?
3     A.    **Well, when it drove off, it went in the**
4 **northwesterly direction, so. . .**
5     Q.    But we're not sure which direction it got
6 off the berm, or how it got off the berm?
7     A.    **It went left, it went right, and it came**
8 **back left.  And that's when it was able to drive off.**
9     Q.    Okay.  Forward, in a forward motion.
10    A.    **Yes, northwesterly direction.**
11    Q.    Okay.
12          So, when the car finally gained
13 traction, it proceeded forward and northwesterly.
14    A.    **Correct.**
15    Q.    Okay.  Did you get a view of the driver as
16 it went by you?
17    A.    **I did.**
18    Q.    What did you observe?
19    A.    **A Hispanic male.**
20    Q.    Age?
21    A.    **In his twenties.**
22    Q.    Anything else?
23    A.    **That's all I recall.**
24    Q.    Did the subject look at you as it went by,
25 the subject went by?

Page 118

---

1     A.    **I don't recall.**
2     Q.    Okay.  Do you recall having eye contact at
3 this -- up until this point with the subject?
4     A.    **I don't recall.**
5     Q.    Okay.  Do you change your --
6          Well, in response to the car coming off
7 the berm, what do you do next?
8     A.    **Go back to the patrol vehicle.**
9     Q.    Okay.  Prior to the car coming off the
10 berm, you -- at the time you pulled your weapon, you
11 saw the vehicle almost strike Officer Torr, correct?
12    A.    **I pulled the weapon after I saw it strike**
13 **Officer Torr, I pulled the weapon as it was driving**
14 **off.**
15    Q.    Okay.  I'm sorry, your voice is a little
16 faint.  When did you pull your weapon?
17    A.    **After the car went towards Officer Torr,**
18 **and it came back left is -- and then it drove off is**
19 **when I pulled my weapon.**
20    Q.    Okay.  In order for the car to go near
21 Officer Torr, it would have to be going to the right;
22 is that correct?
23    A.    **Correct.**
24    Q.    And when it went near Officer Torr to the
25 right, was the car going forward or backwards?

Page 119

---

1     A.    **I don't recall.**
2     Q.    What did you see Officer Torr do, if
3 anything, after the vehicle proceeded to go left and
4 gain traction?
5     A.    **I don't recall what I -- what he did, or**
6 **what I saw him doing.**
7     Q.    Okay.  When's the next time during this
8 incident that you see or are aware of what Officer Torr
9 is doing?
10    A.    **As the vehicle is driving off, I could see**
11 **in the corner of my right eye Officer Torr standing**
12 **there.**
13    Q.    Okay.  What did Officer Torr do at that
14 point?
15    A.    **Returned to the patrol vehicle.**
16    Q.    Okay.  So you both get back in.
17    A.    **We get back in.**
18    Q.    Okay.  Do you hear any radio traffic from
19 Torr?  Is he telling Dispatch what's going on?  Do you
20 hear any of that?
21    A.    **At that moment I heard him say that he was**
22 **almost struck by the vehicle.**
23    Q.    Mm-hmm?
24    A.    **And he related to me that he was able to**
25 **hit the vehicle with his flashlight.**

Page 120

---

Page 117 - Page 120

Page 121

1   Q.   Okay.  He hit the vehicle with his
2  flashlight, he told you?
3      **A.   Yes.**
4      Q.   Okay.  And did the two of you have any
5  further conversation about what you were going to do
6  next?
7      **A.   No.**
8      Q.   Did you ever talk to your partner about
9  whether or not to continue the chase?
10     **A.   We did not, no.**
11     Q.   Okay.  And the decision-making process you
12  are going through was a mental one internally?
13     **A.   Correct.**
14     Q.   Okay.  The car then is proceeding, once
15  again, northbound on Alma.
16     **A.   Yes.**
17     Q.   Okay.  You proceed to follow the vehicle?
18     **A.   Yes.**
19     Q.   And what's your distance, the distance
20  between your two vehicles?
21     **A.   Maybe ten car lengths.**
22     Q.   Okay.  Any -- any more radio traffic?  Are
23  any Officers coming to help?  Do you know anything
24  about any other agencies?  Did Dispatch tell you
25  anything?  Any -- Are you getting any inside out- --

Page 122

1  sorry -- any outside input at this point?
2      **A.   I don't recall.**
3      Q.   Okay.  So you proceed how much further
4  down Alma, does the vehicle go?
5      **A.   I'm not quite sure how far it went down**
6  **Alma Street.**
7      Q.   Okay.  Approximately.
8      **A.   Less than a mile.**
9      Q.   Okay.  What happens in less than a mile?
10     **A.   The vehicle goes into a -- an apartment**
11  **complex.**
12     Q.   Okay.
13         The speed from the scene of the -- we'll
14  call it the spin-out into the -- is it a right turn
15  into the apartment complex?
16     **A.   A straight turn.**
17     Q.   I'm sorry?
18     **A.   It was straight.**
19     Q.   Okay.  Meaning, Alma ended at the
20  apartment complex?
21     **A.   Correct.**
22     Q.   Ah.  Okay.
23         Approximate speed of the vehicle in that
24  section, from the spin-out to when it goes into the
25  apartment complex?

Page 123

1      **A.   I'm not quite sure about the speed, but it**
2  **was at a high rate, again.**
3      Q.   Any other vehicular traffic present since
4  the spin-out on Alma, other than your vehicle and the
5  subject vehicle?
6      **A.   I don't recall any other vehicles in the**
7  **area.**
8      Q.   Okay.  You would be paying close attention
9  to that, because you were in a high-speed pursuit?
10     **A.   Very close.**
11     Q.   Okay.  So that's one of things you are
12  doing, besides trying to keep up with this guy, is
13  trying to monitor the presence of other vehicles.
14     **A.   Correct.**
15     Q.   To ensure the safety of those vehicles.
16     **A.   Correct.**
17     Q.   Okay.  What do you do when the -- after
18  the car pulls into the complex -- goes straight into
19  the complex?
20     **A.   We were approaching the vehicle's**
21  **location, at which time the reverse lights come on, and**
22  **the vehicle backs out.**
23     Q.   Is that the first time you've seen the
24  reverse lights?
25     **A.   That I can recall, yes.**

Page 124

1      Q.   Where is your vehicle located when the
2  reverse lights come on?
3      **A.   Approaching his location; so, behind it.**
4      Q.   Okay.  Were you in a position to block the
5  Honda within the complex?
6      **A.   No.**
7      Q.   Okay.  Did the Honda succeed in backing
8  out?
9      **A.   It did.**
10     Q.   Okay.  How many car lengths did you say
11  you were behind it on Alma before it went into the
12  complex?
13     **A.   I don't recall.**
14     Q.   Were you staying fairly close?
15     **A.   No; at that time it had a pretty good lead**
16  **on us.**
17     Q.   Because you had to get back into your car,
18  and because, from the spin-out, he was already in his
19  car?
20     **A.   Yes.**
21     Q.   Okay.  And you hadn't managed to close
22  that distance from the time you left the scene of the
23  spin-out until the time that Alma dead-ended in the
24  apartment?
25     **A.   Yes.**

**Page 125**

1    Q.   Are you familiar with Alma?
2    A.   **Somewhat.**
3    Q.   Were you familiar with it then?
4    A.   **Somewhat.**
5    Q.   Did you know it dead-ended in an
6  apartment?
7    A.   **I did not, no.**
8    Q.   Okay.  But you were unable to block the
9  Honda in, correct?
10   A.   **Correct.**
11   Q.   Okay.  What did the Honda do when it
12  exited the apartment complex?
13   A.   **It travelled into the westbound lane of**
14  **Oak Grove Avenue.**
15   Q.   Were the Honda's lights on or off, if you
16  know?
17   A.   **I don't recall.**
18   Q.   What do you do with your car, in response
19  to the Honda going westbound on Oak Grove?
20   A.   **It was actually going -- going eastbound**
21  **in the westbound lane.**
22   Q.   Okay.  What do you do in response to the
23  subject vehicle going eastbound in the westbound lane
24  of Oak Grove?
25   A.   **Continued following it in the eastbound**

**Page 126**

1  lane.
2    Q.   What's its approximate speed at this time?
3    A.   **I'm not quite sure.**
4    Q.   Is Oak Grove a relatively straight street
5  at this location?
6    A.   **Yes.**
7    Q.   Okay.  About how far down Oak Grove can
8  you see?  Does Oak- -- I'm sorry.  Does Oak Grove begin
9  on Alma --
10   A.   **It does not.**
11   Q.   What?
12   A.   **No.**
13   Q.   Okay.  How far, from the point that you
14  turn eastbound on the eastbound side, what kind of
15  vision do you have down Oak Grove?
16   A.   **Clear.**
17   Q.   Okay.  Several blocks?
18   A.   **Oh, yeah.**
19   Q.   Okay.  When you turned eastbound, did you
20  observe any traffic?
21   A.   **I did not, no.**
22   Q.   Okay.  At this point, you still have not
23  received any communication from any County agency about
24  this chase?
25   A.   **At that point, as we're traveling east on**

**Page 127**

1  Oak Grove.
2    Q.   At that point, what?
3    A.   **As we were traveling east on Oak Grove --**
4    Q.   Eastbound on Oak Grove yeah.
5    A.   **-- I saw two patrol vehicles approaching**
6  **our location.**
7    Q.   Okay.
8         Other than seeing these vehicles
9  approach, did you receive any information on the
10  radio about the pursuit that you are involved in,
11  either from CHP, or from the County?
12   A.   **I don't recall hearing anything.**
13   Q.   Okay.  Did you have any information
14  whether this was a stolen vehicle?
15   A.   **No.**
16   Q.   Do you have any information it wasn't a
17  stolen vehicle?
18   A.   **No.**
19   Q.   Did you have any information about who the
20  registered owner was?
21   A.   **I did not.**
22   Q.   At this time had you received any
23  information at all regarding the vehicle, the driver,
24  from any source via the radio?
25   A.   **I did not.**

**Page 128**

1    Q.   You hadn't.
2    A.   **Yes.**
3    Q.   Okay.  How long after you turn onto
4  eastbound Oak Grove do you observe the patrol vehicles?
5    A.   **I'm not quite sure of the time period.**
6    Q.   Okay.  Minutes?
7    A.   **It was pretty instant.**
8    Q.   Okay.  How did you know they were patrol
9  vehicles?
10   A.   **I could see the red lights coming.**
11   Q.   Red lights being the emergency lights?
12   A.   **Correct.**
13   Q.   Okay.  And the -- Did you see these red
14  lights prior to the vehicle -- Oh, I'm sorry, strike
15  that.
16         Did you observe the two patrol vehicles
17  make a right turn from a perpendicular street onto
18  eastbound Oak Grove?
19   A.   **I did not.**
20   Q.   Okay.  The first time you recall observing
21  them, they were heading westbound on the westbound
22  side; is that correct?
23   A.   **Correct.**
24   Q.   Okay.  And did each of the vehicles have
25  their emergency lights on?

**Page 129**

1    A.    They did.
2    Q.    Okay.  Sirens?
3    A.    I don't recall.
4    Q.    Okay.  And they were coming in the
5 opposite direction that you were going, correct?
6    A.    Yes.
7    Q.    And the opposite direction from the
8 subject vehicle, correct?
9    A.    Yes.
10    Q.    How many lanes are on Oak Grove, how is it
11 configured?
12    A.    One in each direction.
13    Q.    Is there a shoulder?
14    A.    I'm not quite sure.
15    Q.    Okay.  A curb?  Is there a curb on it?
16    A.    Bordering the lanes?
17    Q.    Yeah.
18    A.    I'm not quite sure.
19    Q.    Okay.
20          And is it a narrow, two-lane street,
21 with the lawns and buildings coming close up to where
22 the lanes are, or is it a two-lane street with some
23 room on either side, or you don't know?
24    A.    I think the lanes are pretty wide there.
25    Q.    Meaning, there is room on either side?

**Page 130**

1    A.    I'm pretty sure.
2    Q.    Okay.
3          Are the Honda's lights on or off at this
4 point, if you know?
5    A.    I don't recall.
6    Q.    Okay.  Did your attention get attracted to
7 the patrol vehicles because of their lights, or because
8 of their sirens?
9    A.    Lights.
10    Q.    Okay.  Did you or Officer Torr communicate
11 at all at that time with those vehicles?
12    A.    No.
13    Q.    How far -- What was the distance between
14 your vehicle and the Honda at the time you first
15 observed the Deputy Sheriff's vehicles?
16    A.    Maybe approximately six to seven car
17 lengths.
18    Q.    And where were you in terms of the
19 intersection -- How far had you proceeded from the
20 Alma -- in the apartment complex on Oak Grove at the
21 time that you saw the lights?
22    A.    Not too far.
23    Q.    Okay.  Half a block?
24          I don't know what "not too far" means.
25 You have to help me a little.

**Page 131**

1    A.    Maybe only a couple hundred feet.
2    Q.    Okay, a couple hundred feet.
3          So, at the time that you first see the
4 lights, and you've gone a couple hundred feet or so
5 on westbound Oak Grove, and the subject vehicle,
6 which is going westbound on the east side, is six to
7 seven car lengths ahead of you; is that correct?
8    A.    The suspect's vehicle is going eastbound
9 on the westbound side.
10    Q.    I'm sorry.  Eastbound on the westbound
11 side, and approximately six to seven car lengths ahead
12 of you.
13    A.    Correct.
14    Q.    Okay.  What did the subject vehicle do, if
15 anything, when you first observed the Deputy Sheriff's
16 vehicle?
17    A.    It maintained its course of travel.
18    Q.    Okay.  What did the Deputy Sheriff's
19 vehicle do, if anything, when you first saw them?
20    A.    They were traveling west.
21    Q.    Okay.  Did they change their direction at
22 all, or make any changes -- maneuvers to avoid the
23 Honda?
24    A.    They had to swerve out of the way to avoid
25 the Honda.

**Page 132**

1    Q.    Okay.  And did you observe them actually
2 swerve out of the way?
3    A.    Yes.
4    Q.    Okay.  What was the distance between the
5 two Deputy Sheriff's vehicles?
6    A.    Between each other?
7    Q.    Yeah.
8    A.    I'm not quite sure.
9    Q.    Were they close, or were there five, six,
10 seven car lengths, or were there one or two car
11 lengths?
12    A.    I'm not quite sure what the distance is.
13    Q.    Okay.  How close was the first Deputy
14 Sheriff to the Honda at the moment it made its maneuver
15 to avoid it, how far apart were they in distance?
16    A.    When approaching each other, or. . .
17    Q.    Yes.  Approaching each other.
18    A.    I'm not quite sure.
19    Q.    If you know.  You are not sure?
20    A.    No.
21    Q.    All right.
22          And you observed one of the Deput- --
23 You observed both the Deputy Sheriffs maneuver to the
24 right-hand -- their right-hand shoulder, which would
25 have been their right-hand shoulder?

Deposition of MICHAEL NOVOSEL    NELSON-GONZALES VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008    USDC, NORTHERN DIST OF CA, No. CV07-04720 CRB

Case 3:07-cv-04720-CRB    Document 52-3    Filed 09/11/2008    Page 37 of 63

1    A.    Yeah, they went towards the right.
2    Q.    And did they both come to rest, do you
3 know?  The two Sheriff's cars, do they pull over and
4 stop?  Do they keep going?  What do they do?
5    A.    I'm not quite sure what they did.
6    Q.    Okay.  You know that they pulled to the
7 right, but you are not sure if they stopped, or if they
8 kept going.
9    A.    Correct.
10    Q.    Okay.  When you passed their position with
11 your vehicle, how far were you from the Honda, same
12 approximate distance, six or seven car lengths?
13    A.    No, I slowed a little, when the patrol
14 vehicles were approaching, because of the situation
15 that possibly could have occurred, with a head-on
16 traffic collision.
17    Q.    Okay.  So, as soon as you saw them, you
18 slowed down to increase the distance between you and
19 the possible collision that could occur on the other
20 side of the divider.
21    A.    Correct.
22    Q.    Okay.  What would you estimate your car --
23          What was the distance in car lengths
24 between you and the Honda at the time you passed the
25 Deputy Sheriff's vehicle?

Page 133

1    Do you hear any broadcast from the
2 Deputies?
3    A.    I do not.
4    Q.    Okay.
5          What happens next?
6    A.    The Honda, after it passes the Deputies,
7 it comes back into the appropriate lane.
8    Q.    Okay.  No divider?  No raised divider?
9    A.    None.
10    Q.    Okay.  How long after passing the
11 Deputies?  Is it almost immediate that it gets back, or
12 is there a passage of time?
13    A.    Only a few seconds.
14    Q.    Okay.  And then the vehicle is proceeding
15 straight on Oak Grove.
16    A.    Correct.
17          MR. DAAR:  Okay.  I think this is probably
18 a good place for our lunch break.
19          MR. DEVINE:  Okay.
20          THE VIDEOGRAPHER:  Here marks the end of
21 Videotape No. 2, Volume No. I in the deposition of
22 Michael Novosel.  Going off the record, the time is
23 12:26 p.m.
24          (Luncheon recess taken from 12:27 p.m. to
25          1:30 p.m.)

Page 135

1    A.    Maybe nine to ten.
2    Q.    Okay.  And as you passed the Deputy
3 Sheriff's vehicle, you are not certain whether they
4 were parked, or whether they were proceeding on the
5 right side of the road.
6    A.    I don't recall --
7    Q.    Okay.
8    A.    -- now.
9    Q.    And the Honda never changed at this point,
10 it didn't change its direction at all in response to
11 the presence of these two vehicles.
12    A.    Correct.
13    Q.    Okay.  And was there any communication
14 between you and the Sheriffs as you go by on the radio?
15    A.    None.
16    Q.    Okay.  Did you inform Dispatch that other
17 vehicles had become involved, other police vehicles had
18 become involved in the pursuit?
19    A.    My partner may have.
20    Q.    Okay.  But you are not sure --
21    A.    Correct.
22    Q.    -- whether that happened or not.  Okay.
23          The Honda is proceeding eastbound on the
24 westbound side.  You are about ten car lengths behind
25 it.  He's just passed these Deputies.

Page 134

1 THURSDAY, APRIL 17, 2006        1:30 O'CLOCK P.M.
2          ---oOo---
3    A F T E R N O O N   S E S S I O N
4
5 EXAMINATION RESUMED BY MR. DAAR:
6          THE VIDEOGRAPHER:  Here begins Videotape
7 No. 3, Volume No. 1, in the deposition of Michael
8 Novosel.
9          Back on the record.  The time is 1:27 p.m.
10          Counsel, please continue.
11          MR. DAAR:  Q.  Going backwards just a bit
12 to the period in time at which you observed the two
13 Sheriff's Deputy vehicles, pull to the side of the
14 road, were you able to tell from your position as to
15 whether they each pulled over the same distance
16 relative to the center line?
17    A.    I'm not quite sure.
18    Q.    That wasn't a great question.
19          Each of the Sheriff's vehicles that pulled
20 over to their right, were they -- were the vehicles
21 pulled at equal distance from the center line of the
22 road?  Did they each pull off the same degree from the
23 roadway, if you know?
24    A.    I didn't see.
25    Q.    I'm sorry?

Page 136

**Page 137**

1   A.  I didn't see.

2   Q.  Okay.  So you don't -- You are not sure
3  whether they pulled off to the same degree or not.

4   A.  Correct.

5   Q.  Okay.

6     With respect to the first Sheriff's
7  vehicle, when the Honda passed that vehicle, and you
8  were about six or seven car lengths behind the Honda,
9  or more?

10   A.  Possibly more.

11   Q.  Okay.  How far did the driver's side of
12  the Honda come to the driver's side of the Sheriff's
13  vehicle?

14   A.  Approximately 25 feet.

15   Q.  Okay.  And that was the first vehicle,
16  correct?

17   A.  Correct.

18   Q.  Okay.  With respect to the second vehicle,
19  same question:  What was the distance between the Honda
20  and the second Sheriff's vehicle, if you know?

21   A.  I do not.

22   Q.  Okay.

23     We were on -- We passed the vehicles,
24  and you are going down Oak Grove.  And we -- does the
25  subject vehicle increase its speed?

**Page 138**

1   A.  It does.

2   Q.  Okay.  What speed does it reach, as you
3  are following, the highest speed at this point?

4   A.  I'm not sure of its speed, but I remember
5  my partner -- I could hear my partner telling our
6  Dispatch at that time that we were going 90 miles per
7  hour.

8   Q.  Because you recall -- one of the things
9  you recall your partner saying is telling Dispatch,
10  "We're going" -- some words to the effect that, "The
11  subject is going 90 miles an hour."

12   A.  Correct.

13   Q.  Okay.  And at this point, have you
14  received any information from Dispatch, from local
15  agencies, or anyone else, regarding the chase, to your
16  knowledge?

17   A.  I have not.

18   Q.  Okay.  How far are you behind the subject
19  vehicle when it's going 80 down Oak Grove?

20   MR. DEVINE:  Excuse me.  That misstates
21  his testimony.  He said 90 --

22   MR. DAAR:  Q.  90.  I'm sorry, 90.

23   A.  Approximately nine or ten car lengths.

24   Q.  Okay.  At that time did you know how Oak
25  Grove ran, and where it terminated?

**Page 139**

1   A.  I knew up to the point of Middlefield
2  Road.

3   Q.  Okay.  You were not aware, then, whether
4  Oak Grove continued or not then?

5   A.  Correct, yes.

6   Q.  Okay.  Did your partner --

7     Did your partner give -- impart you any
8  information about whether Oak Grove was terminating
9  or not?

10   A.  He did not.

11   Q.  Okay.  After the subject vehicle
12  accelerated to 90, what did you -- and you are how many
13  car lengths behind at this point?

14   A.  Approximately nine to ten.

15   Q.  Okay.  What happens next?

16   A.  The vehicle travels through Middlefield
17  Road, and continues onto Oak Grove Road.

18   Q.  Mm-hmm.  I thought we were on Oak Grove,
19  or maybe I got confused.

20   A.  Or stays on Oak Grove Road as -- after it
21  passed Middlefield.

22   Q.  Okay.  Oak Grove crosses Middlefield.

23   A.  Correct.

24   Q.  Is that a controlled intersection?

25   A.  It is.

**Page 140**

1   Q.  Is there a light?

2   A.  Traffic lights, yes.

3   Q.  Okay.  And what was the light that you
4  crossed?

5   A.  If I recall, I think it was green.

6   Q.  Okay.  So you weren't -- you didn't have
7  to slow down for that intersection?

8   A.  No.

9   Q.  And your car is going 80, 90, too?

10   A.  Correct.

11   Q.  Okay.  So both vehicles go through
12  Middlefield intersection at 80 to 90 miles an hour?

13   A.  Correct.

14   Q.  And what happens after that?

15   A.  We go down Oak Grove for a little ways.

16   Q.  Mm-hmm?

17   A.  At that part of Oak Grove there is some
18  "S" turns in there.

19     As we're coming to another street at the
20  time, which I didn't know what it was at the time, I
21  observe a cloud of dust.

22   Q.  Mm-hmm.  Okay.

23     What type of neighborhood is Oak Grove
24  going toward at this point?

25   A.  Residential.

Deposition of MICHAEL NOVOSEL        NELSON GONZALES VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008                          USDC, NORTHERN DIST. OF CA, No. CV07-04720 CRB

Case 3:07-cv-04720-CRB    Document 52-2    Filed 09/11/2008    Page 39 of 63

1    Q.  Okay.  And what kind of residential
2  neighborhood?  Large residences, small residences,
3  tightly-packed?
4    A.  I'm not quite sure.
5    Q.  Okay.  Prior -- There were some "S" turns
6  on Oak Grove that you observed the subject vehicle
7  negotiate?
8    A.  Correct.
9    Q.  Did you observe the subject vehicle brake
10  prior to the "S" turns?
11    A.  I did not.
12    Q.  Okay.  Are you focusing, in part, on the
13  subject vehicle's brake lights, so you can control your
14  vehicle accordingly?
15    A.  Yes.
16    Q.  Okay.  So you were -- you did not observe
17  the subject vehicle put on its brakes at all through
18  that intersection, through the S's.
19    A.  I don't recall seeing any.
20    Q.  You don't recall.
21    Did you use your brakes through those
22  S's?
23    A.  I did not.
24    Q.  Okay.  So the vehicle could negotiate
25  those S's at the speed your vehicle -- both the

Page 141

---

1  vehicles were going, without braking, without crashing.
2    A.  That's the way it appeared, yes.
3    Q.  After you've gone through the "S" turns,
4  does it then become straight again?
5    A.  Yes.
6    Q.  And the next thing -- And you are about
7  still eight, nine car lengths back?
8    A.  Maybe nine to ten.
9    Q.  Okay.
10    And the first thing that you notice that
11  changes is that you see a cloud of dust?
12    A.  Yes.
13    Q.  Okay.  What was the dust illuminated by?
14  What was the source of lighting which allowed you to
15  see the dust?
16    A.  My headlights.
17    Q.  You do not recall seeing the car's brake
18  lights.
19    A.  No.
20    Q.  What was the speed of the subject vehicle
21  immediately prior to your seeing the cloud of dust?
22    A.  I was still going 80 to 90 miles an hour.
23    Q.  Okay.  And you hadn't seen that car brake?
24    A.  No.
25    Q.  Okay.  And the next thing you see is a

Page 142

---

1  cloud of dust.
2    A.  Correct.
3    Q.  So, as far as you know, the car was going
4  80 to 90 miles an hour at the time the cloud of dust
5  was created.
6    A.  Possibly.
7    Q.  You don't have any reason to believe
8  anything different, do you?
9    MR. DEVINE:  Objection.  Calls for
10  speculation.
11    MR. DAAR:  Q.  Were there any facts that
12  you are aware of to cause you to believe that the
13  vehicle was traveling at less than 80 or 90 miles an
14  hour when you saw a cloud of dust?
15    A.  No.
16    Q.  Okay.
17    What did you do after you saw the cloud
18  of dust?
19    A.  I started to slow the patrol car.
20    Q.  Mm-hmm?
21    A.  At which time I saw the reverse lights
22  come on.
23    Q.  Okay.  When you started to slow, did you
24  put the brakes on --
25    A.  Yes.

Page 143

---

1    Q.  -- or did you just take your foot off the
2  gas?
3    A.  Brakes.
4    Q.  Okay.  Did you brake hard, medium, gently?
5    A.  Gently.
6    Q.  How long a time did it take between the
7  time you saw the dust, and began to gently apply your
8  brakes, until the time your vehicle stopped?
9    A.  I don't recall.
10    Q.  Seconds?
11    A.  Seconds, yes.
12    Q.  Okay.  How far --
13    How long does it take a CHP cruiser to
14  come to a complete stop, in terms of time, from
15  80 miles an hour to zero?
16    A.  I don't know.
17    Q.  Do you have any idea?
18    A.  No.
19    Q.  You have no idea how long it takes the car
20  to stop from 80 to zero?
21    A.  No idea.
22    Q.  Okay.  Do you have any idea, when you are
23  braking in a CHP cruiser, how many feet the vehicle
24  travels when it attempts to stop from 80 miles an hour?
25    A.  I do not.

Page 144

**Page 145**

1  Q. Do you have an estimate, in terms of car
2  lengths, how many car lengths would it take to stop
3  your vehicle when it's going 80?
4  A. No.
5  Q. You have no idea at all?
6  A. No idea.
7  Q. Not at all?
8  A. Not at all.
9  Q. Could it be as much as 250 car lengths?
10  A. I do not know.
11  Q. Well, you take various driving classes to
12  be a CHP Officer?
13  A. At the Academy, yes.
14  Q. You get instructed as to what safe
15  distances are for vehicles to follow one another on the
16  highway?
17  A. Oh, yeah.
18  Q. And, for example, at 65 miles an hour,
19  when you are patrolling 101 southbound, what do you
20  consider a safe distance to keep between cars, so you
21  can stop in time?
22  A. It depends what time of day it is.
23  Q. Does it depend what time of day it is,
24  because of the visibilty issue?
25  A. Well, traffic can be heavier at certain

**Page 146**

1  times of day.
2  Q. How would traffic impact the safe distance
3  between two vehicles?
4  A. Well, if it's bumper-to-bumper, you are
5  going to be about a car length behind.
6  Q. Okay. So if it's 80 miles -- 65 miles an
7  hour, bumper-to-bumper, it's safe to be a car length
8  behind another car?
9  A. Are we going 65 miles per hour?
10  Q. Yeah.
11  A. Okay. No, I'd just say, approximately six
12  car lengths back.
13  Q. And what's that based on, the six car
14  lengths. What is that? Why six car lengths?
15  A. That's what I've heard: A car length for
16  every 10 miles an hour.
17  Q. Ah, okay.
18  So it wouldn't -- And that Code is
19  designed to give vehicles safe distances between them
20  to stop, right?
21  A. I don't know if it's a Code.
22  Q. I might have misheard you. I thought you
23  said "Code".
24  A. No.
25  Q. Oh, okay. So, where do you get this "one

**Page 147**

1  vehicle length for every 10 miles an hour" from?
2  A. It could be growing up, Driver's
3  Ed, or at the Academy. I don't recall where I heard
4  it.
5  Q. But you remember something like that.
6  A. Yes.
7  Q. Okay. And do you believe that that
8  distance relates in some way to a car's ability to stop
9  from a certain speed; is that. . .
10  A. Possibly, yes.
11  Q. Can you think of any --
12  Do you have any other possible
13  explanation for the "one car length per 10 miles an
14  hour"?
15  A. I do not, no.
16  Q. In your situation, if you had braked in an
17  emergency fashion, to stop as quickly as possible, it
18  isn't it true that it would take your CHP cruiser, at
19  80 miles an hour, approximately eight car lengths?
20  A. Well, possibly; but you have to take into
21  consideration of braking, too.
22  Q. Or more?
23  A. Yes.
24  Q. And that's under full emergency braking,
25  correct?

**Page 148**

1  A. All the way to the floor?
2  Q. To the point of losing -- you know,
3  stopping, but prior to losing control of the vehicle.
4  Stop the vehicle as quickly as you can and as safely as
5  you can.
6  A. Possibly.
7  Q. And so, in this situation, since you were
8  braking gently, it would have taken far more than eight
9  car lengths for you to come to a stop, correct?
10  A. Possibly.
11  Q. Well, do you think it takes less than
12  eight car lengths, braking gently in your CHP cruiser,
13  or do you think it possibly takes even more than that?
14  A. It could be more.
15  Q. Could it be less?
16  A. It could be less.
17  Q. Okay. Hmm.
18  So, you have some idea of what distance
19  is required to stop your vehicle, correct?
20  A. Um, a little.
21  Q. Okay. How far down the road do your
22  headlights illuminate?
23  A. I do not know.
24  Q. More or less than 50 feet?
25  A. I hope more than that.

Deposition of MICHAEL NOVOSEL   NELSON-GONZALES VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008                    USDC, NORTHERN DIST. OF CA, No. CV07-04720 CRB

Case 3:07-cv-04720-CRB   Document 52-3   Filed 09/11/2008   Page 41 of 63

**Page 149**

1   Q.   Okay.  How about a hundred?

2   A.   **I'm not quite sure.**

3   Q.   Okay.  Car lengths is eight to 10 feet, is
4   that what -- What's a car length?

5   A.   **The average is ten to 15 feet.**

6   Q.   Okay.
7        And it's your testimony that you gently
8   began applying the brakes when you saw the cloud of
9   dust at the last location of the subject vehicle.

10   A.   **Correct.**

11   Q.   Okay.  And then you indicated that you saw
12   a reverse light; is that correct?

13   A.   **Correct.**

14   Q.   At what point was your vehicle when you
15   saw the reverse light?

16   A.   **Maybe five to six car lengths back.**

17   Q.   And you were still in the process of
18   slowing down.

19   A.   **Correct.**

20   Q.   How long has it been since you've seen the
21   cloud of dust, between the cloud of dust and the
22   reverse light?

23   A.   **One or two seconds.**

24   Q.   Okay.  Have you seen brake lights prior --
25   Oh, I'm sorry.  Let me say this again.

**Page 150**

1        On Oak -- It's Oak Grove, had you seen the
2   car brake at any time?

3   A.   **On Oak Grove?**

4   Q.   Yeah.

5   A.   **Prior to the cloud of dust?**

6   Q.   Yeah.

7   A.   **No.**

8   Q.   Subsequent to the cloud of dust, did you
9   see any brake lights?

10   A.   **When I went into reverse, I think I went**
11   **forward again, and then I saw brake lights.**

12   Q.   Okay.  So, while you are slowing down, you
13   saw the reverse light come on?

14   A.   **Correct.**

15   Q.   Okay.  And you are about five to six car
16   lengths back when this first began.

17   A.   **Correct.**

18   Q.   And what exactly happened next?

19   A.   **Then the vehicle's reverse lights went**
20   **off --**

21   Q.   Okay.

22   A.   **-- and the vehicle appeared to move**
23   **forward.**

24   Q.   Could have?  Did you say could have?  I --

25   A.   **Appeared to.**

**Page 151**

1   Q.   Appeared to, okay.
2        Were its driving lights on, its headlights
3   and taillights at this time?

4   A.   **I don't recall.**

5   Q.   And how is it that it appeared that the
6   vehicle moved forward?  What were you observing that
7   moved?  What did you see move with your eye while you
8   were slowing down that caused you to believe the
9   vehicle was moving forward?

10   A.   **The car moved into the brush area more.**

11   Q.   So when you first saw the cloud of dust,
12   you saw the reverse light for one or two seconds, and
13   then it went off, correct?

14   A.   **Correct.**

15   Q.   And after it went off is when you saw the
16   vehicle move forward?

17   A.   **Correct.**

18   Q.   Okay.  If -- So, you saw the vehicle
19   itself.  Since the brake lights are no longer
20   illuminated, the reverse lights are illuminated; so,
21   what you are observing is the vehicle without lights;
22   is that correct?

23   A.   **I don't recall if the lights were on, but**
24   **I observed the vehicle moving forward.**

25   Q.   Okay.  But as we've testified today, you

**Page 152**

1   don't remember seeing lights on the vehicle, or do you?

2   A.   **I don't remember if he ever turned the**
3   **headlights on or the taillights on.**

4   Q.   Well, my question is, if you close your
5   eyes and picture the car as you saw it when it started
6   moving, are -- in that picture, are your lights on or
7   off?

8   A.   **At what point?**

9   Q.   The point when the reverse light comes off
10   and the vehicle moves forward.

11   A.   **If the headlights were on?**

12   Q.   Or the taillights.

13   A.   **I don't recall the taillights on, but I**
14   **saw the brake lights illuminate.**

15   Q.   Okay.  But my understanding, that the
16   reverse light illuminated, and then it went off, and
17   then there was a period of time where there was light,
18   but before the brake lights came on and the car moved.

19   A.   **From the time the reverse lights went off**
20   **to when the brake lights went on was maybe two seconds.**

21   Q.   Okay.  So, there is one -- you said a
22   two-second period of time after the reverse lights go
23   off before the brake lights come on, correct?

24   A.   **Correct.**

25   Q.   And is it your testimony that during those

**Page 153**

1  Q. two-second period, that you observed the vehicle move?
2  A. **Correct.**
3  Q. Okay. And how far were you, at the point
4  that the brake lights first come on, how far are you
5  away from the subject vehicle?
6  A. **At that time, maybe two to three car**
7  **lengths.**
8  Q. Your vehicle is still moving.
9  A. **Yes.**
10  Q. It's still slowing down.
11  A. **Correct.**
12  Q. At this point in time, have you received
13  any information about this chase from any outside
14  agency?
15  A. **I have not.**
16  Q. Okay. Has Officer Torr discussed with you
17  what you are going to do next?
18  A. **No.**
19  Q. Has Officer Torr given you any
20  information, from Dispatch, or from anyone else,
21  regarding this chase?
22  A. **He did not.**
23  Q. Is it fair to say that from the beginning
24  of this chase until now, you have primarily been
25  concentrating on driving?

**Page 154**

1  A. **Correct.**
2  Q. And that, but for a few comments that we
3  discussed, you really haven't heard a lot of what
4  Officer Torr or Dispatch are saying to each other.
5  A. **Correct.**
6  Q. Okay. And Officer Torr, because you are
7  in an exigent circumstance, hasn't had time to sort of
8  catch-you-up with the information that's coming in.
9  A. **I don't know if it's so much**
10  **catching-me-up. I mean, his primary duty is to talk to**
11  **our Dispatch and relay information.**
12  Q. Okay. But he hasn't really relayed any
13  information to you.
14  A. **Not too much, no.**
15  Q. Okay. And you haven't really relayed any
16  information to him.
17  A. **Correct.**
18  Q. Okay. You see the brake light come on.
19  And you are looking through this cloud of dust?
20  A. **Correct.**
21  Q. The sole source of illumination is your
22  headlights?
23  A. **Correct.**
24  Q. Okay. Spotlight, is on or off?
25  A. **I don't recall Officer Torr turning it on.**

**Page 155**

1  Q. Okay. Siren?
2  A. **It's on.**
3  Q. On?
4  A. **Yes.**
5  Q. And your emergency lights are still
6  activated.
7  A. **Correct.**
8  Q. How long did the brake light stay lit?
9  A. **I don't recall.**
10  Q. Moments? Stay lit until the end of the
11  day? Did it go off -- Sorry.
12  Did the brake light go off again?
13  A. **I don't recall.**
14  Q. Okay. So the last thing you remember
15  about looking at the brake lights is seeing them come
16  on when you are two to three car lengths away from the
17  subject vehicle.
18  A. **Correct.**
19  Q. And you don't have a recollection of
20  whether they come back on or off subsequent to that.
21  A. **Correct.**
22  Q. Okay. From the moment that you see the
23  brake lights illuminate until you stop your vehicle,
24  your patrol vehicle, did you observe the subject
25  vehicle move?

**Page 156**

1  A. **From the time I stopped?**
2  Q. From the time you saw the brake lights
3  until the time you stopped, between those two periods
4  of time, did you observe the subject vehicle move?
5  A. **I don't recall.**
6  Q. Were you able to determine, after seeing
7  the brake lights, how Oak Grove terminated, how the
8  street of Oak Grove ended or terminated, were you able
9  to observe that?
10  A. **It dead-ended into Green Oaks.**
11  Q. Okay. Is that a "T" intersection?
12  A. **Correct.**
13  Q. With Oak Grove being the part that
14  terminates on the "T"?
15  A. **Correct.**
16  Q. Okay. How far from the shoulder line on
17  Green Oaks was the subject vehicle located at the point
18  that you come to a stop?
19  A. **I think I stopped the patrol car about ten**
20  **feet behind him.**
21  Q. Okay. And where --
22  You only stopped the patrol car at this
23  part of the incident one time. You took up a single
24  position in this incident.
25  A. **At this point?**

| | |
|---|---|
| 1 Q. Yeah. | 1 Q. Any rocks? |
| 2 A. Yes. | 2 A. There were some rocks, yes. |
| 3 Q. Okay. And you made a tactical decision as | 3 Q. How big were the rocks? |
| 4 to where to stop your vehicle. | 4 A. They were -- I think there were two |
| 5 A. Correct. | 5 boulders. I'm not quite sure about that. |
| 6 Q. Okay. And your testimony is that the | 6 Q. Boulders, as big as a medium-sized TV? |
| 7 subject vehicle was about 10 feet from your vehicle | 7 A. Probably a little smaller than the TV |
| 8 when you stopped. | 8 there. |
| 9 A. Approximately, yes. | 9 Q. Okay. Do you want to just use feet, so |
| 10 Q. Okay. Explain to me why you chose the | 10 the record is clearer? |
| 11 particular place to stop that you did. | 11 A. Maybe ten feet in diameter. |
| 12 A. It's what I decided to do, stop right | 12 Q. I'm sorry? |
| 13 there. | 13 A. Maybe 10 feet in diameter. |
| 14 Q. Okay, I understand that was your decision. | 14 Q. Okay. So one or two boulders of that |
| 15 What I'm asking you is to share with me | 15 size? |
| 16 why there? Why didn't you stop 100 feet back? Why | 16 A. I recall there being two, yes. |
| 17 didn't you drive 10 feet forward? | 17 Q. And they were present in the path that the |
| 18 Why did you choose that particular | 18 vehicle, the Honda had gone, correct? |
| 19 location to stop your vehicle? | 19 A. They were, yes. |
| 20 A. Well, if I would have drove forward, I | 20 Q. Okay. Was there a telephone pole there? |
| 21 would have ended up in the brush area, as the suspect | 21 A. There was a pole, yes. |
| 22 did. So, I decided to keep the patrol car on the | 22 Q. Was there a -- Do you know what a guy wire |
| 23 asphalt, just in case we had to get going again. | 23 is? |
| 24 Q. Okay. So, that the factor that determined | 24 A. Yes. |
| 25 where you stopped was the ability of your car to move | 25 Q. Was there guy wires -- any guy wires |
| Page 157 | Page 159 |

| | |
|---|---|
| 1 again, if necessary? | 1 holding up the pole? |
| 2 A. Possibly. | 2 A. I don't recall. |
| 3 Q. Any other factors with went into the | 3 Q. Any kind of guard rail? |
| 4 decision to stop where you did? | 4 A. I don't think so. |
| 5 A. And also to block him in, and hope to | 5 Q. Okay. Approximate diameter of the trees, |
| 6 prevent him from leaving again. | 6 what kind of trees were they, how big or small? |
| 7 Q. Okay. And you obviously recalled the | 7 A. They were good-sized trees. |
| 8 incident moments earlier, when you had failed to block | 8 Q. Would you describe the area as |
| 9 him in, and he had gotten away. | 9 heavily-wooded? |
| 10 A. Yes. | 10 A. Yes. |
| 11 Q. That was present in your mind when | 11 Q. And the front wheel of your CHP cruiser is |
| 12 positioning yourself this time. | 12 at the edge of the roadway; is that correct? |
| 13 A. Correct. | 13 A. Close to it. |
| 14 Q. And you tried to position yourself this | 14 Q. Close to the edge of the roadway. |
| 15 time in such a way as to block him in, without | 15 And you are guessing there is about |
| 16 jeopardizing the ability of the patrol vehicle to move, | 16 10 feet between the front of your car and the back of |
| 17 if necessary. | 17 the Honda? |
| 18 A. Correct. | 18 A. Approximately, yes. |
| 19 Q. Okay. | 19 Q. Okay. And are any of these objects that |
| 20 In the area that you described, I think | 20 we've described, the boulders, the trees, the telephone |
| 21 you used the word "brush". I'm not sure. | 21 pole, in-between where your vehicle is and the Honda? |
| 22 How would you describe the area that the | 22 A. I think the boulders are in-between. |
| 23 Honda was in? | 23 Q. Okay. |
| 24 A. Brush, trees, it's a wooded area; dirt; a | 24 A. I don't recall the telephone pole or the |
| 25 lot of leaves on the ground. | 25 trees being in the way. |
| Page 158 | Page 160 |

**Page 161**

1  Q.  But the boulders were in the path that, if
2 you kept going to the bumper of the Honda, you would
3 hit the boulders.
4  A.  Yes.
5  Q.  And if the Honda backed out in your
6 direction, it would hit the boulders.
7  A.  Correct.
8  Q.  Okay.  When you stopped your car, did you
9 shut your vehicle off?
10  A.  I did not, no.
11  Q.  Did you place your vehicle in "park"?
12  A.  I did.
13  Q.  Does your siren shut off when your vehicle
14 is in "park"?
15  A.  It does.
16  Q.  Did it?
17  A.  Yes.
18  Q.  Okay.  Lights:  All the other lights
19 stayed on?
20  A.  Yes.
21  Q.  At this point, is your spotlight being
22 utilized?
23  A.  I'm not sure if Officer Torr turned it on.
24  Q.  You are not sure.
25  A.  Yeah.

**Page 162**

1  Q.  But you don't recall seeing the spotlight
2 illuminating anything.
3  A.  I'm not sure if he turned it on.  I don't
4 recall.
5  Q.  You don't -- He may have; he may not have.
6      My question is, do you remember the
7 spotlight illuminating the scene in any way?
8  A.  I do not, no.
9  Q.  Okay.  Did you have your low beams on or
10 your high beams on the car, if you know?
11  A.  I think, with the "Code 3" lights, I think
12 it's the high beams on that are functioning.
13  Q.  Okay.  Do you have any conversation with
14 Officer Torr before you get out of your vehicle?
15  A.  No.
16  Q.  He has no conversation with you?
17  A.  No conversation.
18  Q.  Do you get out of your vehicle immediately
19 upon putting it in "park"?
20  A.  Yes.
21  Q.  Does Officer Torr get out of the vehicle
22 immediately upon you putting the vehicle in "park"?
23  A.  He does.
24  Q.  Okay.  When your vehicle comes to a stop,
25 do you observe brake lights on the Honda?

**Page 163**

1  A.  I don't recall.
2  Q.  Do you recall reverse lights?  This is
3 when you first stopped your vehicle.
4  A.  I saw the reverse lights prior to coming
5 to a stop.
6  Q.  Okay.  You saw reverse lights.  You saw
7 brake lights.  You come to a stop.
8  A.  Correct.
9  Q.  We're now at the stop.
10  A.  Correct.
11  Q.  Before you got out of the car, you
12 assessed the scene, didn't you?
13  A.  No.
14  Q.  Did you determine before you got out of
15 your vehicle whether the Honda was moving or
16 stationary?
17  A.  I couldn't tell.
18  Q.  You say you couldn't tell whether the
19 vehicle is moving or not moving when you got out of
20 your car, correct?
21  A.  Correct.
22  Q.  When you got out of your vehicle, did you
23 look to see if the brake lights were on or not?
24  A.  I did not.
25  Q.  You did not.

**Page 164**

1  A.  (Nodding head.)
2  Q.  Did you look to see whether the reverse
3 lights were on or not?
4  A.  I did not.
5  Q.  And you don't recall any memory of that,
6 either.
7  A.  After the stop --
8  Q.  At this moment, you are getting out of
9 your car.  You don't recall now any memory of whether
10 the subject vehicle was moving at that time?
11  A.  When --
12  Q.  When you first --
13  A.  -- approaching the car, the -- I could
14 hear the engine revving at a high rate.
15  Q.  Okay.  We'll come back to that.
16      But the car itself was not moving, as
17 far as you could tell.
18  A.  I cannot tell, yes.
19  Q.  Okay.  You couldn't tell -- You don't
20 recall the brake lights being on --
21  A.  I do not --
22  Q.  -- when you first got out?
23  A.  No.
24  Q.  And you don't recall the reverse lights
25 being on when you first got out.

| |
|---|
| 1   A.   **Correct.** |
| 2   Q.   But you do recall hearing an engine rev. |
| 3   A.   **Correct.** |
| 4   Q.   Okay.  And it was sort of the same thing |
| 5  as before:  Was the engine at a fixed rpm, revolutions |
| 6  per minute -- |
| 7   A.   **Yes.** |
| 8   Q.   -- and holding, or was it going up and |
| 9  down/up and down? |
| 10   A.   **It was maintaining.** |
| 11   Q.   Okay. |
| 12   And it was maintaining a high rate of |
| 13  engine's revolutions, so that the motor would sound |
| 14  strained, and so forth?  Rpm's, you are familiar with |
| 15  rpm's. |
| 16   A.   **It was maintaining a high rate of rpm's.** |
| 17   Q.   Okay.  It was loud. |
| 18   A.   **Yes.** |
| 19   Q.   Okay.  What do you do upon exiting your |
| 20  vehicle, what's the next thing you do? |
| 21   A.   **Run towards the driver's-side door.** |
| 22   Q.   Okay.  And you were planning -- What were |
| 23  you planning to do when you started towards the |
| 24  driver's-side door, what was your plan in your mind |
| 25  that you were going to do? |

Page 165

| |
|---|
| 1   A.   Well, my goal, my hope were to apprehend |
| 2  the suspect right then and there. |
| 3   Q.   Okay.  And how was it that you planned to |
| 4  apprehend him? |
| 5   A.   **I was just hoping that, him seeing me, he** |
| 6  **would realize that it was time to come to a stop.** |
| 7   Q.   Okay.  Because you weren't even sure he |
| 8  had seen you on the previous stop, because you had |
| 9  never made eye contact with him, correct? |
| 10   MR. DEVINE:  Objection:  Calls for |
| 11  speculation. |
| 12   MR. DAAR:  Q.  You still have to answer |
| 13  the question. |
| 14   A.   **Oh, repeat it.** |
| 15   Q.   The question is, you are not even sure |
| 16  that the driver actually saw you on the previous |
| 17  occasions, because you never made eye contact with the |
| 18  driver, correct? |
| 19   A.   **I don't recall making eye contact with** |
| 20  **him.** |
| 21   Q.   Okay.  So you have no recollection of him |
| 22  ever looking at you and you looking at him? |
| 23   A.   **Correct.** |
| 24   Q.   Okay.  And so, your plan or hope was that |
| 25  you would approach the driver's vehicle, the |

Page 166

| |
|---|
| 1  driver's-side door, and get the person to get out of |
| 2  the car and submit to being arrested. |
| 3   A.   **Correct.** |
| 4   Q.   Did you have any plan strategically with |
| 5  Officer Torr as to how he would approach the car? |
| 6   A.   **No.** |
| 7   Q.   Did you have any knowledge, based on your |
| 8  training and experience, or anything else, as to where |
| 9  Officer Torr would position himself in the situation? |
| 10   A.   **I did not.** |
| 11   Q.   The distance between your driver's door |
| 12  and the driver door of the subject vehicle would be |
| 13  about 10 feet, correct? |
| 14   A.   **Approximately, yes.** |
| 15   Q.   When you got out of the vehicle, did you |
| 16  see where Officer Torr went? |
| 17   A.   **He went to the right, and that's the last** |
| 18  **I saw of him.** |
| 19   Q.   Okay.  When you say "went to the right," |
| 20  did he take a straight line between where he got out of |
| 21  the car and the nearest location on the Honda? |
| 22   A.   **I do not know.** |
| 23   Q.   Okay.  The last time you saw him, he was |
| 24  moving to the right, away from the vehicle, your |
| 25  vehicle. |

Page 167

| |
|---|
| 1   A.   **The last time I saw him, he was getting** |
| 2  **out of the passenger's door.** |
| 3   Q.   Okay.  So the last view you had of Officer |
| 4  Torr is as he's getting out. |
| 5   A.   **Correct.** |
| 6   Q.   And since he's on the right side, you |
| 7  assume he went to the right, since he didn't wind up |
| 8  behind you. |
| 9   A.   **I don't know which way he went.** |
| 10   Q.   Okay.  So all you know is he got out of |
| 11  the car. |
| 12   A.   **Yes.** |
| 13   Q.   And you don't know anything more than |
| 14  that. |
| 15   A.   **Yes.** |
| 16   Q.   Okay.  Your attention is focused on that |
| 17  driver? |
| 18   A.   **Yes.** |
| 19   Q.   Now, do you have any information as to |
| 20  whether this person is armed or not? |
| 21   A.   **I do not.** |
| 22   Q.   Obviously, that would be one of your |
| 23  concerns in the situation. |
| 24   A.   **Yes.** |
| 25   Q.   When you are doing a stop after a pursuit, |

Page 168

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

NELSON GONZALES VS. MICHAEL NOVOSEL, ET AL.
USDC, NORTHERN DIST. OF CA No. CV07-04720 CRB
Case 3:07-cv-04720-CRB Document 54-20 Filed 09/11/2008 Page 46 of 63

Deposition of MICHAEL NOVOSEL
April 17, 2008

1 and when you have concerns about someone being armed,
2 your safety: What steps do you take to avoid the
3 possibility of that person acquiring a weapon and
4 hurting you? What kind of tactical things do you do to
5 lessen the risk to you?
6     A.   **You could conduct a felony stop.**
7     Q.   Okay. What's a --
8      How do you conduct a felony stop?
9     A.   **Stop the patrol car. You get out. You**
10 **instruct them to exit their vehicle, at which time you**
11 **apprehend them.**
12     Q.   And does that mean you stay behind the
13 door of your vehicle and give the instructions?
14     A.   **The vehicle door.**
15     Q.   Your vehicle door.
16     A.   **Yes.**
17     Q.   And why would you stay behind your vehicle
18 door?
19     A.   **More protection.**
20     Q.   Protection against being, what?
21     A.   **Possibly, shot at.**
22     Q.   Because the door is made of metal, and
23 would stop a bullet.
24     A.   **It won't stop a bullet.**
25     Q.   Okay. Slow it down?

Page 169

1     A.   **Maybe.**
2     Q.   Okay. But the concept of getting behind
3 the door is to put you in a protected position?
4     A.   **Correct.**
5     Q.   And from that position, you then give
6 verbal commands.
7     A.   **Yes.**
8     Q.   And they call that a "Felony Stop,"
9 because that's the way that you do a stop in a
10 high-risk situation; is that true?
11     A.   **I'm not sure why they call it "Felony**
12 **Stop," but that's the way I was trained.**
13     Q.   Well, were you trained to employ those
14 tactics when you suspect someone is armed?
15     A.   **You can, yes.**
16     Q.   Well, was there a preferred method of
17 approaching a vehicle in which you think somebody is
18 armed that you are taught?
19     A.   **Mainly, it's to conduct a Felony Stop --**
20     Q.   Okay.
21     A.   **-- yes.**
22     Q.   All right. So you are taught that, if you
23 are afraid of -- the person is being armed, you would
24 conduct a Felony Stop, to keep yourself in relative
25 safety of the door.

Page 170

1     A.   **Yes.**
2     Q.   Okay. You decided, as you are in the
3 moments that you had, not to use that procedure.
4 correct?
5     A.   **Correct.**
6     Q.   Okay. Why is it that you decided not to
7 remain in a relatively safe position behind the door?
8     A.   **I felt that, based on everything that had**
9 **occurred, that, not knowing that backup was there, and**
10 **that, I felt my best approach was to approach the**
11 **driver, maybe by surprise, and apprehend him right then**
12 **and there.**
13     Q.   Okay. So, you thought that you had the
14 element of surprise as a tactical advantage at that
15 point?
16     A.   **Possibly.**
17     Q.   Okay. Even notwithstanding the fact that
18 you had just your siren, the lights are going full
19 bore?
20     A.   **It didn't stop him prior.**
21     Q.   I'm sorry?
22     A.   **The lights and siren didn't stop him prior**
23 **to the incident.**
24     Q.   Right. But I'm just -- You felt that you
25 might surprise -- that your presence might surprise

Page 171

1 him.
2     A.   **Correct.**
3     Q.   And that's one of the reasons you chose
4 not to employ the "Felony Stop".
5     A.   **Yeah. My -- I decided to approach the**
6 **car, and to apprehend him right then and there, and not**
7 **give him the possibility of trying to drive off again,**
8 **and possibly injuring myself, my partner, or the**
9 **public.**
10     Q.   So, to prevent him from driving off again,
11 or injuring you or your partner, you decided to
12 approach the vehicle.
13     A.   **Yes.**
14     Q.   When you got out of the car, did you
15 unholster your weapon?
16     A.   **I did.**
17     Q.   Are you a righty or lefty?
18     A.   **Right-handed.**
19     Q.   Okay. I assume your weapon is in your
20 right hand?
21     A.   **Correct.**
22     Q.   Do you have a flashlight?
23     A.   **I do.**
24     Q.   Were you using it?
25     A.   **I was not.**

Page 172

```
 1    Q.  Spotlight -- Still no spotlight from the
 2 car, that your aware of, just the headlights.
 3    A.  Correct.
 4    Q.  Now, when you got out of the car, you see
 5 the Honda, you hear the engine revving.
 6    A.  Yes.
 7    Q.  You don't see neither a brake light at
 8 this point, nor reverse.
 9        Did you ascertain what the person in the
10 vehicle was doing at the moment you got out of the
11 car?
12    A.  I did not.
13    Q.  Did you have any visual on the driver when
14 you got out of car?
15    A.  Out of the patrol car?
16    Q.  Yeah.
17    A.  I just observed him sitting in the
18 driver's seat.
19    Q.  Okay.  So you could observe the back of
20 his head.
21    A.  Yes.
22    Q.  The shoulders, the top of his shoulders?
23    A.  I just recall seeing his head.
24    Q.  Could you see either of his hands?
25    A.  No.
                                          Page 173
```

```
 1    Q.  The engine is revving.  Can you see him
 2 doing anything when you first got out of the car?
 3        I know you hear the engine, but can you
 4 see the body moving in any way?
 5    A.  I did not, no.
 6    Q.  Okay.  Do you then walk towards the
 7 driver's door of the subject vehicle?
 8    A.  I ran towards it.
 9    Q.  You run.
10    A.  (Nodding head.)
11    Q.  Okay.  Are you attempting, as you run
12 towards the Honda, to make observations about the
13 driver, to determine whether or not you were in a safe
14 position?
15    A.  When I ran towards the Honda, I kind of
16 went off to the left, and so I could -- I was maybe
17 five or ten -- well, approximately 5 feet from the
18 driver's door.
19    Q.  Meaning, you didn't take the most direct
20 route; is that what you're telling me?
21    A.  Correct.
22    Q.  Okay.  So you didn't take the most direct
23 route between the two vehicles.  You took a path that
24 wound up terminating with you 5 feet from the driver's
25 door?
                                          Page 174
```

```
 1    A.  Correct.
 2    Q.  5 feet parallel, but 5 feet away, or
 3 behind 5 feet?
 4    A.  Five feet parallel.
 5    Q.  Okay.  So, at that point, if you turned to
 6 your right, you would see through the driver's window
 7 at the driver.  You were parallel to the driver?
 8    A.  Yeah, but I was facing him.
 9    Q.  So you turn, and you actually, you were
10 facing the driver.
11    A.  Yes.
12    Q.  Okay.  And you have your gun out.
13    A.  Correct.
14    Q.  Is it one hand, or do you hold it with two
15 hands, or how were you holding the gun out?
16    A.  I don't recall.
17    Q.  And you are facing the driver.
18    A.  Yes.
19    Q.  And it's taking a second or two to go from
20 the door to this position --
21    A.  Maybe --
22    Q.  -- however how long it takes to run five
23 or six feet --
24    A.  Couple seconds, yeah.
25    Q.  Okay.  You still don't know where Torr is.
                                          Page 175
```

```
 1    A.  Correct.
 2    Q.  What do you -- The engine's rev --
 3        We used two different words:  One is
 4 "revving" and one is "revved".
 5        The engine is still revved at a high rpm
 6 that's constant?
 7    A.  Correct.
 8    Q.  And it's just wound out. [making a sound]
 9    A.  Yes.
10    Q.  No up and down.
11    A.  [No audible response].
12    Q.  Okay.  From the time you exit your vehicle
13 to the time you take the position 5 feet to the side of
14 the driver's door of the Honda, did you observe the
15 Honda move?
16    A.  I did.
17    Q.  Okay.  What did you observe in terms of
18 movement of the Honda during that period of time?
19    A.  I was observing the Honda going left to
20 right, the front of the vehicle, and then back and
21 forth again.
22    Q.  Okay.  How far back did it go from its
23 position?
24    A.  If I recall, inches.
25    Q.  Okay.
                                          Page 176
```

1    A.   Yeah.
2    Q.   Inches?
3    A.   Maybe inches to feet.
4    Q.   Okay.  Inches to feet.
5         So, you see it go back inches to feet.
6  And then, why does it -- If you know, why does it stop
7  going?  What causes it not to continue backwards?
8    A.   The driver shifting it to go back forward.
9    Q.   Okay.  So, from your observation, it
10  appeared to you that the driver intended to pull
11  forward, and was merely backing up to get traction.
12    A.   It looked like he -- It appeared to me that
13  was attempting to get traction, yes.
14    Q.   So, he could drive forward.
15    A.   Forward or back.
16    Q.   Well, he backed -- you just said he backed
17  up inches to feet.  And why -- and then you said he
18  changed the direction at that point, and went forward?
19    A.   Correct.
20    Q.   Okay.  And so, it was a volitional
21  decision by the driver, as far as you could tell, to
22  stop going backwards and start going forwards.
23    A.   Correct.
24    Q.   Okay.  From the time that the car went
25  forward, did you see anything stop his forward

Page 177

1  forward a few feet?
2    A.   It goes back again.
3    Q.   A third time.
4    A.   It went -- It did that repeatedly.
5    Q.   More than three times.
6    A.   Several, several times.
7    Q.   "Several, several" is a hard number.
8         Three?  Two?  Four?  How many times did
9  it go back?
10    A.   Repeatedly.
11    Q.   You told me about two so far.  And now
12  you've indicated there is a third.
13    A.   A third, and there is a fourth --
14    Q.   Okay.
15    A.   -- and there is a fifth.
16    Q.   Okay.
17    A.   -- and a sixth; and maybe more than that.
18    Q.   All right.  Six, possibly more times, the
19  car went back inches to feet, correct?
20    A.   It's maintaining -- it's maintaining feet.
21    Q.   Okay.  Just to get your words right, so
22  I'm clear:  Five to six times the car goes back a few
23  feet.
24    A.   At least six times.
25    Q.   At least six.  Six times or more?

Page 179

1  progress?
2    A.   No.
3    Q.   Okay.  How far forward did it go?
4    A.   Maybe a foot or two.
5    Q.   Okay.  It went forward a foot or two.
6         And then what happened?
7    A.   And then it went back again.
8    Q.   Okay.  So, for some reason it goes forward
9  a foot or two, and for reason unknown to you, it then
10  reverses.
11    A.   Correct.
12    Q.   Okay.  And how far back does it go the
13  second time?
14    A.   A couple feet.
15    Q.   It goes back a couple of feet.
16         And then, can you tell why it stops?  Why
17  didn't it go -- just hit your car?
18    A.   I do not know why it stopped.
19    Q.   Okay.  So, no idea why it stopped.
20         It goes back a few feet, stopped, and
21  then what happens?
22    A.   And then goes forward again.
23    Q.   Goes forward again.  Again, a few feet?
24    A.   Yes.
25    Q.   Okay.  And what happens after it goes

Page 178

1    A.   I'm throwing "six" out.  It could be
2  seven, it could be eight.  I wasn't keeping track,
3  so...
4    Q.   Okay.  Five, six, seven or eight times the
5  car goes backwards several feet.
6         Are there correspondingly a number of
7  times it goes forward?
8    A.   It goes forward, and the front wheels are
9  going left to right.
10    Q.   I'm sorry?
11    A.   And the front tires are being turned left
12  to right.
13    Q.   Okay, we'll get to left to right.
14         But right now, the forward part, it goes
15  forward six or more times equivalent to the number of
16  backwards shots?
17    A.   I don't know if six times.  You know, like
18  I said, I wasn't keeping track --
19    Q.   Okay.  Whatever the number is --
20    A.   -- but it repeatedly went back and forth.
21    Q.   More than three, more than -- maybe more
22  than six, but it goes forward and it goes backwards?
23    A.   Repeatedly, yes.
24    Q.   Repeatedly, okay.  And you can't tell why
25  it stops when it goes backwards, and you can't tell

Page 180

Deposition of MICHAEL NOVOSEL    NELSON GONZALES VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008    USDC, NORTHERN DIST. OF CA., No. C 07-04720 CRB

Case 3:07-cv-04720-CRB    Document 52-2    Filed 05/12/2008    Page 49 of 63

1 it stops when it goes forward, correct?
2   A.  Correct.
3   Q.  Okay.  And you observe all this from the
4 time you leave your vehicle to you get in your position
5 5 feet off the door.
6   A.  Correct.
7   Q.  Okay.  And you're watching the driver make
8 motions in the vehicle to cause the vehicle to do
9 these -- all these various things, correct?
10   A.  Correct.
11   Q.  Okay.  Now, you have some concern, I would
12 imagine, that this person who is driving pretty wild
13 may have a weapon?
14   A.  Possibly, yes.
15   Q.  And so your training is that you are
16 trying to, at all times, observe where his hands are,
17 correct?
18   A.  Correct.
19   Q.  Okay.  Have you said anything at this
20 point?
21   A.  I was yelling at the driver to --
22   Q.  When did you start yelling, from the
23 moment you get out of the car, from the time you get to
24 that position five feet off where you stopped?
25   A.  To that position.

Page 181

1   Q.  Okay.  But up until the time you get to
2 that position, you haven't yelled yet.
3   A.  I don't recall.
4   Q.  Okay.  Your first good observation -- I
5 mean, when you get out of the car, you really can't see
6 anything but his shoulders and head.
7   A.  Correct.
8   Q.  And you must be very concerned about what
9 else he's doing.
10   A.  Correct.
11   Q.  So you go to a position where you can see
12 what else he's doing the best you can, while being
13 safe.
14   A.  Yes.
15     MR. DEVINE:  Counsel, you are making
16 statements, and then asking him to sign-off on it.  If
17 you could form it in the phrase of a question, I'd
18 appreciate it.
19     MR. DAAR:  Okay.  I get carried away.
20   Q.  So when you arrive at that position to
21 make an observation about what his hands are doing for
22 your safety, what do you see?
23   A.  I see his left hand on the steering wheel,
24 and I see his right hand appear to going back and
25 forth.

Page 182

1   Q.  His right hand doing what?
2   A.  Going in a back-and-forth motion.
3   Q.  Okay.  Consistent with what activity?
4   A.  With the car going back and forth.
5   Q.  Okay.  Well, do you see it touching
6 something, or just -- what part of the arm do you see,
7 when you see on the right arm?
8   A.  I see his right arm just going in a
9 back-and-forth motion.
10   Q.  Okay.  And you can't tell where it's
11 connected to anything.  His hand --
12   A.  I assume it's his body --
13   Q.  -- you can't see his hand?  My bad.
14     You can't see his hand.
15   A.  Well, I can just see his upper body doing
16 it.
17   Q.  Just his upper body.  You can see his left
18 hand, but you can't see his right hand.
19   A.  Correct.
20   Q.  Okay.  And the left hand is going back and
21 forth on the steering wheel.
22   A.  Left and right, yes.
23   Q.  Left and right, okay.
24     And the car is just revved.
25   A.  Correct.

Page 183

1   Q.  Okay.  Is he sitting in a normal position
2 that one sits when you drive?  Anything unusual about
3 how he is sitting?
4   A.  I didn't notice anything.
5   Q.  Okay.  Sitting up in the vehicle?
6   A.  I just saw him sitting there.
7   Q.  Okay.  And did he appear injured in any
8 way?
9   A.  It didn't appear so.
10   Q.  Okay.
11     All right.  So you see his right-hand
12 going back and forth.  You see his left-hand on the
13 wheel.  You are 5 feet away.
14     And you yell what at him?
15   A.  I repeatedly yelled at him to "Stop the
16 car.  Get out of the car.  Turn the car off."
17     That wasn't working.
18     And then I started yelling, "Get the fuck
19 out of the car.  Turn the fucking car off."
20 Repeatedly.
21   Q.  All right.  How long did you stay at that
22 position, 5 feet away, when you verbally come at him?
23 How long did that period of time last?
24   A.  No more than ten seconds.
25   Q.  And his hand movements is consistent with

Page 184

Case 3:07-cv-04220-CRB    Document 47    Filed 09/11/2008    Page 50 of 63

**Page 185**

1 what you described during those ten seconds:  In other
2 words, left hand is on the wheel, right hand is going
3 back and forth.  Right arm.  You can't see the hand.
4    A.   Correct.
5    Q.   And then you decide to do something else,
6 other than try to verbally command the subject.
7         What is your plan?  What is the plan in
8 your mind when you leave that location?
9    A.   Well, prior to approaching the driver, he
10 looked at me one time, and -- but didn't acknowledge my
11 presence in -- with words, or anything, just looked at
12 me -- or appeared to look at me;
13         And then he went back to looking
14 straight ahead again.
15         And then I continued to yell at him, at
16 which time I approached the -- the driver's door.
17    Q.   Okay.  Was his driver's-side window open
18 or closed?
19    A.   It was open.
20    Q.   Radio on or off?
21    A.   I don't know.
22    Q.   Vehicle lights:  His vehicle lights on or
23 off?
24    A.   Inside lights?
25    Q.   Outside lights.

**Page 186**

1    A.   I don't know.
2    Q.   Any interior illumination on the Honda?
3    A.   I don't recall.
4    Q.   Okay.  Your -- In your mind, did you have
5 a planned course of action that you were going to take
6 after the verbal commands, "Stop," and you started
7 moving to him:  What was your plan?
8    A.   Well, my plan was to, you know, to make
9 him realize that it's time to give up.  It's over.  The
10 police are here.  You are not going anywhere.
11    Q.   Okay.  You had tried to do that verbally.
12    A.   Correct.
13    Q.   But had failed.
14    A.   Correct.
15    Q.   Or at least not -- it hasn't worked yet.
16         So, did you try to do something else to
17 bring the situation to a conclusion?
18    A.   I grabbed his left shoulder with my left
19 hand.
20    Q.   Okay.  So did you decide that you were
21 going to try to physically remove the driver from the
22 vehicle before you took any action?  Was that a
23 decision you made?
24    A.   My decision was to -- is to grab his
25 shoulder, and make him realize that we're here.

**Page 187**

1    Q.   Okay.  And -- All right.
2         At that time, right before you grabbed the
3 arm, were you aware of any other units arriving?
4    A.   I was not.
5    Q.   Okay.  You still don't know where Torr is.
6    A.   Correct.
7    Q.   And the car is still revved at a very high
8 rate of speed?
9    A.   Yes.
10    Q.   Did it seem to you -- That's me, I'm
11 sorry.
12         Did it seem to you -- (cell phone
13 ringing).
14         Did it seem to you that, even though he
15 looked at you, did you have a sense that he didn't
16 sense your presence?
17         MR. DEVINE:  Objection.  Calls for
18 speculation.
19         MR. DAAR:  Q.  You had said to me, that
20 you wanted him to know you were there.
21    A.   Mm-hmm.
22    Q.   Right?
23    A.   (Nodding head.)
24    Q.   You had lights.  You had sirens.  You were
25 standing out there.  But did part of you think that

**Page 188**

1 this guy was just not connecting?
2    A.   I didn't know what was I -- what I was
3 dealing with.
4    Q.   I'm sorry?
5    A.   I didn't know what I was dealing with.
6    Q.   You didn't know what you were dealing
7 with, okay.  So, it was an unknown situation to you.
8    A.   Correct.
9    Q.   Okay.  And you couldn't figure out why the
10 person wasn't responding, you didn't have an
11 understanding of that.
12    A.   I had no idea why.
13    Q.   Okay.  So, you approached the driver.  And
14 you closed the 5 feet between you and the door.
15    A.   Correct.
16    Q.   Okay.  Does the driver respond in any
17 fashion to your moving from your position of verbal
18 commands to the door?
19    A.   No.
20    Q.   Okay.  You have your weapon in the right
21 hand.
22    A.   Correct.
23    Q.   Okay.  And you are facing the driver's
24 door of the Honda?
25    A.   Yes.

| | |
|---|---|
| 1   Q.   And your -- How far is the -- your belt<br>2 buckle from the body of the Honda at the point that you<br>3 grabbed this guy's arm?<br>4   **A.   Maybe a foot.**<br>5   Q.   All right.  And what part of his arm do<br>6 you grab?<br>7   **A.   His left shoulder.**<br>8   Q.   His shoulder, okay.<br>9     You are facing him, correct?<br>10   **A.   Correct.**<br>11   Q.   You are facing him.<br>12     And you grab his left shoulder with your<br>13 left arm.<br>14   **A.   Correct.**<br>15   Q.   And the gun, the weapon that you are<br>16 holding in the right-hand, how are you holding it at<br>17 the time that you are grabbing the left arm, where is<br>18 it pointed?<br>19     MR. SCOTT:  Shoulder, counsel.<br>20     MR. DAAR:  Q.  Shoulder, I'm sorry.  Left<br>21 shoulder.<br>22   **A.   It is raised above my left hand -- or left**<br>23 **arm.**<br>24   Q.   Raised above?<br>25   **A.   It was pointing at the driver.**<br>Page 189 | 1   Q.   Okay.  I don't know.  So the safety is off<br>2 all the time.<br>3   **A.   Yes.**<br>4   Q.   So, you don't have to do anything with<br>5 your weapon prior to firing it.<br>6   **A.   Correct.**<br>7   Q.   Okay.  When you impact --<br>8     When you grab his left shoulder, does he<br>9 react?<br>10   **A.   No.**<br>11   Q.   Is his left hand still on the steering<br>12 wheel?<br>13   **A.   Yes.**<br>14   Q.   Is the car still revved?<br>15   **A.   It is.**<br>16   Q.   Can you see the right hand, now that you<br>17 are up against the vehicle?<br>18   **A.   I can.**<br>19   Q.   And what's the right hand doing?<br>20   **A.   It's on the shifter, the column shifter.**<br>21   Q.   Okay.  And you see the right hand going<br>22 back and forth?<br>23   **A.   Correct.**<br>24   Q.   And does the car appear to be going<br>25 forward and backwards, continuing while you are there?<br>Page 191 |
| 1   Q.   So you still have it pointed at the<br>2 driver.<br>3   **A.   Correct.**<br>4   Q.   And it's raised above your left arm,<br>5 meaning that the elevation of the gun is higher than<br>6 where your arm is intersecting with his shoulder.<br>7   **A.   But the gun isn't elevated; it's pretty**<br>8 **much parallel with --**<br>9   Q.   Pretty much what?<br>10   **A.   Parallel with the driver.**<br>11   Q.   So your arm is straight and parallel to<br>12 the ground and pointed at the driver?<br>13   **A.   Yes, above my left arm.**<br>14   Q.   I'm sorry?<br>15   **A.   Above my left arm.**<br>16   Q.   But it's above your left arm.<br>17   **A.   Yes.**<br>18   Q.   Is your safety on or off?<br>19   **A.   It's off.**<br>20   Q.   I'm sorry?<br>21   **A.   It's off.**<br>22   Q.   Off.  When do you turn the safety off?<br>23   **A.   It's never on.**<br>24   Q.   I'm sorry?<br>25   **A.   The safety is never on.**<br>Page 190 | 1   **A.   It is.**<br>2   Q.   Okay.  Torr is still not visible.<br>3   **A.   Correct.**<br>4   Q.   And the engine is still revving.<br>5   **A.   Yes.**<br>6   Q.   Have you now heard any other sirens, or<br>7 seen any other lights?<br>8   **A.   I have not.**<br>9   Q.   Or heard anything?<br>10   **A.   I haven't heard anything.**<br>11   Q.   Okay.<br>12     You pull at his left shoulder.  He's<br>13 continuing to turn the wheel.  What do you do next?<br>14   **A.   I think I was, you know, still yelling at**<br>15 **him to turn the car off and get out.**<br>16     **I mean, I didn't try to pull him out of**<br>17 **the window, or anything like that.**<br>18   Q.   Okay.  Did you try to pull his arm off the<br>19 steering wheel, so you could stop the vehicle from<br>20 moving?<br>21   **A.   Not so much, no.**<br>22   Q.   Okay.  So, did you ever succeed at pulling<br>23 his hand off of the steering wheel?<br>24   **A.   I did not.**<br>25   Q.   I'm sorry?<br>Page 192 |

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

| | |
|---|---|
| 1     A.   I did not.<br>2          MR. DEVINE:  Objection.  Misstates his<br>3  testimony.  He says he never tried to pull the hand off<br>4  the wheel.<br>5          MR. DAAR:  Okay, that's correct.<br>6     Q.   As a result of your pulling, did the hand<br>7  ever come off his steering wheel?<br>8     A.   It did not.<br>9     Q.   Okay.  How long did you have hold of his<br>10 left shoulder?<br>11    A.   Seconds.<br>12    Q.   Okay.  Did you make a decision about what<br>13 you were going to do next at this point?<br>14    A.   I did.<br>15    Q.   Okay.  What was your decision?<br>16    A.   My decision was to, after realizing<br>17 that -- not knowing where Officer Torr was, and in the<br>18 position that I was in, with the car moving, and<br>19 thinking, any at time, it could grab traction, possibly<br>20 run me over, and possibly killing me, possibly killing<br>21 Officer Torr, and fearing for his life and my life, I<br>22 decided to fire at the driver.<br>23    Q.   You were standing within 12 inches of the<br>24 driver's door.<br>25    A.   Close to it, yes.<br><div align="right">Page 193</div> | 1     You decided you didn't -- it wasn't<br>2  necessary for you to move out of the way in response<br>3  to the left/right movements.<br>4     A.   And I maintained my position.<br>5     Q.   Okay.  And did you have any reason to<br>6  believe that the car could successfully move in a<br>7  greater left to right radius, and put yourself in<br>8  danger?<br>9     A.   I did.<br>10    Q.   What were the reasons that you believed<br>11 that?<br>12    A.   I didn't -- You know, the car at any time,<br>13 I thought, could have grabbed traction, left or right,<br>14 or back and forth.<br>15    Q.   Well, okay.  Well, just, you were weighing<br>16 these things in your mind at the time, the best you<br>17 could, in the very short period of time you have to<br>18 deal with, correct?<br>19    A.   Very short period.<br>20    Q.   I understand.<br>21         And do you believe, from where you were<br>22 standing, 12 inches away from the driver's door that,<br>23 had the car gained traction, it could have struck<br>24 you?<br>25    A.   Easily.<br><div align="right">Page 195</div> |
| 1     Q.   And you didn't know where Torr was.<br>2     A.   I did not, no.<br>3     Q.   The car, while you were there up until<br>4  this moment, had it succeeded in moving more than 2 or<br>5  3 feet forward or backwards?<br>6     A.   Yes.<br>7     Q.   Is that correct?<br>8     A.   Correct.<br>9     Q.   You say that the -- and he was turning the<br>10 wheel from left to right; is that correct?<br>11    A.   Correct.<br>12    Q.   Was the car moving from left to right?<br>13    A.   It was.<br>14    Q.   Okay.  How many feet did the car move from<br>15 left to right, or right to left?<br>16    A.   I think, 1 to 2 feet.<br>17    Q.   Okay.  So, were you readjusting your<br>18 position relative to the car because of its continuing<br>19 movement when you stood by the door?<br>20    A.   No.<br>21    Q.   It was not necessary for you to do that,<br>22 because the car didn't come close enough to hit you,<br>23 and you didn't have to reposition yourself?<br>24    A.   It was close to me.<br>25    Q.   I appreciate that.  But you didn't --<br><div align="right">Page 194</div> | 1     Q.   It easily could have struck you.<br>2     A.   Yes.<br>3     Q.   Okay.  And would it have struck you going<br>4  in a forward direction?  Would the wheel, all the way<br>5  turned to the left, is that the manner in which the<br>6  vehicle would have struck you?<br>7     A.   I don't know which way it would have<br>8  struck me.<br>9     Q.   Or it could strike you going in a<br>10 backwards direction.  I'm just trying to understand,<br>11 with the wheel turned all the way turned to the right,<br>12 is that what you were thinking?<br>13    A.   I wasn't sure which way the car could have<br>14 possibly struck me.<br>15    Q.   You considered the risk equal from the<br>16 forward or reverse, in terms of your being struck from<br>17 your position 12 inches off the door?<br>18    A.   Yes.<br>19    Q.   Are you taught in the Academy where the<br>20 safest place to stand is to protect yourself from a<br>21 vehicle that you are afraid is going to hit you on a<br>22 stop?<br>23    A.   It depends what type of stop.<br>24    Q.   Okay.  How about a stop in which the<br>25 person has run in the past, and poses a risk to you,<br><div align="right">Page 196</div> |

1 that kind of stop: What's your training tell you is a
2 safe place to stand?
3     A.   **To conduct a Felony Stop.**
4     Q.   So, in the Felony Stop, you have the
5 protection of your vehicle --
6     A.   **Correct.**
7     Q.   -- to prevent the other vehicle from
8 striking you --
9     A.   **Possibly, yes.**
10     Q.   -- right?  Possibly striking you.  Now,
11 obviously, when you are dealing with a vehicle that may
12 move, there are places that are more or less dangerous
13 than other places in your training, right?
14     A.   **Yes.**
15     Q.   Obviously, if you stand directly in front
16 of or directly behind a vehicle, that would be more
17 dangerous than standing in some other location.
18     A.   **Correct.**
19     Q.   Okay.  Are you trained as to where the
20 safest place, other than from a Felony-Stopped position
21 is, to be dealing with a vehicle that may try to leave?
22     A.   **They just tell us not to stand in front or**
23 **behind the car.**
24     Q.   Okay.  And you never received any training
25 about standing close to the driver's door?

Page 197

1     A.   **I don't recall.**
2     Q.   Okay.  Did anything occur, prior to your
3 shooting Mr. Gonzales, that led you to believe that,
4 notwithstanding the fact that the car had gone back and
5 forth six or seven times, without success, that it was
6 going to succeed?  Were you aware of any facts which
7 led you to believe, after all of these unsuccessful
8 attempts, the car was going to get free?
9         MR. DEVINE:  I'll stop you.  That
10 misstates his testimony.
11         He's testified that it not only moved
12 forward and backwards, but also from side to side, so
13 you left out that element.
14         MR. DAAR:  Okay, let me add it back in, so
15 we're fair, then.
16     Q.   You observed the car going left to right.
17 You observed the car going back and forth.
18         You observed it six -- with your own
19 words -- seven, eight, or even more times, in both axes
20 of direction.
21         Prior to your shooting, were you aware of
22 any information, knowledge, or anything else, which
23 caused you to believe that the car, after failing six,
24 seven or eight times, was now going to free itself?
25     A.   **I did not receive any information, no.**

Page 199

1     A.   **They tell us not to reach in for the car**
2 **keys.**
3     Q.   Okay.  Not to reach in for the car keys.
4 Why is that?
5     A.   **The driver can possibly grab your arm, and**
6 **drive off with you.**
7     Q.   How about reaching in for that shoulder,
8 what do they teach you about that?
9     A.   **They didn't say anything about that.**
10     Q.   Okay.  Do you think a different --
11         Do you think the concerns about reaching
12 in for the keys are different when you reach in to
13 grab the left shoulder?
14     A.   **Yes.**
15     Q.   Okay.  So, does any of your training tell
16 you that, by standing between the pillar between the
17 driver's and passenger door, that that is one of the
18 safest places to approach the vehicle, if you are
19 concerned about the vehicle moving in a way to harm
20 you?
21     A.   **Well, I felt it was a safe spot.**
22     Q.   Okay.  You felt it was a safe spot.
23     A.   **Yes.**
24     Q.   Okay.  You are not sure if you were
25 trained as to that being a safe spot or not.

Page 198

1     Q.   Okay.  Did you consider retreating to the
2 Felony-Stopped position?
3     A.   **I did not.**
4     Q.   Why not?
5     A.   **Because the subject needed to be stopped**
6 **right then and there.**
7     Q.   The subject needed to being stopped right
8 then and there.
9         Why did the subject needed to be stopped
10 right then and there, if doing so would have put both
11 you and Torr at risk?
12     A.   **Well, I was already at the point where I**
13 **was already -- had his left shoulder.**
14     Q.   Hmm?
15     A.   **I already -- I was at the point where I**
16 **already had his left shoulder.**
17         **And, I mean, it's a split-second**
18 **decision that, you know, if the car was going to grab**
19 **at any time then and there, with the jerking back and**
20 **forth, left and right, then, I was seriously possibly**
21 **going to get hurt, along with Officer Torr;**
22         **So, I was definitely in fear for my life**
23 **and my partner's life, and I decided to act.**
24     Q.   Okay.  Did you consider the alternative,
25 of retreating to the Felony-Stopped position, thereby

Page 200

Page 201

1  acquiring a 4,000-pound shield, your car?
2       MR. DEVINE: Objection: Argumentative,
3  and asked and answered.
4       MR. DAAR: I'll rephrase the
5  "argumentative" part.
6       Q.  Did you consider at that point retreating
7  to a Felony-Stopped position, for sake of your safety?
8       A.  I did not.
9       Q.  You don't know if you considered it?
10      A.  No, I said I did not.
11      Q.  You did not even consider that.
12      A.  (Shaking head.)
13      Q.  Is there a reason that you did not
14  consider that?
15      A.  I just felt that the time was then and
16  there to stop him.
17      Q.  Okay.  I understand that you felt that the
18  time was then and there to stop him.
19      I understand that you decided you didn't
20  consider -- or you decided not to retreat.
21      What I'm asking you is why was the time
22  then and there?
23      MR. DEVINE: Counsel, he's already
24  addressed that two times: He's said that he feared for
25  his life and the life of his partner.

Page 202

1       MR. DAAR: Mm-hmm.
2       MR. DEVINE: So, you can bring up the fact
3  that he could have retreated something.
4       He's already said that he shot him at
5  that specific point, because he feared for his life
6  and the --
7       MR. DAAR: Q.  Had you --
8       MR. DEVINE: -- safety of his partner's
9  life --
10      MR. DAAR: Okay.
11      Q.  Had you --
12      MR. DEVINE: -- so please don't ask it six
13  ways to Sunday.
14      MR. DAAR: Well, here's seven:
15      Q.  [MARKED QUESTION]:
16      How -- How, if you had retreated to the
17  Felony-Stopped position, would you be in a safer
18  position with respect to the risks posed by that
19  vehicle?
20      MR. DEVINE: Objection.  Calls for
21  speculation.  You don't have to answer.
22      MR. DAAR: Okay.  Are you instructing him
23  not to answer that?
24      MR. DEVINE: I'm instructing him not to
25  answer.

Page 203

1       MR. DAAR: On speculation?
2       MR. DEVINE: Sure.  Yeah.  Absolutely.
3       MR. DAAR: Okay.  Then, let's mark that
4  one.
5       Q.  When you let go of his left shoulder --
6       When you let go of his left shoulder,
7  had you already formed a decision that you were going
8  to shoot?
9       A.  I already shot.
10      Q.  Okay.  So you shot while holding on to his
11  left shoulder.
12      A.  Correct.
13      Q.  How many times did you shoot?
14      A.  Five times.
15      Q.  Were you holding on to his left shoulder
16  the whole time?
17      A.  No.
18      Q.  When did you let go of his left shoulder?
19      A.  I don't recall.
20      Q.  From the first shot to the last shot, did
21  you ever change your position?
22      A.  I did.
23      Q.  What did you do?
24      A.  I -- After -- At the last shot I was
25  standing at the left rear door of the Honda.

Page 204

1       Q.  So you stepped backwards and away prior to
2  firing the last shot.
3       A.  I stepped back, I was firing all five
4  shots.
5       Q.  You stepped back away from the vehicle as
6  you were firing.
7       A.  As -- Not away from the vehicle, but along
8  the left side of the vehicle.
9       Q.  You were backing -- You were moving
10  towards the back side of the vehicle as you were
11  shooting.
12      A.  I was moving towards the left rear door of
13  the vehicle.
14      Q.  I'm sorry?
15      A.  I was moving towards the left rear door of
16  the vehicle.
17      Q.  Maintaining the same relative distance
18  from the body of the car?
19      A.  Yes.
20      Q.  Parallel to the car moving backwards.
21      A.  Yes.
22      Q.  As you are shooting.
23      A.  Correct.
24      Q.  So you are holding on to his left shoulder
25  during the first shot or two, and then you let go, or

**Page 205**

1  at what point did you let go?
2      A.  **The first shot I was -- I had his left**
3  **shoulder, and after that, I don't remember.**
4      Q.  You fired the first shot.  Did you see
5  where the bullet went?
6      A.  **No.**
7      Q.  Did you see the person react to being
8  shot -- Well, I don't know if he was shot.
9          Did it appear he had been shot after the
10 first bullet?
11     A.  **It didn't appear so.**
12     Q.  Okay.  Did -- The car still revved?
13     A.  **It did.**
14     Q.  It still revved.
15     A.  **It still revved.**
16     Q.  Going backwards for a minute:  Did you
17 observe any of the tires spinning?
18     A.  **I don't recall.**
19     Q.  We'll have to go backwards --
20     A.  **I remember the dust still coming up.**
21     Q.  You remember the dust.  But what I want to
22 ask you now is, from the time you got out of your
23 patrol vehicle when you stopped at this final place
24 until the time you shoot, did you observe the front
25 tires spinning?

**Page 206**

1      A.  **I just -- I observed the dust coming up**
2  **still, so I guess they were still spinning.**
3      Q.  You saw dust, which led you to believe
4  they were spinning, but you didn't see them spin.
5      A.  **Correct.**
6      Q.  Okay.  Was the dust in front of the car,
7  behind the car?  Where was the dust?
8      A.  **All over the car.**
9      Q.  All over the car.
10         You let go of his arm.  You fired a
11 second shot, correct?
12         MR. DEVINE:  Objection.  That misstates
13 his testimony.  Please ask a question.
14         MR. DAAR:  Q.  When did you let go of his
15 arm, in terms of the shots, at what point?
16     A.  **I don't recall.**
17     Q.  Sometime towards the end of the shots you
18 had let him go, you just don't know when.
19     A.  **Correct.**
20     Q.  After the -- And after the first shot, no
21 change in any of the circumstances, correct?
22     A.  **Correct.**
23     Q.  And you fired a second time.
24     A.  **Yes.**
25     Q.  Okay.  Did you see where the second shot

**Page 207**

1  went?
2      A.  **I did not.**
3      Q.  Any reaction?
4      A.  **I don't recall.**
5      Q.  Were you looking to see if you had struck
6  the person you were shooting at?
7      A.  **I was just -- I was looking at the person,**
8  **but I -- I wasn't looking at them to see what they were**
9  **doing after each shot.**
10     Q.  Okay.  Why were you backing up?
11     A.  **It's just -- It's just the way I went.  I**
12 **don't know why.**
13     Q.  No tactical reason for backing up?
14     A.  **No.**
15     Q.  Okay.  Were you holding your weapon with
16 one or two hands?
17     A.  **I don't recall.**
18     Q.  Did you fire the five shots in quick
19 succession?
20     A.  **Yes.**
21     Q.  Did you observe anything change with
22 respect to the driver after the third shot?
23     A.  **I don't recall it, no.**
24     Q.  The engine is still revved?
25     A.  **I don't recall.**

**Page 208**

1      Q.  Well, were you listening for such a thing
2  at the time?
3      A.  **[No audible response].**
4      Q.  I mean, I understand you don't recall.
5  But had the car all of a sudden stopped revving, would
6  that have impacted your activities?
7      A.  **I don't know.  Possibly; but, I mean, I**
8  **was just hearing the gunshots.**
9      Q.  Okay.  Did you see any part of the vehicle
10 that your shots impacted --
11     A.  **I did not.**
12     Q.  -- after the third one?
13     A.  **No.**
14     Q.  Okay.  You stepped further back.  And then
15 you fire four.  And then you fire five.
16     A.  **Yes.**
17     Q.  Did you see any of those shots hit?
18     A.  **I'm not sure if it was the fourth or fifth**
19 **shot, but one of those shots shattered the left rear**
20 **passenger window.**
21     Q.  Mm-hmm.
22     A.  **And that's when I came to a stop, right**
23 **then and there; and I stopped shooting, too.**
24     Q.  And why did you stop on the fifth shot?
25     A.  **I just stopped.  I don't know why.**

NELSON GONZALES VS. MICHAEL NOVOSEL, et al.    Deposition of MICHAEL NOVOSEL
USDC - NORTHERN DIST. OF CA No. CV07-04720 CRB    April 17, 2008
Case 3:07-cv-04720-CRB   Document 52   Filed 09/11/2008   Page 56 of 63

**Page 209**

1  Q.  So you don't have any recollection of why
2  you stopped shooting?
3     A.  No.
4     Q.  Do you have any recollection of why you
5  continued to shoot after the first shot?
6     A.  No.
7     Q.  Second shot?
8     A.  No.
9     Q.  Do you have any recollection of why you
10  decided to take a third shot?
11    A.  No.
12    Q.  Or the fourth?
13    A.  No.
14    Q.  And the fifth, you stopped, but you don't
15  know why you stopped.
16    A.  I think the shattering of the window, you
17  know, kind of hearing that sound, I think kind of put
18  everything in perspective, so that's when I stopped.
19    Q.  So the shattering of the window kind of,
20  you say, put everything in perspective.
21    A.  (Nodding head.)
22    Q.  And were you no longer in danger at that
23  point?
24    A.  I did not know.
25    Q.  Okay.

**Page 210**

1        So you stopped shooting, but you didn't
2  know as to whether or not you were. . .
3        Between the time you started shooting and
4  the time you stopped shooting, the only thing that
5  occurred that impacted your decision to shoot was the
6  breaking of the window.
7     A.  The impact of my decision to shoot?
8     Q.  You had decided you were going to fire the
9  gun at Nelson Gonzales.
10    A.  Correct.
11    Q.  And you started firing the gun at Nelson
12  Gonzales.
13    A.  Correct.
14    Q.  The only thing that occurred that you've
15  told me so far to cause you to stop firing the gun at
16  Nelson Gonzales was the shattering of the window.
17        MR. DEVINE:  I'm going to object to this.
18  That also misstates his testimony, counsel.  He said
19  that he didn't have any type of response from Nelson
20  Gonzales on the first four shots, and then he had a
21  response from him on the fifth shot.
22        MR. DAAR:  Q.  Oh, I didn't hear that.
23        You had a response from Nelson Gonzales
24  on the fifth shot?
25    A.  No, I didn't --

**Page 211**

1     Q.  Well, did the -- Oh, I must have misheard.
2        Did -- did you see something occur with
3  Nelson Gonzales on the fifth shot that caused you to
4  stop?
5     A.  After the window shattered --
6     Q.  Yeah?
7     A.  -- I stopped, and then I saw him kind of
8  slumped in the driver's seat.
9     Q.  But you didn't see him slumped until after
10  you stopped shooting.
11    A.  Correct.
12        MR. DAAR:  Okay.
13        Time out.  Let's take a break.
14        THE VIDEOGRAPHER:  Here marks the end of
15  Videotape No. 3, Volume No. I, in the deposition of
16  Michael Novosel.  Going off the record, the time is
17  2:46 p.m.
18        (Brief recess taken.)
19        THE VIDEOGRAPHER:  Here begins Videotape
20  No. 4, Volume No. I in the deposition of Michael
21  Novosel.  Back on the record, the time is 2:59 p.m.
22        Counsel, please continue.
23        MR. DAAR:  Q.  Where were you aiming when
24  you fired the five shots?  What were you aiming at?
25    A.  At the subject.

**Page 212**

1     Q.  I'm sorry?
2     A.  At the subject.
3     Q.  Okay.  And when you fired your first shot,
4  what portion of the subject was visible to you?
5     A.  The upper body.
6     Q.  Okay.  So where in the upper body did you
7  aim your first shot?
8     A.  At his head.
9     Q.  Okay.  Were the second, third, fourth and
10  fifth shots also directed at his head?
11    A.  I don't recall where they were directed.
12    Q.  Okay.  But as you backed away from the
13  vehicle, the only part of him that would be visible
14  would be the shoulders and head?
15    A.  Part of his upper body through the
16  driver's seat.
17    Q.  And the first time that you noticed any
18  reaction to the shots was after the fifth shot, when
19  the windows shattered?
20    A.  I'm not sure if it was the fourth or fifth
21  shot that shattered the window.
22    Q.  But the first reaction to the shooting
23  that you observed Nelson Gonzales was that he was
24  slumped --
25    A.  Yes.

**Page 213**

1    Q.   -- forward?
2    A.   **Slumped.**
3    Q.   Was his body resting against the steering
4 wheel?
5    A.   **No, un-un.**
6    Q.   Was his body slumped to the side, towards
7 the passenger seat, over the armrest?
8    A.   **He was upright, but just slumped; so, his**
9 **head was down.**
10   Q.   Okay.  And was he wearing a seat belt?
11   A.   **I don't recall.**
12   Q.   Okay.  When you saw him slump, his
13 shoulders were still in contact with the seat back?
14   A.   **I think they were slumped forward a**
15 **little.**
16   Q.   So, his head was forward, and his
17 shoulders were off the seat back, but he hadn't gone
18 far enough to be leaning against the steering wheel?
19   A.   **Correct.**
20   Q.   Prior to the window shattering, did the
21 engine stop being revved?
22   A.   **I noticed it being stopped after the**
23 **window shattered.**
24   Q.   Okay.  Do you recall the engine stopped
25 being revved after the window shattered?

**Page 214**

1    A.   **I remember the engine being revved after**
2 **the first and second shot, but from three to five, I**
3 **don't recall.**
4    Q.   You don't recall it being revved, or you
5 don't recall whether or not it was revved?
6    A.   **Whether or not it was revved.**
7    Q.   Okay.  But after the window broke, you
8 believe that the engine at that point wasn't revved.
9    A.   **Correct.**
10   Q.   Okay.  After that -- the last shot,
11 immediately after the last shot, were you aware of
12 whether or not there were any other units in the area?
13   A.   **No.**
14   Q.   After you finished shooting, in that
15 moment, were you aware of where Officer Torr was?
16   A.   **After my last shot, no.**
17   Q.   Okay.  What did you do after your last
18 shot?
19   A.   **I walked towards the driver to see what**
20 **was happening.**
21   Q.   Okay.  How many steps did you take to get
22 there?
23   A.   **I don't recall.**
24   Q.   How many feet behind the driver's door
25 were you at the time you fired your last shot?

**Page 215**

1    A.   **I walked from the left rear passenger door**
2 to the driver's door.
3    Q.   Okay.  And when you got there, what did
4 you see?
5    A.   **The driver slumped.**
6    Q.   And where were the driver's hands?
7    A.   **I don't recall.**
8    Q.   Okay.  What did you do next?
9    A.   **At that time Officer Torr came over to my**
10 **location, opened the door, and got the driver out.  We**
11 **ended up handcuffing him.**
12   Q.   That's the first time that you would have
13 seen Officer Torr since he left your vehicle when you
14 first stopped after the crash, correct?
15   A.   **Correct.**
16   Q.   Did Officer Torr unbuckle Mr. Gonzales'
17 seat belt?
18   A.   **I don't recall.**
19   Q.   Did Nelson Gonzales -- could you tell
20 whether he was alive or not when you -- when Officer
21 Torr approached the vehicle to get him out?
22       MR. DEVINE:  I'm going to object.  Isn't
23 Nelson Gonzales alive?
24       MR. DAAR:  Alive.
25       MR. DEVINE:  So, could he tell whether he

**Page 216**

1 was alive, or not?
2       MR. DAAR:  Q.  Correct, yeah.  Whether he
3 was living or dead.  I don't know how else to say it.
4    A.   **He was alive.**
5    Q.   Okay.  You could tell he was still alive.
6    A.   **Yes.**
7    Q.   How could you tell he was still alive?
8    A.   **He was still making noise; he was still**
9 **breathing.**
10   Q.   And Officer Torr removed him from the
11 vehicle?
12   A.   **Yes.**
13   Q.   Was he placed face down on the ground?
14   A.   **He was.**
15   Q.   And was he cuffed?
16   A.   **He was.**
17   Q.   And did you -- Were you involved in any of
18 those activities?
19   A.   **I assisted Officer Torr in handcuffing**
20 **him.**
21   Q.   When you took him to the -- When you took
22 him out of the vehicle, was he resisting in any way?
23   A.   **No.**
24   Q.   Were you aware of any blood?  Was he
25 bleeding?  Were you aware of him bleeding at the time

A. MAGGI SAUNDERS & ASSOCIATES (415) 383-6281
57 Plymouth Avenue, Mill Valley, California 94941

**Page 217**

1  you took him out of the vehicle?
2     A.  No.
3     Q.  When you placed him face down on the
4  ground, were you aware of any bullet entry holes?
5     A.  When we placed him face down is when I saw
6  the blood on his shirt, on the back.
7     Q.  When you placed him face down, you could
8  see a bloody portion on the back of his shirt.
9     A.  Correct.
10    Q.  Just one.
11    A.  That's all I saw, yes.
12    Q.  And he was breathing?
13    A.  Yes.
14    Q.  And he was, you say, mumbling?
15    A.  Correct.
16    Q.  And did you or Officer Torr cuff him?
17    A.  I'm pretty sure it was Officer Torr.
18    Q.  All right.  After he's cuffed, on the
19  ground, did you then become aware there were other
20  units present?
21    A.  I did.
22    Q.  Okay.  Which units were present when you
23  looked up?
24    A.  Two Sheriff Deputies.
25    Q.  Okay.  And that was the first time that

**Page 218**

1  you were aware that they were at the scene.
2     A.  Correct.
3     Q.  During the time the vehicle was moving
4  left to right and backwards and forwards, were you able
5  to observe the actual tires moving, or did you just
6  observe the vehicle itself move?
7     A.  The vehicle moving.
8     Q.  You didn't have a vision of the tires
9  turning or moving?
10    A.  I saw the tires going left to right, too.
11    Q.  Okay.  And that would be the front tire?
12    A.  Correct.
13    Q.  Okay.  So, from your position, you could
14  see it turning left and right, the front tire.
15    A.  Correct.
16    Q.  Okay.  Did you ever consider other options
17  for stopping Mr. Gonzales from leaving the scene or
18  hurting someone, other than shooting him?
19    A.  I did not.
20    Q.  You did not consider any other options.
21    A.  No.
22    Q.  Okay.  Did you after Mr. Gonzales was
23  secured observe whether or not there was anything in
24  front of the vehicle that would impede its forward
25  progress?

**Page 219**

1     A.  I did not.
2     Q.  Okay.  Did you notice anything in the back
3  of the vehicle that would have impeded the vehicle's
4  backward progress?
5     A.  No.
6     Q.  Okay.  When an officer is involved in a
7  shooting, such as just occurred for you, what does your
8  training tell you to do after the subject is secure?
9  What are you supposed to do in an officer-involved
10  shooting?
11    A.  Administer first aid.
12    Q.  I'm sorry?
13    A.  Administer first aid.
14    Q.  Okay.  Did you attempt to do that?
15    A.  When that started, another CHP units and
16  Deputies who were arriving handled that.
17    Q.  Okay.  So, based on your training and
18  experience, what do you do, now you've been involved in
19  this incident; Mr. Gonzales is being cared for by other
20  officers:  What are you supposed to do next?  What do
21  you do?
22    A.  After the incident I went back to the
23  office.
24    Q.  Okay.  Did you drive back in your unit?
25    A.  No.

**Page 220**

1     Q.  Did you go in another unit?
2     A.  I did.
3     Q.  Did someone else drive you?
4     A.  Yes.
5     Q.  Did someone take your service revolver or
6  weapon?
7     A.  No, not until I got to the office.
8     Q.  Okay.  And what's the procedure, when you
9  are involved in a shooting when you get to the office,
10  what happens?  What do you do?
11    A.  Let's see.  They took pictures of me in
12  uniform.  Handed the weapon in as evidence.  Gunshot
13  residue on my fingers.  Give a blood test.
14        And then I was interviewed by my
15  department, the District Attorney and Atherton PD.
16    Q.  And that interview occurred how many hours
17  after the shooting?
18    A.  Approximately eight hours.
19    Q.  And who was present?  You had mentioned a
20  District Attorney, Atherton, CHP.
21        Anyone else present during the
22  interview?
23    A.  Yes, my area rep was there.
24    Q.  A union person?
25    A.  Correct.

Case 3:07-cv-04720-CRB   Document 52-2   Filed 09/11/2008   Page 59 of 63

1  Q.  A lawyer, or just a union person?
2  A.  **A union person.**
3  Q.  Okay.  Was any lawyer present?
4  A.  **Actually, let me strike that.  Sorry.**
5     **There was a lawyer there.  I'm sorry.**
6  **There was.  The rep was not there.  It was a lawyer.**
7  Q.  Okay.  And you gave an interview about the
8  events that occurred that day, correct?
9  A.  **Correct.**
10  Q.  Was it recorded, the interview?
11  A.  **I'm pretty sure.**
12  Q.  Okay.  And since that day, have you ever
13  listened to the tape of the interview?
14  A.  **I have not.**
15  Q.  I'm sorry?
16  A.  **No.**
17  Q.  Did you ever review --
18     Was there a report prepared that
19  reflected what occurred during that interview?
20  A.  **There was.**
21  Q.  By Atherton PD?
22  A.  **Correct.**
23  Q.  Did you get a chance to review that
24  report?
25  A.  **I did.**

Page 221

1  Q.  A lawyer, or just a union person?
1  car.
2  Q.  Okay.  I thought you had indicated, or
3  your testimony today, that you were 5 feet off the --
4  Oh, you are correct --
5  A.  **No, this is the first time he came to a**
6  **stop.**
7  Q.  Oh, okay.
8  A.  **(Continuing to review the report).**
9     **Page 35.**
10  Q.  Mm-hmm?
11  A.  **The second paragraph from the bottom**
12  **again, second sentence, where it says:**
13     **"V-Novosel fired two to three more shots**
14     **at the driver."**
15     **I just fired five.**
16  Q.  So just to be clear, the first sentence
17  and the last sentence of that paragraph are accurate,
18  it's the middle sentence that's inaccurate.
19  A.  **Correct.**
20  Q.  Okay.
21  A.  **That's all I see.**
22  Q.  Okay.  And you testified at a preliminary
23  hearing in Redwood City, correct?
24  A.  **Correct.**
25  Q.  Have you ever seen a transcript of that

Page 223

1     MR. DAAR: Is this -- I show you what I've
2  marked as Exhibit A.  Make that No. 1.
3     **(Atherton Police Department, Supplement**
4     **10, 8/29/06 marked Plaintiff's Exhibit 1**
5     **for identification.)**
6     MR. DAAR: Q.  Okay.  Looking at this
7  document, does this appear to be the report that was
8  prepared reflecting your interview?
9  A.  **Correct.**
10  Q.  And have you reviewed this --
11     How recently have you reviewed this
12  report relative to today?
13  A.  **I reviewed it last night.**
14  Q.  Okay.  In reviewing this report, is there
15  anything in the report that does not accurately state
16  what you told the Atherton PD that night?
17  A.  **(Looking through the report).**
18     **Page 33, second paragraph from the**
19  **bottom, where it says:**
20     **"V-Novosel ran up to the Honda's**
21     **driver's window and yelled at the**
22     **driver."**
23     **I didn't run up to the driver's window.  I**
24  **was just standing kind of in the left quarter panel of**
25  **the patrol car -- I mean, left fender of the patrol**

Page 222

1  testimony?
2  A.  **I have not.**
3  Q.  Subsequent to your interview with the
4  Atherton PD and other people regarding this incident,
5  have you, other than to your attorney, have you been
6  subject to an interview by any other law enforcement
7  personnel regarding this incident?
8  A.  **No.**
9  Q.  So that is the only -- the sole time that
10  you've given a statement to law enforcement about these
11  events.
12  A.  **Correct.**
13  Q.  Okay.  Have you ever been back to the
14  scene to view it yourself since the incident?
15  A.  **I have.**
16  Q.  Okay.  How long after the incident did you
17  go back to the scene?
18  A.  **Maybe three to four months after.**
19  Q.  Okay.  Who did you go back with?
20  A.  **My partner, Officer Walsh.**
21  Q.  Okay.  And did you discuss with Officer
22  Walsh these events?
23  A.  **I did.**
24  Q.  Anything about the scene that, when you
25  went back, surprised you, compared to your memory?

Page 224

1    A.    Yes.
2    Q.    What surprised you, compared to your
3 memory.
4    A.    The actual location where the vehicle came
5 to a stop.
6    Q.    And how was that different than you
7 remembered it?
8    A.    It was much --
9         MR. DEVINE: Objection. Assumes facts not
10 in evidence. You are saying that there is a
11 difference. What -- You are saying something surprised
12 you.
13        MR. DAAR: I'm surprised. No.
14    Q.    Whatever, something surprised you -- let's
15 use that word -- I'm sorry; your word was "surprise".
16        Something surprised you about the scene,
17 compared with your memory.
18    A.    Just how much tighter of a space it was.
19    Q.    Meaning, the proximity of the trees, the
20 telephone pole, the boulders, and everything else, that
21 the wooded area was a more confined space than you
22 remembered it.
23    A.    No, not so much the telephone pole --
24    Q.    Okay.
25    A.    -- but the wooded area, the trees, and
Page 225

1 everything, yes.
2    Q.    It appeared more crowded, confined than
3 you remembered --
4    A.    Correct.
5    Q.    -- is that fair?
6    A.    Correct.
7    Q.    Okay. Have you reviewed any reports
8 prepared by other officers regarding this incident?
9    A.    I have not.
10    Q.    Have you looked at any physical evidence
11 regarding this incident? Have you examined any
12 evidence that was collected at the scene, or anything
13 like that?
14    A.    No.
15    Q.    Have you reviewed photographs taken at the
16 scene?
17    A.    The ones that were at the preliminary
18 hearing.
19    Q.    Okay. And other than the preliminary
20 hearing?
21    A.    No.
22    Q.    Have you conducted any independent
23 research or investigation into this incident?
24    A.    No.
25    Q.    Okay. Other than Officer Walsh, have you
Page 226

1 discussed, and other than your attorney, have you
2 discussed with anyone else what happened that night?
3    A.    My wife.
4    Q.    Okay. Anyone else beyond that?
5    A.    That's it.
6         MR. DAAR: Okay. We're almost done for
7 the day. What's the time?
8         MS. COLWELL: Almost 3:30.
9         MR. DAAR: Q. In your training, have you
10 encountered a concept of "Shoot and Assess"?
11    A.    I don't recall.
12    Q.    Have you encountered any strategy or
13 methodology for tactically taking a second assessment
14 of a situation after a decision to shoot?
15        MR. DEVINE: Objection. Vague.
16        MR. DAAR: Yeah, let me reword that.
17    Q.    Are you trained in any way to conduct an
18 evaluation or an assessment of a situation, after
19 making a decision to use deadly force in the form of a
20 weapon?
21    A.    I don't quite understand.
22    Q.    Did anything in your training suggest to
23 you that, after discharging your weapon a certain
24 number of times, the officer should stop and reevaluate
25 the situation?
Page 227

1    A.    No.
2    Q.    Okay. How were you trained in respect to
3 making the decision as to whether or not to employ
4 deadly force? What is your training in that regard?
5    A.    There is no training. It's your
6 perception and what you feel is -- when you know deadly
7 force is necessary.
8    Q.    Okay. What was the first thing you said?
9 Did you say there is no training?
10    A.    I don't know if there is a training --
11    Q.    Okay.
12    A.    -- but it's -- it's the individual's
13 perception when deadly force is needed.
14    Q.    Okay. So, the training that you now
15 recall, if any, had to do with the individual's
16 perception as to whether the force is needed; is that
17 fair?
18    A.    No. I don't think it's training. I think
19 it's -- it all comes down to the individual --
20    Q.    Okay.
21    A.    -- of when force is needed.
22    Q.    All right.
23    A.    Everybody is different.
24    Q.    So you don't recall any specific training
25 on the use of deadly force.
Page 228

1    A.    Well, at the Academy, we have the training
2  on, you know, use of deadly force, but it's mainly
3  policy training.
4    Q.    What's the policy that you're trained on?
5    A.    To use deadly force?
6    Q.    Yeah.
7    A.    Self-defense for yourself or others;
8  apprehension mode.
9    Q.    "Apprehension mode," did you say?
10   A.    Yes.
11   Q.    Okay.  And when do you use deadly force in
12 apprehension mode?
13   A.    Apprehension mode, if a violent or
14 atrocious felony has occurred;
15         And, self-defense, well, self-defense --
16   Q.    Okay.
17   A.    -- or self-defense of others.
18   Q.    All right.  Any other circumstances, in
19 the use about deadly force?
20   A.    That's all I recall.
21   Q.    Okay.  And in this case, was the use of
22 deadly force based on self-defense, or was it based on
23 apprehension?
24   A.    Self-defense.
25   Q.    Not on apprehension.

Page 229

1    A.    No.
2    Q.    Did you learn anything about trying a
3  variety of escalating methods, involving greater and
4  greater degrees of force, to get compliance?
5    A.    Yes.
6    Q.    What's that called?  What do you call it?
7    A.    I think it's -- I have a name -- Wheel
8  of...
9    Q.    Okay.
10   A.    I'm not quite sure what it is, but --
11   Q.    Okay.  But you received training about
12 escalating force used, under certain circumstances.
13   A.    Yes.
14   Q.    Okay.  And in this particular case, you
15 employed some different means to try to get Mr.
16 Gonzales to comply, correct?
17         MR. DEVINE:  Objection.  Vague.
18 Well, "some means"?  I. . .
19         MR. DAAR:  Okay.  All right.
20   Q.    And did you use verbal means initially?
21 This is at the point of the crash on Oak Grove:  What
22 was the first method you used to try to get Mr.
23 Gonzales to comply?
24   A.    Verbal.
25   Q.    And after "verbal" failed, did you employ

Page 231

1    A.    Self-defense of myself and my partner.
2    Q.    And do you get any training on the degree
3  of risk that you need to perceive before employing
4  deadly force?
5    A.    I don't recall.  It probably just comes
6  down to the individual on what they perceive the risk
7  is.
8    Q.    All right.  At least with respect to
9  Officer Torr during that incident, did you feel that
10 you had the basis for using deadly force based -- to
11 protect him, based on the information you had?
12   A.    Yes.
13   Q.    Okay.  And you -- Okay.
14         You also -- Did you believe that you,
15 based on the policy, procedure and training --
16 putting aside Torr for the moment -- that, based on
17 your circumstances, that you had a right to employ
18 deadly force?
19   A.    Yes.
20   Q.    Did you perceive anyone other, at this
21 moment that you made this decision, other than you and
22 Officer Torr that was at risk?
23   A.    No, just Officer Torr and I.
24   Q.    Okay.  Did they teach you about a
25 continuum of force?  Did you ever hear that expression?

Page 230

1  a second, higher level of force or persuasion to try to
2  get him to comply?
3    A.    I don't want to say it's "higher force".
4  I mean, me just grabbing his shoulder, I wasn't
5  grabbing it violently, or anything, I was just trying
6  to get his attention.
7    Q.    All right.  So, it would be verbal;
8         Physical:  Physically grabbing him.
9    A.    Yeah.
10   Q.    Okay.  What would be the next level of
11 force that you were taught in the Academy, after
12 grabbing somebody that you have at your disposal?
13   A.    This situation?
14   Q.    Yeah; let's do this situation.
15         MS. COLWELL:  I'll object.  That's an
16 incredibly vague question.
17         MR. DEVINE:  It also calls for speculation
18 as to evaluating his training in the current
19 circumstances.
20         MR. DAAR:  Okay.
21   Q.    Did you have a baton?
22   A.    No.
23   Q.    You don't carry a baton, as part of your
24 duty uniform?
25   A.    I carry -- It's -- The baton ring is

Page 232

1 there. It's -- It's your choice whether or not you
2 want to carry it.
3        But I carry an asp, which is an ex- --
4 kind of like a baton, where it extends out.
5    Q.   Is that one of the things that slides
6 inside each other --
7    A.   Correct.
8    Q.   -- one of those sticks that comes out?
9    A.   Yes.
10    Q.   Okay.  And how do you employ an asp to
11 gain compliance?
12    A.   In this situation?
13    Q.   Mm-hmm.
14        MR. DEVINE:  You didn't use it in this
15 situation.
16        Just answer his question:  He's asking,
17 how do you use an asp --
18        MR. DAAR:  Q.  How do you employ an asp?
19 What do you do with an asp to get someone to comply?
20    A.   You would strike them in certain parts of
21 the body.
22    Q.   You would strike them in certain parts of
23 the body.
24    A.   Yes.
25    Q.   Okay.  And does that asp cause pain?
                                              Page 233

1    A.   I'm sure it could.
2    Q.   Isn't that the methodology by which you
3 gain the compliance?
4    A.   Probably pain, and get the person's
5 attention.
6    Q.   Did you have a Taser?
7    A.   At the time, no.
8    Q.   Did you consider using your asp in this
9 situation?
10    A.   No.
11    Q.   Why -- Well, I guess, if you didn't
12 consider it, I can't ask you why.
13        Did you receive any training about the
14 potential for high-speed chases impacting officers'
15 decision-making, based upon the associated adrenaline
16 and excitement factors that are present in a high-speed
17 chase?
18    A.   We didn't receive training about it.
19        But, I mean, they make you aware that,
20 you know, the adrenaline is going to kick in, and you
21 are probably going to get tunnel vision, and it's up
22 to that individual to control those factors.
23    Q.   Okay.  So, you received training that
24 these factors could affect your ability to make a
25 decision.
                                              Page 234

1    A.   Well, it depends on the individual.
2    Q.   Okay.
3        In this particular case, was your
4 ability to make a decision impacted by adrenaline?
5    A.   No.
6    Q.   Do you feel that you had a clear --
7 Understanding, this is all split-second.
8        MR. DEVINE:  I didn't hear that.
9        MR. DAAR:  Q.  Understanding that this is
10 a decision that was made in split-seconds, do you feel
11 that the psychological impact of being in a high-speed
12 pursuit did not in any way interfere with your weighing
13 your options and coming to a decision?
14        MR. DEVINE:  I'm going to object that that
15 calls for speculation.
16        MR. DAAR:  Q.  Okay.  You can answer the
17 question.
18    A.   Can you repeat the question, please?
19    Q.   Did the psychological impact of being in a
20 high-speed chase, as far as you can tell, interfere in
21 your decision-making process on the use of deadly
22 force?
23    A.   It did not.
24    Q.   And the "tunnel vision" that you spoke
25 about did not occur in your instance, in this instance,
                                              Page 235

1 to you?
2    A.   During the pursuit, no.
3    Q.   Okay.  Did it occur during the shooting?
4    A.   No.  Un-un.
5    Q.   So, you were fully aware of everything
6 that one would be aware of in a normal state, normal
7 mental state.
8    A.   Correct.
9        MR. DAAR:  I'm going to stop the
10 deposition for now.
11        I will be doing a Motion to Compel;
12        And so, we will be continuing, of course
13 subject to what the Court decides, this deposition
14 potentially at a later date, to take up the various
15 subject matter which I was precluded from going into
16 during this phase of the deposition.
17        MR. DEVINE:  I would like a copy of the
18 deposition, and a -- both the condensed and the CD
19 versions, please.
20        MS. COLWELL:  I will have a copy of the
21 deposition, the condensed deposition and an ASCII.  I
22 don't need the video.
23        THE REPORTER:  Did you mean a floppy disk,
24 or a CD?
25        MS. COLWELL:  I'll have it on the CD.  I
                                              Page 236

Deposition of MICHAEL NOVOSEL    NELSON GONZALES VS. MICHAEL NOVOSEL, ET AL.
April 17, 2008    USDC, NORTHERN DIST OF CA, No. CV07-04720 CRB

Case 3:07-cv-04720-CRB    Document 52-2    Filed 09/11/2008    Page 63 of 63

```
 1  just don't want the pictures.
 2          THE VIDEOGRAPHER: Here marks the end of
 3  Videotape No. 4, Volume No. I, in the deposition of
 4  Michael Novosel.
 5          Going off the record, the time on the
 6  monitor is 3:34 p.m.
 7      (The proceedings were completed
 8       and adjourned at 3:35 p.m.)
 9
10
11
12      MICHAEL NOVOSEL
13
14          ---oOo---
15
16
17
18
19
20
21
22
23
24
25
```

Page 237

```
 1  STATE OF CALIFORNIA          )
 2                              )  ss
 3                              )
 4          CERTIFICATE OF REPORTER
 5      I, A. MAGGI SAUNDERS, a Certified Shorthand
 6  Reporter in and for the State of California, duly
 7  appointed and licensed to administer oaths and so
 8  forth, do hereby certify:
 9      That the witness named in the foregoing
10  deposition was by me duly sworn to tell the truth,
11  the whole truth and nothing but the truth;
12      That the deposition was reported by me, a
13  Certified Shorthand Reporter and disinterested
14  person, and thereafter transcribed into typewriting
15  under my direction;
16      That if the deposition has not been signed
17  by the time of trial, a reasonable opportunity having
18  been given the witness to do so, signature has been
19  waived in accordance with stipulation between
20  counsel.
21      IN WITNESS WHEREOF, I have hereunto set my
22  hand and subscribed my signature this 1st day of May,
23  2008.
24
25
```

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,

**In and For the State of California**

Page 238