Kimberly E. Colwell (SBN: 127604)
kcolwell@meyersnave.com
Tricia L. Hynes (SBN: 212550)
thynes@meyersnave.com
MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12th Street, Suite 1500
Oakland, CA  94607
Telephone: (510) 808-2000
Facsimile: (510) 444-1108

Attorneys for Defendants
OFFICER RON CARLINO, OFFICER SEAN CURMI,
OFFICER ANTHONY BORDIGON and OFFICER JASON FUKUSHIMA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NELSON GONZALES,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>MICHAEL NOVOSEL, R. CARLINO, S. CURMI, A. BORDIGON, J. FUKUSHIMA and DOES 1-25, inclusive,<br><br>　　　　　　Defendants. | Case No:  C07-04720 CRB (JL)<br><br>**DEFENDANTS OFFICER RON CARLINO, OFFICER SEAN CURMI, OFFICER ANTHONY BORDIGON AND OFFICER JASON FUKUSHIMA'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, SUMMARY ADJUDICATION**<br><br>DATE:　　　October 10, 2008<br>TIME:　　　10:00 a.m.<br>DEPT:　　　Courtroom 8, 19th Floor<br>JUDGE:　　 Hon. Charles R. Breyer |

Defs Carlino, Curmi, Bordigon and Fukushima's Motion for Summary Judgment/P's & A's  [C07-04720 CRB]

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    FACTS...............................................................................................................2

    A.     Mr. Gonzales's actions that brought him to the Officers' attention ..............2

    B.     Custody Efforts...........................................................................................3

    C.     Mr. Gonzales's Hospital Stay ......................................................................7

III.   ARGUMENT....................................................................................................10

    A.     Summary Judgment is Proper in This Case .................................................10

    B.     Defendants are entitled to summary judgment on plaintiffs' First and Only Cause of Action..............................................................................................10

        1.     Mr. Gonzales's Fourth Amendment Rights were not violated because based upon the undisputed facts the officers' actions were reasonable....................11

        2.     The officers are entitled to Qualified Immunity because the rights allegedly violated were not clearly established and a reasonable officer could have believed that the officers' actions were reasonable. ........................................14

        3.     Plaintiff is precluded from pursuing any type of excessive force claim premised solely upon the Fourteenth Amendment, and thus, his Fourteenth Amendment Excessive Force claim must be summarily adjudicated in the City Defendants' favor. .......................................................................................18

    C.     Mr. Gonzales's shooting after leading the CHP on a high speed pursuit is an unforeseeable event to such a degree that it constitutes a superseding, intervening cause for which the City Officers are not liable.........................................21

IV.    CONCLUSION................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Jeffers v. Gomez*
  267 F. 3d 895 (9th Cir. 2001) ................................................................. 16

*Adams et al. v. Speers et al.*
  2004 WL 5567292 (E.D. Cal.) ............................................................... 20

*Albright v. Oliver*
  510 U.S. 266 (1994) ......................................................................... 18, 19

*Anderson v. Creighton*
  483 U.S. 635 (1987) ............................................................................. 15

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ............................................................................. 10

*Backlund v. Barnhar*
  778 F.2d 1386 (9th Cir. 1985) ............................................................. 15

*Barker v. Norman*
  651 F.2d 1107 (5th Cir. 1981) ............................................................. 10

*Beck v. City of Upland*
  527 F3d 853 (2008) .............................................................................. 20

*Billington v. Smith*
  292 F.3d 1177 (9th Cir. 2002) ............................................................. 15

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) ............................................................................. 10

*Galen v. County of Los Angeles*
  477 F.3d 652 (9th Cir., 2007) .............................................................. 20

*Graham v. Connor*
  490 U.S. 386 (1989) .........................................................11, 16, 18, 19

*Hansen v. Black*
  885 F.2d 642 (9th Cir. 1989) ............................................................... 10

*Harlow v. Fitzgerald*
  457 U.S. 800 (1982) ......................................................................... 14-16

*Heck v. Humphrey*
  512 U.S. 477 (1994) ............................................................................. 17

## TABLE OF AUTHORITIES (CONTINUED)

Page(s)

**CASES**

*Hunter v. Bryant*
　502 U.S. 224 (1991) ................................................................... 15

*Mitchell v. Forsyth*
　472 U.S. 511 (1985) ................................................................... 15

*Robi v. Five Platters, Inc.*
　918 F.2d 1439 (9th Cir. 1990) ..................................................... 10

*Saman v. Robbins*
　173 F.3d 1150 (9th Cir. 1999) ..................................................... 12

*Saucier v. Katz*
　533 U.S. 194 (2001) ............................................................. 15, 16

**STATUTES**

California Penal Code §148 ............................................................ 17

California Welfare & Institutions Code §5150 ................................. 8, 9

Federal Rules of Civil Procedure 56(c) ............................................. 9

**OTHER AUTHORITIES**

42 U.S.C. §1983 ...........................................................2, 10, 18, 19

Fourth Amendment ..............................................................Passim

Fourteenth Amendment ..................................................2, 10, 18-19

## I.   INTRODUCTION

No one involved in this litigation denies that the events that occurred in the early morning hours of August 19, 2006, were tragic:  A young man's life was dramatically and permanently altered that morning.  What is in dispute, though, is the propriety of the City of South San Francisco Defendant Officers' actions *five days prior to Mr. Gonzales's brush with California Highway Patrol Officer Michael Novosel.*

Nelson Jose Quintanilla Gonzales, Jr., whose impressive criminal history substantiates that he is well-versed in law enforcement interactions, decided to check himself into the South San Francisco La Quinta Inn on August 13, 2006 with crack cocaine, marijuana and sexual accoutrements in order to take "a little vacation" from his home life.  He proceeded to ingest enough crack so that he lost track of time, resulting in the Inn's desk clerk calling the South San Francisco Police Department to help escort Mr. Gonzales off the premises for failure to pay for an additional day or leave voluntarily on August 14, 2006.

The South San Francisco Police Officers ("Officers") responding to this call tried in vain to coax Mr. Gonzales out of the Inn of his own volition.  Mr. Gonzales yelled irrationally and rapidly through the locked hotel room door, signaling to the Officers that he was under the influence of some type of drug.  All of the Officers' efforts only served to enrage Mr. Gonzales further.  Indeed, the Officers' verbal attempts only elicited threats from Mr. Gonzales—he informed the Officers that if they attempted to come into the room, they'd need "good luck," as he had a gun and he would use it.

After myriad failed attempts at persuading him to come out of the room, the Officers determined that they needed to arrest Mr. Gonzales.  A hotel maintenance worker provided the Officers with a key to open Room 445, which Mr. Gonzales promptly blocked with his body weight. He further threatened to blow up the entire Inn with dynamite—warning that he possessed the requisite amount of explosives to achieve this goal.  The four Officers were able to eventually gain entry, after which Mr. Gonzales fought violently.

Immediately upon gaining entry, the four Officers noticed that every light was off.  Mr. Gonzales was throwing blind punches at the four Officers, and even when the four Officers got a hold of him, Mr. Gonzales wrenched his body out of their grasps, struggled against them violently, and, as

people who are high on drugs will do, exhibited a frighteningly high level of strength, and an equally

shocking tolerance to the Officers' trained pain compliance techniques.  After an intense, 15-minute

struggle which fatigued all four able-bodied Officers, they were able to gain control of him.

Mr. Gonzales is alleging a single cause of action against all four Officers—a violation of his

Fourth & Fourteenth Amendment rights through 42 U.S.C. §1983.  Because, however, the Officers

had probable cause to enter the room to remove Mr. Gonzales from the premises, are at the very least

entitled to qualified immunity, the Officers are all entitled to summary judgment of the suit in their

favor.

Alternatively, the Officers seek summary adjudication that the shooting which occurred five

days after his altercation, with the City's officers, is a superseding, intervening cause which operates

to cut off any alleged liability for all four Officers.

## II.    FACTS

### A.    Mr. Gonzales's actions that brought him to the Officers' attention

On August 14, 2006, around 9:20 in the evening, La Quinta Inn desk clerk Michael Malapo

("Mr. Malapo") called the City of South San Francisco Police Department after a hotel guest refused

to check out or pay for an additional night.  This hotel guest was Nelson Gonzales ("Mr. Gonzales").

Mr. Gonzales had paid cash to rent a room—Room 445—at the hotel on August 13, and failed to

check out by noon the following day, August 14, per the hotel's policy.  Mr. Gonzales would check

into hotels once in a while to take vacations from his family.  (Gonzales Depo., 21:3-7).  Before

calling the police, Mr. Mapalo called Mr. Gonzales's hotel room from the hotel lobby and told

Gonzales that he needed to leave the hotel property or pay for another night's stay.  According to Mr.

Mapalo, Mr. Gonzales appeared confused and disoriented and asked him for directions to the nearest

bank so he could pay for an additional night.  Mr. Mapalo provided him with directions and advised

him that he had a half hour to come up with the money or he needed to leave.  About an hour later,

Mr. Mapalo had not heard from Mr. Gonzales so he called Room 445 again.  Mr. Gonzales still

appeared confused and disoriented and was adamant that he had just paid him for an additional

night's stay.  Mr. Mapalo told Mr. Gonzales that he had not paid for an additional night's stay and

now needed to leave the hotel property.  One-half hour later, Mr. Mapalo called Mr. Gonzales's hotel

room a third time to see if the latter had left, but there was no answer. Mr. Mapalo sent a hotel maintenance worker to Room 445 to check if it was now vacant. When the maintenance worker checked the room, they noticed the hotel room door was locked from the inside with the deadbolt lock. When Mr. Mapalo was made aware of this he called the South San Francisco Police Department for assistance in removing Mr. Gonzales from the hotel's property. (Curmi Dec. ¶ 4)

### B.    Custody Efforts

Officer Anthony Bordigon[1] ("Officer Bordigon") and Officer Sean Curmi[2] ("Officer Curmi") responded to the La Quinta Inn on Mr. Mapalo's report of a male subject refusing to leave the property. The officers contacted the reporting party, desk clerk Michael Mapalo, in the lobby of the hotel. The Officers learned all that had transpired between Mr. Gonzales and Mr. Mapalo immediately preceding their arrival from Mr. Mapalo. After speaking with Mr. Mapalo, the two Officers went to Room 445. Officer Bordigon knocked on the hotel room door and announced the Officers' presence. Mr. Gonzales spoke through the locked hotel room door and repeatedly refused to open it. He insisted that he had paid for another night's stay. Officer Bordigon repeatedly explained to Mr. Gonzales why the hotel staff wanted him out of the hotel room, but Mr. Gonzales was argumentative and irrational. Mr. Gonzales continued to refuse to open the door for the Officers, instead demanding that they leave. (Curmi Dec. ¶ 5; Bordigon Dec. ¶ 3)

Mr. Gonzales sounded peculiarly irrational, and at times did not make sense when he spoke, or spoke very fast. This led the Officers to believe that Mr. Gonzales might be under the influence of a controlled substance. Officer Bordigon advised Mr. Gonzales that if he continued to refuse to open the door, both he and Officer Curmi would have to open the door with a key. After hearing this, Mr. Gonzales got extremely agitated and yelled that he was armed with a gun and if the Officers came in, he would have no choice but to "use it" on the officers. (Curmi Dec. ¶ 6; Brodigon Dec. ¶ 3; Fukushima Dec. ¶ 5; Carlino Dec. ¶ 5)

---

[1] Filed herewith is the Declaration of Officer Anthony Bordigon in Support of Motion for Summary Judgment ("Bordigon Dec.").

[2] Filed herewith is the Declaration of Officer Sean Curmi in Support of Motion for Summary Judgment ("Curmi Dec.")

Based on Mr. Gonzales's threat, Officer Curmi requested that South San Francisco Police Communications dispatch additional cover units to the Hotel. Sergeant Ron Carlino[3] ("Sergeant Carlino") and Officer Jason Fukushima[4] ("Officer Fukushima") responded to the fourth floor to assist Officer Bordigon and Officer Curmi. Sergeant Wall, Officer Kalagayan and Officer McHale responded to the exterior of the building (in case Mr. Gonzales jumped out or attempted to leave the fourth floor hotel room window). (Bordigon Dec. ¶ 3; Curmi Dec. ¶ 7; Fukushima Dec. ¶ 4; Carlino Dec. ¶ 4)

At one point, Mr. Gonzales demanded that the police leave the area before he would open the door. Officer Bordigon told Mr. Gonzales that the police were not going to leave until he left the property. Officer Bordigon explained again that if Mr. Gonzales did not open the door, the Officer would have to open it with management's help. This enraged and agitated Mr. Gonzales further. (Curmi Dec. ¶ 8; Fukushimi Dec. ¶ 6; Carlino Dec. ¶ 5)

After many failed attempts to negotiate with Mr. Gonzales, a hotel maintenance employee produced a key that would unlock the deadbolt lock on the door and allow the officers access to the room. Officer Bordigon and Sergeant Carlino warned Mr. Gonzales that they were going to enter the room. Mr. Gonzales yelled, "[d]o what you got to do! Good Luck!" Officer Bordigon asked Mr. Gonzales what he meant by saying that. Mr. Gonzales replied, "[i]f you come in here, you're going to need good luck!" (Carlino Dec. ¶ 6; Curmi Dec. ¶ 9)

As Mr. Gonzales continued to yell at the officers through the locked door, Officer Bordigon used the key to unlock the door. Mr. Gonzales immediately slammed the door shut and began yelling unintelligibly. It appeared to the Officers as if Mr. Gonzales was using his body weight against the door from the inside to keep the door closed. Sergeant Carlino in turn used his body weight to attempt to open the door. Mr. Gonzales continued throwing his body weight against the door in an attempt to keep it shut. As the officers were struggling to get the hotel room door open, Mr. Gonzales yelled, "I have enough dynamite in here to blow up the whole building!" At this point,

---

[3] Filed herewith is the Declaration of Sergeant Ron Carlino in Support of Motion for Summary Judgment ("Carlino Dec.")

[4] Filed herewith is the Declaration of Officer Jason Fukushima in Support of Motion for Summary Judgment ("Fukushima Dec.")

since Sergeant Carlino was already committed to opening the door, he continued on with this course of action.  None of the Officers disregarded any of the threats Mr. Gonzales was making.  (Curmi Dec. ¶ 10; Bordigon Dec. ¶ 4; Fukushimi Dec. ¶ 7; Carlino Dec. ¶ 7)

Once the hotel room door was open, Sergeant Carlino and Officer Curmi noticed that Mr. Gonzales had turned off all the lights in the hotel room.  The room was pitch black, with the only source of illumination coming from the hallway light.  Mr. Gonzales was several feet away from the door in a fighting stance, similar to that of a boxer.  As Sergeant Carlino entered the hotel room, Mr. Gonzales lunged towards the Sergeant and tried to punch him.  Sergeant Carlino immediately reacted, as he is trained to do, and gave Mr. Gonzales one distraction blow to the face which put an end to Mr. Gonzales's forward momentum.  This technique also allowed Officer Bordigon, Officer Fukushima and Officer Curmi, who were forced to enter in a single file line because of the narrowness of the hallway, to now enter the hotel room.  Once the Officers were all in, Mr. Gonzales began throwing blind punches with both of his arms.  The Officers were eventually able to all get a hold of Mr. Gonzales, but he was violently struggling to break free.  Even though all four Officers had a hold on Mr. Gonzales and were attempting to get him down to the ground, he was still able to maintain his balance and continue to fight.  (Curmi Dec. ¶ 11; Bordigon Dec. ¶ 4; Fukushima Dec. ¶ 8; Carlino Dec. ¶ 8)

At one point during the struggle, Mr. Gonzales grabbed a hold of Officer Curmi's left long shirt sleeve with his right hand and began dragging the Officer to the ground.  Mr. Gonzales had a full grip of the Officer's uniform shirtsleeve and was able to twist his wrist to get a better hold. Officer Curmi struggled to break free from Mr. Gonzales's hold, who was now using his body weight to pull the Officer down towards the ground.  Fearing that Mr. Gonzales was going to force the Officer to the ground because of his excellent grip, his ability to use his body weight as an anchor, and the fact that he outweighed the Officer by a good thirty five pounds, Officer Curmi delivered four to six distraction blows to Mr. Gonzales's face and head.  Immediately following this technique, Mr. Gonzales continued to hold onto the Officer's left shirtsleeve, but stopped pulling him to the floor. Officer Fukushima was eventually able to get Mr. Gonzales to release his hold on Officer Curmi's shirtsleeve by prying his fingers off away from my shirt.  (Curmi Dec. ¶ 2; Fukushimi ¶ 8)

The four Officers were eventually able to get Mr. Gonzales into a facedown position at the end of one of the beds (the one nearest to the window). Officer Curmi took a position at Gonzales's head, while Sergeant Carlino, Officer Bordigon and Officer Fukushima attempted to gain control of Mr. Gonzales' hands and arms. Mr. Gonzales, who was still violently struggling and repeatedly ignoring the Officers' commands to "stop resisting" and "put [your] hands behind your back," placed both of his arms under his chest and attempted to push up from the bed. Fearing that Mr. Gonzales was going to stand up again, Officer Curmi attempted to deliver a single knee strike with his right knee to Mr. Gonzales's right shoulder and collarbone area. As he was in the process of delivering the knee strike, Mr. Gonzales quickly moved his head and the Officer's knee struck him on the top of his head. (Curmi Dec. ¶ 13; Bordigon Dec. ¶ 4; Carlino Dec. ¶ 10)

In spite of all four of the Officers actively attempting to physically restrain Mr. Gonzales, he displayed extremely high levels of strength and pain tolerance. Mr. Gonzales repeatedly attempted to push himself up from the bed, so Officer Curmi used his O.C. (Oleoresin Capsicum) canister and sprayed Mr. Gonzales's right eye and right side of his face with a quick one to two second burst of O.C. This appeared to have little or no effect on Mr. Gonzales. Officer Curmi then sprayed Mr. Gonzales once again with another quick one to two second burst of O.C. this time at Mr. Gonzales's left eye and left side of his face. This second burst appeared to have some effect because eventually, Officer Fukushima was able to apply a handcuff to Mr. Gonzales's right wrist. However, Officer Bordigon was having trouble bringing Mr. Gonzales's left arm behind his back. Sergeant Carlino took hold of Mr. Gonzales's left wrist with both of his hands while Officer Bordigon retrieved his handcuffs. Sergeant Carlino had to use his legs, back, and both arms to pull Mr. Gonzales's left arm behind his back so Officer Fukushima could apply the other handcuff to his wrist. Mr. Gonzales continued to scream and thrash his body from side to side. (Curmi Dec. ¶ 14; Bordigone Dec. ¶ 5; Fukushima Dec. ¶ 8; Carlino Dec. ¶ 11)

Once in handcuffs, Mr. Gonzales continued to scream and violently move his body from side to side. The Officers directed Mr. Gonzales to the floor of the hotel room from the bed, but he continued to violently move his body and kick his legs in an obvious effort to get to his feet. Officer Fukushima, Officer McHale and Officer Curmi held Mr. Gonzales down on the floor, until Sergeant

1  Wall responded to the scene with the "WRAP" (body restraining devise). It took three of the Officers

2  to hold Mr. Gonzales down on the floor. Mr. Gonzales began to calm down slightly as the Officers

3  placed him in the "WRAP." This did not last long, however. One minute Mr. Gonzales would be

4  extremely agitated, would not make sense when he spoke and would repeat what he said several

5  times. The next minute Mr. Gonzales would relax and speak in a childlike voice. Mr. Gonzales

6  repeatedly said things similar to, "Sleepy!," "God loves you Nelson!" and "God forgives you

7  Nelson!" (Curmi Dec. ¶ 15; Bordigon Dec. ¶ 5; Carlino Dec. ¶ 12)

8        While attempting to speak with Mr. Gonzales, Officer Curmi noticed that the former showed

9  signs and symptoms of being under the influence of a controlled substance. Officer Curmi has been

10  trained in the detection of objective signs of drug influence to the human body. He has attended a

11  P.O.S.T. certified training course where the subject matter was detecting individuals under the

12  influence of controlled substances. (Curmi Dec. ¶ 16; Bordigon Dec. ¶ 7)

13        Based upon the totality of the circumstances confronting the Officers, including the facts that

14  Mr. Gonzales refused to leave the hotel room, threatened them with a gun, threatened the entire Hotel

15  and all its patrons with dynamite, fought off four trained officers with super-human strength by

16  charging, struggled against every attempt to restrain him, and exhibited numerous signs of being

17  under the influence of illegal drugs or powerful narcotics, the Officers were left with little choice but

18  to meet Mr. Gonzales's resistance with that force reasonably necessary to bring him into custody.

19  The Officers then called South San Francisco Fire Fighter paramedics to medically clear Mr.

20  Gonzales after use of the O.C. spray. The paramedics transported him to Mills-Peninsula for medical

21  clearance. (Curmi Dec. ¶ 17; Carlino Dec. ¶ 13)

22    **C.    Mr. Gonzales's Hospital Stay**

23        Mr. Gonzales was involuntarily admitted to Mills-Peninsula Hospital ("Hospital") for *five*

24  *days.* He was originally admitted against his will by the Emergency Department doctors because he

25  was medically unstable—that is, his vital signs concerned the Hospital staff to the point they felt it

26  medically necessary to admit and treat him immediately. (Gianotti Depo.[5] 85:23-86:11) Moreover,

27

28  _____

[5]   Deposition of Dr. Alan Gianotti is attached as Exhibit A to the Declaration of Tricia Hynes in
     Support of Defendants Motion for Summary Judgment filed herewith ("Gianotti Depo.")

1  Mr. Gonzales was not "oriented X3," meaning, he had no idea who he was, where he was, or what

2  date and time he was in. (*Id.* at 22:13-18)

3          According to the Emergency Department doctor working that evening—Dr. Alan Gianotti

4  ("Dr. Gianotti")—his understanding is that it is Hospital policy not to take any patients who are in

5  police custody ever.  (*Id.* at 82:13-83:17)  As such, Mr. Gonzales was "un-arrested" and admitted

6  involuntarily so that he could be rendered critical medical attention.  Mr. Gonzales was thus admitted

7  to the Hospital as "self-pay" on this basis.  (Ex. B [6] pp. 5 & 9)

8          After his admittance to the Hospital's Emergency Department, Dr. Gianotti determined that

9  Mr. Gonzales needed to be restrained—both physically *and* chemically.  (Gianotti Depo. 25:20-25)

10 While he possessed no independent recollection of Mr. Gonzales during his deposition, Dr. Gianotti

11 nonetheless testified that he is sure that he felt physically threatened, and that Mr. Gonzales posed a

12 significant and very real threat to him and his staff because it is actually quite rare to have to restrain

13 someone both physically and chemically.  (*Id.* at 76:11-22; 94:8-22)Dr. Gianotti relied upon his notes

14 and those of the admitting staff, which are kept in the normal course of the Hospital's business, in

15 providing his deposition testimony.

16         Dr. Gianotti examined Mr. Gonzales and a CT scan was ordered.  The doctor noted no

17 abrasions, bruising or other injuries to Mr. Gonzales's head whatsoever.  (*Id.* at 34:17-35:2)  He

18 attributed Mr. Gonzales's unstable condition to illegal drug use.  He began trying to stabilize Mr.

19 Gonzales's temperature, pulse rate and heart rhythm immediately.  (*Id.* at 88:23-90:4)  Mr. Gonzales's

20 CT scan came back negative—meaning no injuries or abnormalities were noted whatsoever—and all

21 of Mr. Gonzales' Mills-Peninsula medical records note no abnormalities at all to his head.  (*Id.* at

22 58:18-22; Ex. B, p. 39)

23         Mr. Gonzales was ministered to in the Emergency Department and transferred to the

24 Hospital's Intensive Care Unit within hours of his initial admittance.  His vitals were stabilized to the

25 medical staff's satisfaction, according to Mr. Gonzales's chart, enough so that he was then transferred

26

27

28

[6] Medical record of Plaintiff is attached as Exhibit B to the Declaration of Tricia Hynes in Support of
Defendants Motion for Summary Judgment filed herewith ("Ex. B")

to the TCU—a step down from ICU but still above general medical/surgical floors—and his cardiac output was continued to be monitored. (Gianotti Depo. 103:3-17; Ex. B, p. 40)

It was during his time in the Hospital's TCU that staff noted in his charts that Mr. Gonzales appeared to need a psychiatric consult in order to determine whether he posed a danger to himself or others, or was otherwise gravely disabled within the meaning of California's Welfare & Institutions Code §5150. (Gianotti Depo. 64:12-65:12) During his stay in the TCU, Hospital staff noted that Mr. Gonzales admitted to hearing voices since he was a child. He also admitted that he contemplated suicide at least once in his past. He denied any present suicidal tendencies, though, and he was able to identify himself, his location and the date and time by this point. (Ex. B, p. 24)

By the afternoon of August 18, 2006, the Hospital determined that Mr. Gonzales was not a danger nor gravely disabled under California Welfare and Institutions Code  section 5150, and so he was discharged. Mr. Gonzales's discharge papers note that he promised to contact his psychiatrist and make an appointment. He was released into his mother's care. (Ex. B, p. 7)

Five days after his encounter with the South City defendant-officers, and hours after his release from the psychiatric unit of Mills-Peninsula, Mr. Gonzales led San Mateo County Deputies and California Highway Patrol Officers on a high speed chase that culminated in Officer Novosel shooting Mr. Gonzales. (See, Docket No. 51, Exhibit A to the Declaration of John Scott, 48:15-19; 59:11 to 60:4; and 189:22 to 190:10). This lawsuit followed.

Mr. Gonzales remembers arriving at the La Quinta Inn on August 13. He recalls going to his room with a few items, including his luggage, a dildo, and a glass pipe used for smoking crack cocaine. (Gonzales Depo.[7] 30:18-20, 32:2-8) He does not remember arguing with Mr. Mapalo, the desk clerk. (*Id.* at 23:20-23) He does not remember the City's Officers arriving and speaking to him. (*Id.* at 23:24-24:1) He does not remember threatening them with a gun or with blowing up the entire Hotel. (*Id.* at 24:2-26:2) He does not remember fighting with the Officers for over 20 minutes. (*Id.* at 25:6-27:8) He has a vague flash of a memory of one of the Officers coming towards him and hitting him with some object. (*Id.* at 24:5-13) To be clear, Mr. Gonzales is not disputing that any of

---

[7] Deposition of Nelson Gonzales is attached as Exhibit C to the Declaration of Tricia Hynes in Support of Defendants Motion for Summary Judgment filed herewith ("Gonzales Depo.")

1  the above undisputed material events happened; rather, he simply has no memory of what occurred in

2  the La Quinta Inn that night, and thus, the Officers' detailed reports are not disputed.

3  ### III.    ARGUMENT

4  #### A.    Summary Judgment is Proper in This Case

5  Summary judgment in favor of a moving party is proper if there is no genuine issue of

6  material fact as to any essential element of the non-moving parties' case on which the non-moving

7  party would bear the burden of proof at trial (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

8  "[T]he plain language of Rule 56(c)…mandates that the moving party is entitled to judgment as a

9  matter of law because the nonmoving party has failed to make a sufficient showing on an essential

10 element of [his] case with respect to which [he] has the burden of proof."  (*Celotex Corp.*, 477 U.S. at

11 322-323; *Hansen v. Black*, 885 F.2d 642 at 643-644 (9th Cir. 1989).)  "The mere existence of a

12 scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome summary

13 judgment]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

14 Under F.R.Civ.P. 56(c), a summary judgment/adjudication motion, interlocutory in character,

15 may be rendered in the issue of liability alone.  "In cases that involve. . .multiple causes of action,

16 summary judgment may be proper as to some causes of action but not as to others, or as to some

17 issues but not as to others, or as to some parties, but not as to others.") *Barker v. Norman*, 651 F.2d

18 1107, 1123 (5th Cir. 1981); *see also, Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990).)

19 #### B.    Defendants are entitled to summary judgment on plaintiffs' First and Only
20 Cause of Action

21 Plaintiff's First and Only Cause of Action alleges that the City's four officers are liable,

22 pursuant to 42 U.S.C. § 1983, for the use of excessive force against Mr. Gonzales, in violation of his

23 Fourth and Fourteenth Amendment rights.  Based upon the undisputed facts of this case, the officers'

24 actions did not arise to an unreasonable use of force given the totality of the circumstances.  Even if,

25 however, a violation of either the plaintiffs' or Mr. Gonzales's rights could be made out, the officers

26 are entitled to qualified immunity.  And lastly, Mr. Gonzales is precluded, as a matter of law, from

27 asserting an excessive force claim based upon the Fourteenth Amendment's Due Process Clause.

28 Each of these three arguments is addressed in turn, below.

### 1.   Mr. Gonzales's Fourth Amendment Rights were not violated because based upon the undisputed facts the officers' actions were reasonable.

Central to this case is the reasonableness of the amount of force the Officers used to detain Mr. Gonzales.  The officers were summoned to the La Quinta Inn after receiving a call from the Inn's desk clerk relative to a guest that had barricaded himself in one of the rooms, and was refusing to leave or pay.  When the first two officers arrived on scene, they contacted desk clerk Michael Malapo and were told that Mr. Malapo had tried numerous times to convince Mr. Gonzales to either leave or simply pay for his stay.  He also told the Officers about the bizarre behavior that Mr. Gonzales exhibited—he was disoriented and confused as to the time, date and recent as well as present events. He insisted that he had gone to an ATM, withdrawn money, and paid for an additional night.  After Mr. Mapalo's third and final failed attempt to roust Mr. Gonzales from the room he was illegally occupying, and learning that Mr. Gonzales had barricaded himself in this room with the dead bolt lock, Mr. Mapalo called the police.

Armed with this information, the Officers proceeded to Room 445 and attempted to engage Mr. Gonzales in a conversation.  After knocking and announcing themselves to Mr. Gonzales, he continued to yell through the locked door that he had paid, and was therefore allowed to stay.  The Officers went back and forth with Mr. Gonzales many times trying to explain to him that he had not paid for an additional night, and that all the Hotel wanted was for him to pack up and leave.

Only after they thoroughly exhausted seeking Mr. Gonzales's compliance through speaking with him, and after Mr. Gonzales threatened to shoot them, did the Officers plan to enter the room and arrest him.  They were met with fierce pugilistic resistance from Mr. Gonzales that was fueled by his crack cocaine ingestion.  The Officers were left with little choice but to combat his force with their force.

To determine whether an officers' use of force was reasonable, the court will consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  (*Graham v. Connor*, 490 U.S. 386, 396 (1989).)  This list is by no means exhaustive.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…. 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  (*Graham*, 490 U.S. at 396-397; *Saman v. Robbins*, 173 F.3d 1150 (9th Cir. 1999).)

As discussed above, it is undisputed that the Officers were within their rights to detain Mr. Gonzales.  He had not paid for an additional night's stay and he was trespassing.  The Inn's clerk called the police, asked that Mr. Gonzales be removed, and signed a citizen's arrest form.  If the Officers had probable cause to detain him—meaning none of Mr. Gonzales's rights were thus far violated—then did the Officers have the right to use the amount of force that they did?  This question, too, must be answered in the affirmative.

Taking the "totality of the circumstances" test, the governmental interest at stake in this case is important:  the Officers were summoned to the Inn because a disoriented and delirious man had locked himself into a room that he did not pay for.  In other words, they were called there to do their jobs—arrest a trespasser who appeared to be on drugs and was belligerently refusing to leave.  They had an interest in executing their duties while keeping in mind the safety of all involved, as well as that of the general public.

Next, Mr. Gonzales posed a threat in the eyes of each Officer that night *and* he actively resisted.  Mr. Gonzales posed a physical threat to the Officers both by fighting them off and refusing to obey their commands as well as making terrorist and life endangering threats.  Mr. Gonzales told the Officers that he wished them good luck after learning they were done talking and intending to enter the room.  When questioned about why they needed good luck, he responded that he already told them what would happen.  (Fukushima Dec.)  Earlier, he did indeed tell all four Officers that he had a gun, and if they came in, he'd be forced to use it on them.  The Officers understood him to be threatening to shoot them if they came into the room.  Even more alarming to the Officers, as they were attempting to enter, Mr. Gonzales screamed, "[a]re you fucking crazy," (Fukushima) and, "I've

got enough dynamite to blow up the whole building!"  (Carlino, Curmi)  The Officers took immediate and necessary action to bring Mr. Gonzales into custody after this last threat.

Mr. Gonzales began resisting when he used verbal resistance, including refusing to leave, dead-bolting the unpaid-for room from the inside, threatening to shoot the officers, and to blow up the Hotel, and quickly escalated to battling with the Officers as soon as they entered the room. Sergeant Carlino was the first Officer through the door, and he watched Mr. Gonzales leap out of his boxer's stance and charge at the Sergeant.  Based on his training and experience, Sergeant Carlino rendered a single distraction punch to Mr. Gonzales in an attempt to end the confrontation.  His punch served to stop Mr. Gonzales's charge and allow the other three Officers to enter the room.  Mr. Gonzales, however, retained his balance and violently fought off every single Officer.  The Officers attempted to hold onto Mr. Gonzales, in an effort to handcuff him.  Mr. Gonzales threw blind punches, and pulled, pushed, twisted and wrenched his arms and torso away from the Officers.  The Officers attempted to physically restrain plaintiff and he physically resisted—indeed, he grabbed a hold of Officer Curmi's long-sleeved shirt and began dragging the officer down onto the ground, using his natural bulk to his advantage—in the Officer's estimation, Mr. Gonzales weighed about 190 to the Officer's 145.  Officer Curmi was afraid of what Mr. Gonzales would do if he successfully pinned the Officer to the ground.  When confronted with this rapidly devolving situation, Officer Curmi, relying upon his training and experience, quickly assessed the situation in seconds and determined that he needed to use distraction punches to Mr. Gonzales in an attempt to free himself from the suspect's clutches.  The technique worked and Mr. Gonzales, although not releasing his grip, ceased dragging Officer Curmi to the ground in response to the distraction hits.

The Officers were then able to steer the struggling melee onto one of the two Hotel beds, where the resistance continued.  Mr. Gonzales physically resisted the Officers' legitimate and myriad attempts at gaining control of him.  Mr. Gonzales, in addition to fighting with the Officers, began to try and get up from the bed.  Fearing that he would be able to gain his legs once again and be in a better position to continue fighting, Officer Curmi, relying upon his training and experience, prepared to give a knee strike to Mr. Gonzales's right shoulder and collarbone area.  As he prepared to do so,

1  Mr. Gonzales, who never ceased battling the officers, jerked his head in the area of Officer Curmi's

2  knee strike and was hit on the top of his head.

3  Another factor the Officers considered was the obvious lack of sobriety of Mr. Gonzales.  Mr.

4  Gonzales was exhibiting super-human strength and an alarmingly high tolerance for the Officers'

5  trained pain-compliance techniques.  He was further able to lift himself off of the bed onto which the

6  Officers had maneuvered him, taking the Officers up with him.  At this point, the Officers had been

7  struggling for some time.  Mr. Gonzales exhibited numerous signs of being under the influence of

8  illegal drugs, including irrational and rapid speech, super human strength, immunity to pain and

9  extreme agitation and rage.  In order to bring a swift end with minimal damage, and again based upon

10  his training and experience, Officer Curmi deployed his O.C. spray in Mr. Gonzales's face.  The first

11  burst appeared to have no effect on Mr. Gonzales, who continued to fight.  Officer Curmi attempted a

12  second burst, which enabled the Officers to begin to handcuff Mr. Gonzales.

13  Even after he was cuffed and seated, Mr. Gonzales continued to scream and violently thrash

14  about. (Curmi Report, p. 7, first line).  Again, looking at this scene from the perspective of

15  reasonable officers in these Officers' shoes in the moment—they were confronted with an individual

16  high on illegal drugs, exhibiting super human strength and an incredible tolerance for pain, making

17  terroristic threats and threats to shoot the Officers, and violently struggling with them—any

18  reasonable officer would use the techniques and force that these four Officers took that evening.

19  Based upon the totality of the circumstances, then, the amount of force each Officer used was

20  reasonable.  None of Mr. Gonzales's rights were violated, and thus, the Officers are entitled to

21  summary judgment in their favor.

22  **2.    The officers are entitled to Qualified Immunity because the rights
       allegedly violated were not clearly established and a reasonable officer**

23  **could have believed that the officers' actions were reasonable.**

24  Even if the undisputed facts, alone, are not enough to determine whether Mr. Gonzales's

25  rights were not violated, and the Officers' actions were reasonable, they are all still entitled to

26  qualified immunity.  Whether a defendant is entitled to qualified immunity is a question of law for

27  the Court to decide.  (*See Harlow v. Fitzgerald*, 457 U.S. 800 (1982).)  The qualified-immunity

28  doctrine insulates government employees from civil trials and other litigation burdens against them,

1  in their individual capacities, stemming from actions taken pursuant to their discretionary authority.

2  (*Harlow, supra,* at 807.)  Qualified immunity is "an entitlement not to stand trial or face the other

3  burdens of litigation." (*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).)  The privilege is "an

4  immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is

5  effectively lost if a case is erroneously permitted to go to trial." (*Mitchell, supra*, at 526.)  Courts

6  stress "the importance of resolving immunity questions at the earliest possible state in litigation."

7  (*Hunter v. Bryant*, 502 U.S. 224, 227 (1991).)

8          In determining whether a public employee is entitled to qualified immunity, a two step

9  analysis is undertaken.  The threshold question in deciding if a defendant is entitled to qualified

10  immunity is whether, taken in the light most favorable to the party asserting injury, the facts show the

11  officer's conduct violated a constitutional right.  (*Saucier v. Katz*, 533 U.S. 194, 201 (2001);

12  *Billington v. Smith*, 292 F.3d 1177, 1183 (9th Cir. 2002).)  If not, "there is no necessity for further

13  inquiries concerning qualified immunity." (*Saucier*, 533 U.S. at 201.)

14          If a violation could be found, then the courts must take the second step and ask whether the

15  law was clearly established.  (*Id.* at 201.)  "[T]he right the official is alleged to have violated must

16  have been 'clearly established' in a more particularized, and hence more relevant, sense:  The

17  contours of the right must be sufficiently clear that a reasonable official would understand that what

18  he is doing violates that right." (*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).)  "The relevant,

19  dispositive inquiry in determining whether a right is clearly established is whether it would be clear

20  to a reasonable officer that his conduct was unlawful in the situation he confronted." (*Saucier*, 533

21  U.S. at 202.)  "The question is what the officer reasonably understood his powers and responsibilities

22  to be, when he acted, under clearly established standards." (*Id.* at 208.)  Plaintiff bears the burden of

23  showing "that <u>the particular facts</u> of his case support a claim of clearly established right." (*Backlund*

24  *v. Barnhart,* 778 F.2d 1386, 1389 (9th Cir. 1985).  [Emphasis in original.])

25          Third, even if the law was clearly established, officers are *still* entitled to summary judgment

26  if they had a reasonable, though mistaken, view of either the law or the facts:  "[a]n officer might

27  correctly perceive all of the relevant facts, but have a mistaken understanding as to whether a

28  particular amount of force is legal in those circumstances." (*Saucier*, 533 U.S at 205.)  "If the

officer's mistake as to what the law requires is <u>reasonable</u>, however, <u>the officer is entitled to the immunity defense</u>."  (*Id.* at 205.)  "The converse also is true: Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution." (*Jeffers v. Gomez*, 267 F. 3d 895 at 909 (9th Cir. 2001).)

Last, and most importantly, ". . .to deny summary judgment any time a material issue of fact remains on the excessive force claim [ ] could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment."  (*Saucier* at 2156, (citing *Harlow, supra,* 457 U.S. at 818.).)

As shown above, the undisputed facts demonstrate that the Officers had probable cause to enter Room 445 and detain Mr. Gonzales that evening—they responded to a call for help with a man who was confused, disoriented, and refusing to leave the Hotel or to pay for the night.  The critical issue here, then, is the amount of force the Officers used to detain Mr. Gonzales.  Their use of force is measured by applying the Fourth Amendment's "reasonableness standard."  *See, Graham, supra,* 490 U.S. at 395.  And to determine whether this amount of force was reasonable depends on whether objectively reasonable officers in their position could have believed that Mr. Gonzales was occupying the room illegally, that he exhibited numerous signs and symptoms of being high on illegal drugs or powerful prescription narcotics, that he threatened to "use" a gun on any Officer that entered the room, that he made terrorist threats to blow them all up with dynamite, and that he was actively and aggressively resisting them.  Again, the "reasonableness" of the amount of force used by the four Officers that night "*must* be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight. . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (*Graham, supra,* at 396-397.)

Here the objective reasonableness of the four Officers' belief is clear.  The Officers observed Mr. Gonzales's erratic and delusional behavior, perceived his threats to shoot them or blow up the entire Hotel as credible under the tense and rapidly evolving situation, attempted to bring him into

1  custody, and were met with fierce—indeed, superhuman—resistance.  And once he physically

2  resisted them, they were <u>authorized</u> to use that force which was reasonably necessary to overcome

3  Mr. Gonzales's resistance.  Indeed, Mr. Gonzales is currently being criminally prosecuted with

4  resisting, obstructing and delaying the Officers that evening, and will be tried for the same on

5  November 3.  If he is convicted, then he will have no viable excessive force claim against any South

6  City Officer, because a necessary element of a California Penal Code §148 claim is that law

7  enforcement used reasonable force, which the criminal defendant illegally resisted.  To allow Mr.

8  Gonzales to proceed with an excessive force claim after being convicted of obstruction would

9  constitute an impermissible collateral attack upon his conviction.  (*Heck v. Humphrey*, 512 U.S. 477

10  (1994).)

11       Officer Bordigon tried countless times to verbally persuade Mr. Gonzales of the reality that he

12  had not paid for the night, and that Hotel management simply wanted him gone.  After many back-

13  and-forth exchanges, the Officers decided that verbal interaction was not working, and so they

14  informed Mr. Gonzales that they would be entering the room to get him out.  Mr. Gonzales's response

15  to this? "I have a gun.  You don't want to come in here.  I'm trying to save your life!"  (Bordigon).

16  He further told all four Officers that he would use this gun if they came in.  Because they were

17  getting nowhere with Mr. Gonzales through talking, and because he upped the threat level by

18  announcing he had a gun that he was prepared to use, the Officers decided that they had no choice but

19  to enter the room and detain Mr. Gonzales.

20       As they were unlocking the deadbolt, Mr. Gonzales then escalated the situation in mere

21  seconds when he shouted, "[a]re you crazy?  I have enough dynamite to blow up the building!"  The

22  Officers renewed their efforts to enter the room, despite resistance from Mr. Gonzales throwing his

23  body weight against the other side of the door.  Once in, they attempted to neutralize Mr. Gonzales

24  swiftly and safely.  Mr. Gonzales, however, had no intention of going peacefully.

25       When Mr. Gonzales lunged and took aim at Sergeant Carlino with his fists, the Sergeant

26  administered a single distraction punch, which served to halt plaintiff's charge and allow the other

27  Officers to gain entry into the room.  When Mr. Gonzales threw punches blindly, aiming to strike

28  anything or anybody within his reach, the Officers attempted to take hold of him in order to cuff him.

1  When Mr. Gonzales clamped down on to Officer Curmi's arm and attempted to drag the Officer

2  underneath him on the ground, Officer Curmi administered short, rapid distraction punches which

3  served to stop the downward momentum.  When Mr. Gonzales fought violently against all four

4  Officers and tried to gain solid ground in order to continue the battle, Officer Curmi issued a knee

5  strike.  And, when Mr. Gonzales powered on, exhibiting frightening levels of strength and pain

6  tolerance, Officer Curmi dispensed two short bursts from his O.C. spray.  Despite all that had

7  unfolded thus far, Mr. Gonzales still fought against the Officers, and tried repeatedly to thwart their

8  attempts at controlling and cuffing him.  Indeed, it took three of them to put the cuffs around his left

9  wrist.

10     Each Officer used a reasonable amount of force given the totality of the circumstances with

11  which they were confronted.  And, again, the Officers need not be correct on *either* the law or facts at

12  the time of the incident for qualified immunity purposes.  All that they need to establish in order to be

13  entitled to immunity from Mr. Gonzales's current suit is that reasonable officers in their position

14  would not have thought that they were violating any of the suspect's rights.  Clearly, this was a

15  reasonable detention and use of force under the *Graham* standard.

> **3.    Plaintiff is precluded from pursuing any type of excessive force claim
> premised solely upon the Fourteenth Amendment, and thus, his
> Fourteenth Amendment Excessive Force claim must be summarily
> adjudicated in the City Defendants' favor.**

19     It appears that plaintiff attempts to assert some sort of independent excessive force violation,

20  based solely upon the Fourteenth Amendment.  He cannot.  The guarantees of the first Eight

21  Amendments stake out reliable limits to the exercise of government authority in particular situations.

22  Thus, "[w]here a particular amendment 'provides an explicit textual source of constitutional

23  protection' against a particular sort of government behavior, 'that Amendment, not the more

24  generalized notion of "substantive due process," must be the guide for analyzing these claims.'"

25  (*Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 394

26  (1989).)

27     The standard for evaluating all claims that a law enforcement officer's search or seizure of a

28  suspect were violative of his constitutional rights is the Fourth Amendment's reasonableness

standard.  (*Graham*, supra, at 395.)  In *Graham*, the Supreme Court held that these types of claims brought under Section 1983 must be analyzed under the explicit textual sources of constitutional protection found in the Fourth Amendment, not the more subjective standard of substantive due process. (*Graham*, 490 U.S. at 394-95.)

The Court reaffirmed the *Graham* rule in Albright, where the plaintiff alleged that the defendants violated his substantive due process rights by initiating a criminal prosecution without probable cause to believe he had violated state law.  (*Albright*, 510 U.S. at 274.)  The Court noted that "[t]he Framers considered the matter of pretrial deprivations of liberty, and drafted the Fourth Amendment to address it."  (*Albright, supra*, 510 U.S. at 274.)  Because an explicit textual provision of the constitution protected against the area of governmental conduct challenged by the plaintiff in *Albright*, *Graham* precluded him from obtaining additional relief under the notion of substantive due process.  Id. at 274-275.

As in *Albright*, Mr. Gonzales's claim for relief on the Federal Constitution's Due Process Clauses is manifestly improper and should be rejected.  The conduct he challenges is the force used by the officers to effect his detention on August 14, 2006.  Specifically, Mr. Gonzales alleges, "[i]n doing the acts and/or omissions alleged herein, Defendants used **excessive and unreasonable force** against Nelson Gonzales in violation of his rights under the Fourth and **Fourteenth Amendments** to the United States Constitution." (Docket No. 1, Complaint, 5:1-3.)  As in *Albright* and *Graham*, a specific textual provision of the constitution already protects plaintiff from the conduct he challenges.  Under the Fourth Amendment, as argued above, he is barred from relief.  The Due Process clauses do not open another avenue for attack.

As such, Mr. Gonzales's claim is explicitly prohibited from being brought under the Fourteenth Amendment.  To the extent that any of plaintiff's causes of action are premised upon the Fourteenth Amendment, they are manifestly improper as a matter of law and must be dismissed with prejudice.

**C.    Mr. Gonzales's shooting after leading the CHP on a high speed pursuit is an unforeseeable event to such a degree that it constitutes a superseding, intervening cause for which the City Officers are not liable.**

Pursuant to traditional tort law causation principles, which are applied in the Ninth Circuit to Section 1983 cases, a personal injury plaintiff must be able to plead and prove that the particular

defendant he is suing is the proximate cause of his injuries. (*Galen v. County of Los Angeles*, 477 F.3d 652, 663 (9th Cir., 2007), citing *Van Ort v. Estate of Stanwich*, 92 F.3d 831, 837 (9th Cir. 1996).) A superseding, intervening cause, however, can break the chain of liability if the cause was unforeseeable. Indeed, another defendant's actions can constitute a superseding, intervening cause of a plaintiff's injuries and thus break the chain of causation so as to relieve the initial actor of liability if the latter defendant's actions were unforeseeable. For example, in a false arrest case where the plaintiff was accusing police officers of falsely arresting him, the prosecutor's exercising independent judgment when determining that probable cause existed for the accused's arrest operated as a superseding, intervening cause, thereby breaking the "chain of causation between an arrest and prosecution" and immunizing "investigating officers. . . from damages suffered after the complaint was filed." *Beck v. City of Upland*, 527 F3d 853, 862 (2008) (citing *Smiddy v. Varney*, 665 F.2d 261, 266-267 (1981)).

In *Adams v. Speers*, the plaintiffs were the parents of decedent Alan Speers, who led Merced County Deputy Sheriffs and California Highway Patrol Officers on a high speed chase, which ended with the decedent being shot four to six times by CHP Officer Paul Speers. *Adams et al. v. Speers et al.*, 2004 WL 5567292 (E.D. Cal.).[8] Among other grounds, the County argued, and the U.S. District Court for the Eastern District of California found, that the *County* could not foresee that an officer from another agency would unreasonably fear for his safety and fire six shots at the decedent after the decedent's vehicle had passed by the extra-agency officer's vehicle. *Adams, supra*, at *19. The Court went on to find that although County officers may have exposed the decedent to risk of harm of an initial pursuit, they could not be expected to have protected him from Officer Speers' actions after the CHP requested them to withdraw. Accordingly, Officer Speers' firearm discharge and Alan's resulting death as alleged by his parents were not foreseeable to County officers and constituted a superseding, intervening act, relieving the County of all liability for Alan's wrongful death.

If it was unforeseeable for the County in *Adams* to have foreseen that the suspect they were pursuing would eventually be shot by the CHP, how, then, can the City's four officers—from an

---

[8] Although the County of Merced was dismissed from this Action, it is still proceeding to trial against CHP Officer Speer presently, with a jury trial dates of January 20, 2009. Only a Slip Copy of the Decision on Defendants' Summary Judgment/Adjudication Motions is currently available.

agency separate and apart from the CHP—have foreseen that *five days after his encounter with them*, Mr. Gonzales would lead the CHP and County Deputy Sheriffs on a high speed pursuit that ended with him being shot?  Logic dictates that they could not.  Officer Novosel's use of deadly force against Mr. Gonzales following a high speed chase operates as a superseding, intervening cause to cut off any liability which the City's Officers could allegedly be said to have.  Thus, if this Court declines to extend them qualified immunity, the Officers respectfully request a ruling that the shooting in this case, five days after the plaintiff's encounter with the South City Officers, constitutes a superseding, intervening cause which broke any purported chain of causation between the August 14 events and the August 19, 2006 events.

## IV.  CONCLUSION

The rules of society cannot always be enforced with absolute precision.  Our Federal Constitution and the laws of the State of California recognize that law enforcement officers must be given discretion in order to perform their important public responsibilities.  Woven into the very fabric of our system of justice is the recognition that police officers are human, and like all human beings, they can make mistakes.  Because a civilized society not only values, but requires their service, our laws preclude the imposition of liability on police officers or upon their employers for reasonable, even if mistaken, attempts to discharge their duties—oftentimes under tense, rapidly evolving and dangerous conditions.  When the dust settles, the outcome may not be ideal, indeed, it can even be tragic, as is certainly the case here.  However, in order to allow peace officers to fulfill that heavy responsibility with which they are charged, they must be given the support and encouragement to do so, when appropriate.  This case is one such appropriate occasion, and these defendants are entitled to summary judgment.

Dated: September 12, 2008          Respectfully submitted,

MEYERS, NAVE, RIBACK, SILVER & WILSON

By:_____/s/_____
           Tricia Hynes
           Attorneys for Defendants
           OFFICER RON CARLINO, OFFICER SEAN
           CURMI, OFFICER ANTHONY BORDIGON
           and OFFICER JASON FUKUSHIMA

1147038.1