Kimberly E. Colwell (SBN: 127604)
kcolwell@meyersnave.com
Tricia L. Hynes (SBN: 212550)
thynes@meyersnave.com
MEYERS, NAVE, RIBACK, SILVER & WILSON
555 12th Street, Suite 1500
Oakland, CA 94607
Telephone: (510) 808-2000
Facsimile: (510) 444-1108

Attorneys for Defendants
SERGEANT RON CARLINO, OFFICER SEAN CURMI,
CORPORAL ANTHONY BORDIGON and OFFICER JASON FUKUSHIMA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NELSON GONSALES,<br><br>        Plaintiffs,<br><br>v.<br><br>MICHAEL NOVOSEL, R. CARLINO, S. CURMI, A. BORDIGON, J. FUKUSHIMA; and DOES 1 to 25, inclusive,<br><br>        Defendants. | Case No:   C07-04720 CRB (JL)<br><br>**DECLARATION OF OFFICER SEAN CURMI IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION OF THE ISSUES**<br><br>DATE:    October 10, 2008<br>TIME:    10:00 a.m.<br>DEPT:    Courtroom 8, 19th Floor |

Dec. of Officer S. Curmi ISO Def. MSJ [C07-07420 CRB (JL)]

I, OFFICER SEAN CURMI, declare as follows:

1. I am a Police Officer for the City of South San Francisco Police Department, and have been so employed since 2000. If called to testify, I could and would competently testify as to the facts within this Declaration, based on my personal knowledge.

2. Attached hereto as exhibit 1 is a true and correct copy of my police report from the incident that took place at 20 Airport Blvd., South San Francisco, on August 14, 2006 involving Plaintiff.

3. On August 14, 2006, I was on patrol for the South San Francisco Police Department. I was patrolling in my marked police unit.

4. At approximately 2135 hours Officer Bordigon and I responded to 20 Airport Blvd., South San Francisco (La Quinta Inn), on a report of a subject refusing to leave the property. Officer Bordigon and I contacted the reporting party, Michael Mapalo ("Mapalo"), in the lobby of the hotel. Mapalo stated that a male subject (later identified as Plaintiff Nelson Gonzales ("Gonzales")) paid cash to rent a room at the hotel on 8/13/2007. He failed to "check out" of the hotel room (#445) at 1200 hours on 8/14/2006 per the hotels policy. Mapalo called Gonzales's hotel room from the hotel lobby and told Gonzales that he needed to leave the hotel property or pay for another night's stay. According to Mapalo, Gonzales appeared confused and disoriented and asked him for directions to the nearest bank so he could pay for an additional night. Mapalo provided him with directions and advised him that he had a half hour to come up with the money or he needed to leave. Approximately one hour later, Mapalo had not heard from Gonzales so he called Gonzales's hotel room again. Gonzales still appeared confused and disoriented and was adamant that he had just paid him for an additional night's stay. Mapalo told Gonzales that he had not paid for an additional night's stay and now needed to leave the hotel property. Approximately a half hour later, Mapalo called Gonzelz's hotel room a third time to see if Gonsalez had left, but there was no answer. Mapalo sent a hotel maintenance worker to Gonzales's room to check if it was now vacant, but when the maintenance worker checked the room, they noticed the hotel room door was locked from the inside via the deadbolt lock. When Mapalo was made aware of this he called the South San Francisco Police Department for assistance in removing Gonazalez from the hotel's property.

5. After speaking with Mapalo, Officer Bordigon and I went to the hotel room (#445). Officer Bordigon knocked on the hotel room door and announced our presence. Gonzales spoke to us through the locked hotel room door and repeatedly refused to open the door. Gonzalaz insisted that he had paid for another night's stay. Officer Bordigon repeatedly explained to Gonzales why the hotel staff wanted him out of the hotel room, but Gonzales was argumentative and irrational. Gonzales continued to refuse to open the door for us and demanded that the police leave.

6. Gonzales sounded peculiarly irrational, at times did not make sense when he spoke, and spoke very fast. This led Officer Bordigon and me to believe that Gonzales might be under the influence of a controlled substance. I noticed that he sounded as if he was under the influence of a controlled substance. Officer Bordigon advised Gonzales that if he did not open the hotel room door, we would have to open the door with a key. After hearing this, Gonzales got extremely agitated and stated that he was armed with a gun and would leave him no choice but to "use it" on us.

7. Based on Gonzales's statement, I advised South San Francisco Police Communications to dispatch additional cover units via the police radio. Sergeant Carlino and Officer Fukushima responded to the fourth floor to assist Officer Bordigon and me, and Sergeant Wall, Officer Kalagayan and Officer McHale responded to the exterior of the of the building (in case Gonzales jumped out or attempted to exit the fourth floor hotel room window).

8. At one point, Gonzales demanded that the police leave the area before he opened the hotel room door. Officer Bordigon told Gonzales that the police were not going to leave until he left the property and explained again that if he did not open the door, he may have to force the door open. This got Gonzales extremely angry and agitated.

9. After many failed attempts to negotiate with Gonzales, a hotel maintenance employee was able to retrieve a key that would unlock the deadbolt lock on the hotel room door and allow us access in the hotel room. Officer Bordigon and Sergeant Carlino gave Gonzales warning that we were going to enter the room. Gonzales yelled something to the affect of, "Do what you got to do! Good Luck!" Officer Bordigon attempted to get clarification as to what Gonzales meant by saying that. Gonzales replied by saying something to the affect of, "If you come in here, you're going to need good luck!".

10.     As Gonzales continued to yell at us through the locked hotel room door, Officer Bordigon used the key to open the hotel room door. Gonzales immediately slammed the door shut and began yelling (unknown what Gonzales was saying). It appeared as if Gonzales was using his body weight against the door from the inside in an attempt to keep the door closed. Sergeant Carlino used his body weight to force the door back open. The door did not open immediately because Gonzales was still on the other side of the door (inside the hotel room) throwing his body weight against the door in an attempt to keep it shut. As we were struggling to get the hotel room door open, Gonzales yelled, "I have enough dynamite in here to blow up the whole building!" Sergeant Carlino was eventually able to open the door.

11.     Once the hotel room door was open, I immediately noticed that Gonzales had turned off all the lights in the hotel room. Gonzales was now several feet away from the door in a fighting stance (similar to a boxer's stance). As Sergeant Carlino entered the hotel room, Gonzales lunged towards Sergeant Carlino and appeared to have attempted to punch him. Sergeant Carlino immediately reacted and punched Gonzales once in the face (unknown exactly where) with his right hand and pushed him back away from the door. This allowed Officer Bordigon, Officer Fukushima and me, who were in a single file line starting at the threshold of the room and ending in the hallway, to now enter the hotel room. Once in the room, Gonzales began throwing blind punches with both of his arms. We were eventually able to all grab hold of Gonzales, but he was violently struggling to break free from our hold on him. Even though all four of us had a hold on Gonzales and were attempting to force him down to the ground, he was still able to maintain his balance and continue to struggle with us

12.     At one point during the struggle, Gonzales grabbed a hold of the left sleeve of my long sleeve uniform shirt with his right hand and began attempting to pull me down to the ground. Gonzales had a full grip of my uniform shirtsleeve and twisted his wrist to get a better hold. I was unable to break free from Gonzales's hold and felt his body weight begin to pull me down towards the ground. Fearing that Gonzales was going to force me to the ground because of his good hold on me and the fact that he outweighed me (Gonzales at approximately 190 lbs. compare to my weight at approximately 145 lbs.), I delivered four to six closed fist distraction blows to Gonzales's face and head with my right hand. Gonzales continued to hold onto my left shirtsleeve, but stopped attempting

to pull me to the floor. Officer Fukushima was eventually able to get Gonzales to release his hold on my shirtsleeve by prying his fingers off away from my shirt.

13. We were eventually able to force Gonzales into a facedown position at the end of one of the beds (the one nearest to the window). I took a position a Gonzales's head, while Sergeant Carlino, Officer Bordigon and Officer Fukushima attempted to gain control of Gonzales' hands and arms. Gonzales, who was still violently struggling and repeatedly ignoring our commands to "stop resisting" and "put [your] hands behind your back," placed both of his arms under his chest and attempted to push up from the bed. Fearing that Gonzales was going to stand up again, I attempted to deliver a single knee strike with my right knee to Gonzales's right shoulder and collarbone area. As I was in the process of delivering the knee strike, Gonzales quickly moved his head and my knee struck him on the top of his head.

14. In spite of all four of us actively attempting to physical restrain Gonzales, he displayed extremely high levels of strength and pain tolerance. Gonzales repeatedly attempted to push himself up from the bed, so I deployed my department issued O.C. (Oleoresin Capsicum) canister and sprayed Gonzales's right eye and right side of his face with a quick one to two second burst of O.C. This appeared to have little or no effect on Gonzales, so I sprayed Gonzales once again with another quick one to two second burst of O.C. this time at Gonzales's left eye and left side of his face. This application of O.C. appeared to have been somewhat effective and Sergeant Carlino, Officer Bordigon and Officer Fukushima were eventually able to get Gonzales's arms restrained in handcuffs.

15. Once in handcuffs, Gonzales continued to scream and violently move his body from side to side. We directed Gonzales to the floor of the hotel room from the bed, but he continued to violently move his body and kick his legs. Officer Fukushima, Officer McHale and I held Gonzales down on the floor, until Sergeant Wall responded to the scene with the "WRAP" (body restraining devise). Gonzales began to calm down as we placed him in the "WRAP" and we sat him in an upright position. One minute Gonzales was extremely agitated, would not make sense when he spoke and would repeat what he said several times. The next minute Gonzales would relax and speak in a childlike voice. Gonzales repeatedly said things similar to, "Sleepy!," "God loves you Nelson!" and "God forgives you Nelson!"

16. While attempting to speak with Gonzales, I noticed he showed signs and symptoms of being under the influence of a controlled substance. I have been trained in the detection of objective signs of drug influence to the human body. I have attended a P.O.S.T. certified training course where the subject matter was detecting individuals under the influence of controlled substances.

17. Based upon the totality of the circumstances confronting us, including the facts that Mr. Gonzales refused to leave the hotel room, threatened us with a gun, fought off four trained officers with super-human strength by charging us, fought us off, struggledg against every attempt to restrain him, and exhibited numerous signs of being under the influence of illegal drugs or powerful narcotics, we were left with little choice but to meet Mr. Gonzales's resistance with that force reasonably necessary to bring him into custody.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

EXECUTED this 12th day of September, 2008 in Oakland, California.

_____/S/_____
Sean Curmi

1145481.1