1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                    ---oOo---

                                        **CERTIFIED**
4    NELSON GONZALES,                    **COPY**

5         Plaintiff,

6    vs.                           Case No. C07-04720 JL

7    MICHAEL NOVOSEL; R. CARLINO;
     S. CURMI; A. BORDIGON;
8    J. FUKUSHIMA AND DOES 1-25,
     INCLUSIVE,

9
          Defendants.
10   _____/

11

12        DEPOSITION OF ALAN GIANOTTI, M.D.

13

14

15     Taken before DAWN E. HOWARD, CSR

16   Certified Shorthand Reporter No. 13201

17

18

19

20        Monday, August 11, 2008

21

22

23

24

25

**EXHIBIT A**

```
 1                    I N D E X

 2                                          PAGE

 3  EXAMINATION BY MS. HYNES            4, 110

 4  EXAMINATION BY MR. DEVINE              74

 5  EXAMINATION BY MR. SCOTT              83

 6

 7

 8                  E X H I B I T S

 9  DEFENDANTS' EXHIBIT:                   PAGE

10  A    Defendants' notice of deposition of      4
         Alan Gianotti, M.D. (3 pgs.)
11
    B    Patient care report for Hector           4
12       Gonzalez, date of service 8/14/06,
         run number 06-2696, Incident report
13       number 2006-0603223-000, emergency
         department records, progress records
14       (54 pgs.)

15

16

17

18

19

20

21

22

23

24

25
                                          Page 2
```

1      A.    Okay.  Now we're getting into my notes for the

2    actual physical exam.  Which doesn't really correspond,

3    unfortunately, with the form.  This form is really set

4    up for people who want to do an entire history and

5    physical on the form.

6             And in this case, I didn't use the form for

7    that, because I was dictating that same format.  So I'm

8    just using this as a fresh piece of paper to write my

9    notes down.  So you have to separate the notes on the

10   left side with my own handwritten notes, because they

11   don't really correlate.

12            So way down next to "abdomen" is when I start

13   writing some notes.  And the first thing I wrote is he's

14   oriented times one.  Meaning, he's only oriented to his

15   name.  That's how I abbreviate that.  So he's not

16   oriented to place.  He didn't know that he was in the

17   hospital.  He's not oriented to date.  He didn't know

18   what day it was, but he did respond to his name.  Which

19   in review of my dictation, that corresponds directly.

20            Continuing on, I wrote that there was an

21   obvious abrasion noted to his left shoulder.  And then I

22   wrote some actual laboratory test findings, which was

23   that his urine tox was positive for cocaine and

24   marijuana.  And that chest x-rays showed a globular

25   heart that was prominent, but no other signs of injury,

1    time of transfer of the patient's care from myself and

2    the emergency department to the internal medicine

3    doctor, Dr. Bogale, I had virtually everything back --

4           Well, hold on.  Can I actually look at my

5    dictation, because I'll tell you.

6           MS. HYNES:  Absolutely.

7           THE WITNESS:  I believe that the urinalysis was

8    done about 2:00, which means by 2:45 or 3:00 a.m. all

9    the tests were back, short of the fact that we were

10   going to scan his head, but he wasn't keeping still, so

11   we waited.  That was done early in the night or earlier

12   in the morning.

13          MR. DEVINE:  Your dictation is on page 11.

14          THE WITNESS:  Thanks.

15          So certainly by the time I dictated that the

16   urinalysis was back, my sense is --

17          Do you have a copy of the entire chart here,

18   which would include the exam?

19          MS. HYNES:  No.

20          THE WITNESS:  I do remember that -- and this is

21   very typical.  Patients like this, it's very difficult

22   initially to get a urinalysis because they require a

23   straight catheterization.  And he was too agitative and

24   combative to do that initially until he was restrained

25   chemically as well as physically.

1    see me, they oftentimes can't even isolate where the

2    taser is.  So that pain, I think, is short-lived.

3         MS. HYNES:   Q.   So because you noted down

4    here under the physical exam, where you read, his

5    orientation is unclear, he's combative, aggressive and

6    cooperative.  These are your notes and this is what you

7    observed at the time you --

8         A.   Uncooperative; I hope I didn't say

9    "cooperative."

10        Q.   Sorry.

11        A.   Yeah, he was very uncooperative.

12        Q.   So these are your notes now.  This isn't what

13   you were told by paramedics?

14        A.   No, now we're in my physical exam, so

15   everything here is my direct experience with the

16   patient.

17        Q.   So if you look to the right of "HEENT," which

18   is head, ears, eyes -- was it neck and throat?

19        A.   Right.

20        Q.   Okay.  It looks to be about the fourth -- oh,

21   excuse me, the fifth sentence and the last sentence,

22   "There are no signs of trauma to the face, scalp, or

23   neck."

24        A.   Right.  But it is important to point out,

25   first, that I noted the conjunctivitis.  So with the

1    exception of the conjunctivitis, there was no sign of

2    trauma to the face, scalp, or neck.

3         Q.    And if there had been ...

4         A.    This is where it would be documented.

5         Q.    Okay.  And again, extremities, here, you do

6    note the slight abrasion to the left shoulder and the

7    right shin, but that he's moving all extremities

8    appropriately.

9         A.    Right.

10        Q.    And then it says, "There is good capillary

11   refill in all distal extremities."  What does that mean?

12        A.    That's really important because all these guys

13   that come in in restraints, you worry that the

14   restraints are too tight and could be blocking off blood

15   flow to the hands and feet.

16             So it's one thing I regularly check with

17   anybody that comes in on restraints, is to make sure

18   that they have good coloration, good blood flow to all

19   distal extremities.  So it's something I check, of

20   course, on everybody, but it's really important to do it

21   with the guys who are in restraints.

22             That was the point there, is that I looked at

23   the hands and feet and there was good blood flow going

24   to them.

25        Q.    If you had noticed any abrasions that appeared

1   says:  Amnesia, patient denies having any history of

2   this.  Can't tell me what has happened to him in the

3   past few days.

4        Do you want me to continue to read or ...

5   Q.   No, that's fine.

6        Actually, I was wondering if that, whatever it

7   is following "history," is that some sort of symbol or

8   is that just --

9   A.   Can you show me where history is?

10  Q.   Absolutely.  Right here.

11  A.   History of this.

12  Q.   Oh, that's the word "of."

13  A.   History of this, so amnesia.  Patient denies

14  having a history of this.

15  Q.   Then if you go -- counting from the line where

16  "amnesia" appears, if you go down six lines.

17  A.   One, two, three, four, five, six, yes.

18  Q.   It looks like there's a "CT" and a minus symbol

19  and a circle.  Do you know what that means?

20  A.   Right.  So the CT of his head was performed,

21  and it showed no signs of injury.  It was read as

22  negative.

23  Q.   Did you order a CT scan when he came in?

24  A.   No, no.  And I was doing my best to recollect

25  why, because typically on these patients we do.  But my

Page 58

1    they're asking for their consultation at that point.

2        Q.    And this is August 15th at 10:15 a.m.?

3        A.    Right.

4        Q.    And then there's this reference to a sitter.

5    So they had someone sitting with him.

6        A.    That just means he was worried.  That he was

7    worried about his own safety.

8        Q.    The patient's safety?

9        A.    The patient's safety.  So you're hiring someone

10   to just sit in the room and watch the patient so that

11   they don't try to hurt themselves.

12       Q.    Then on page 20, it looks like there's 8/15 at

13   noon and 8/16.  Is there any mention on this page that

14   you can see that he actually was evaluated for

15   psychiatric emergency services?

16       A.    Yes.  So at noon on the 15th is the first note

17   that says, "PES intake," so that will be a nurse's note.

18   Checked in on patient -- this will be a psychiatric

19   nurse, checked in on patient.  Patient is sleeping.  He

20   is sleeping and appears to be in no distress.  PES

21   intake will follow up with patient on the 16th, based on

22   Dr. Allen's request.

23            Okay.  So this is your first kind of, you

24   know -- I don't know -- proof that in fact that it's

25   Dr. Allen that's taking -- that is the medical doctor

1    now who's caring for the patient.

2        Q.    And according to this notation, it appears that

3    Dr. Allen is the one that requested --

4        A.    The psychiatric evaluation, yeah.

5              And that's why you don't see a note from the

6    psych nurse, an official note, until the 16th.

7        Q.    So page 21 is the psychiatric nurse's intake

8    notes?

9        A.    Yeah.  So that's the first -- it will be a

10   psychiatry nurse that evaluates the patient and then

11   recommends that the psychiatrist come in for a

12   consultation.

13       Q.    And about a third or -- excuse me -- halfway

14   through her notes she says patient was given an "MMSE."

15   Do you know what that is?

16       A.    Mental medical screening exam, I believe.

17       Q.    And it looks like he scored a 21.

18       A.    Scored a 21, which indicates mild cognitive

19   impairment.

20       Q.    Does that mean anything to you?

21       A.    It really doesn't.  It's not a -- it's not an

22   exam or an evaluation that we do in the emergency

23   department.

24       Q.    It looks like page 22 might be Dr. Allen's

25   notes again, perhaps.

1    neurological examination.  You say, "He is otherwise

2    combative and aggressive and noncommunicative."

3        A.    Right.  That really -- it can be found in

4    either place.  It can be a review of systems, meaning

5    the reason I couldn't find out what his symptoms were is

6    because of that type of activity.  You could throw it in

7    the general category.

8             And more specifically, I always include it in

9    the neurological category because that explains to

10   people what his neurological state was at the time.

11       Q.    And you mentioned something that you felt

12   unsafe.  Did you think that he was unsafe to you and to

13   others?

14       A.    Absolutely.

15       Q.    Could you --

16       A.    That's why he was put in restraints.  The very

17   few people that you'll put either in physical restraints

18   or you will chemically restrain are people that you feel

19   unsafe around.  And in his case, I felt that not only

20   was he uncooperative but he was aggressive, meaning that

21   if we took him out of restraints, he would harm us or

22   harm himself in fact.

23            So it was clear to me, I mean, that he was not

24   of his sound mind and that the only way to protect

25   ourselves was to restrain him.  But that's included in

1    A.   That he wasn't oriented to reality.  Sorry.  So

2   that he was, again, acutely psychotic.  He was

3   delusional.  He had no orientation as to where he was or

4   why he was there.  And though he responded to his name,

5   you know, I'm not sure he -- we could probably make a

6   case that he didn't know who he was at that time.

7       Q.   If I could have you turn your attention back to

8   page 17.

9       A.   Okay.

10       Q.   There was some discussion about the 5150 and

11   the status of the patient.

12       A.   That's right.

13       Q.   And now I'm drawing your attention to the last

14   sentence on that page and it says, "Of note here, the

15   patient is currently unarrested by the PD and the PD has

16   asked us to notify them upon discharge of the patient to

17   possibly re-arrest him."

18         Does that shed any light on your view about

19   whether Mr. Gonzalez was arrested or unarrested?

20       A.   This is -- okay.  Again, this is not my note.

21   This is Dr. Bogale.  So he would have had his own

22   interaction with the patient and the nursing staff and

23   possibly even the paramedics.

24         But this is not that uncommon; this is what I

25   was referring to earlier.  It's not that uncommon that a

Page 82

1   patient who is incarcerated or under arrest comes to our

2   facility.  But since our facility is not capable, as far

3   as I know, of admitting an arrested patient -- the

4   patient has to be unarrested for us to admit someone to

5   the ICU.  Now, this is not the case at the county

6   hospitals where they actually have an incarcerated

7   floor.  And I remember this from my residency, where the

8   police are actually on the floor and the patient remains

9   arrested, but that's not the case at Mills-Peninsula.

10          So that patient was unarrested with the plan to

11  rearrest him when he was medically stable.  It's really

12  not that different than my understanding of a 5150.  Of

13  course that doesn't really pertain here, because the

14  patient wasn't on a 5150.  Though I didn't spell it out,

15  Dr. Bogale certainly did, that the plan here was that

16  the patient was to be rearrested after he was stabilized

17  medically.

18          MR. DEVINE:  Let me just take a quick look at

19  my notes.  I think that's all I have, then.

20          Thank you.  That's all I have.

21          THE WITNESS:  Sure.

22                  EXAMINATION BY MR. SCOTT

23          MR. SCOTT:  Q.   Doctor, my name is John Scott

24  and I represent Nelson Gonzalez, and I have a few

25  questions, so bear with me.

Page 83

1      Q.    So in this case, hypothetically, if Nelson

2    Gonzalez was arrested, then he couldn't have been

3    admitted?

4      A.    Boy, I don't know that because I don't know

5    "could."  I don't know that that's a stated bylaw of the

6    hospital, that an arrested patient cannot be admitted.

7    We could call the hospital and ask, like the risk

8    management department, and find out if that's the law or

9    the rule of the hospital, because I don't know.

10     Q.    Oh.  Now, can a patient that's been 5150'd by

11   the police be admitted for 72 hours?

12     A.    Well, sure, that happens all the time.

13   Patients on 5150s come in and, based on my evaluation of

14   the case, if they are medically unstable, they're

15   admitted to the hospital with a medical diagnosis.  Or,

16   they're medically cleared by me and admitted to our

17   psychiatric department, where then they have to be seen

18   by a psychiatrist to remove that hold.

19          The question you're asking I think is, you're

20   getting to is, does that hold have to be released if the

21   patient is being medically admitted.  And my sense is

22   that that's the case, yes.

23     Q.    So as far as you know, he was medically

24   admitted but not admitted on a 5150?

25     A.    I do know that for a fact.

```
1         Q.   And he was admitted as a voluntary patient?

2         A.   Oh, no.  You can't say that he was voluntary,

3    because he was not of his sound mind.

4         Q.   All right.  So --

5         A.   He was medically unstable, partly because of

6    the psychosis.

7         Q.   All right.  So he was not free to leave; is

8    that correct --

9         A.   That's --

10        Q.   -- at least initially?

11        A.   That's true.

12        Q.   Okay.  And can you tell me if at some point he

13   was free to leave based on your review of the records?

14        A.   Well, that will be up to the medical doctors.

15   So if you ask Dr. Bogale or Dr. Allen when he came to a

16   sound mind, was he okay or legally allowed to leave?  I

17   don't know.

18        Q.   Now, if he's not of sound mind and a danger to

19   himself or others, then he falls within the definition

20   of a 5150?

21        A.   Absolutely.

22        Q.   And did he -- based on your review of the

23   record, did he fall within the category of a 5150?

24        A.   I think he certainly did.  So I think if he was

25   medically stable, he would have been placed on a 5150
```

1       A.   Right.

2       Q.   -- then he will just stay there until that

3   condition is cleared, for the lack of a better term.

4       A.   Absolutely.

5       Q.   Okay.

6       A.   I mean, he was already -- we had already signed

7   the forms to restrain him, so it was -- he was, you

8   know, in essence, I guess, in a held position because he

9   was being restrained for the safety of all involved.

10      Q.   But what --

11      A.   If he tried to leave, a 5150 would have been

12  placed on him.   That's the way that that generally

13  transpires.

14      Q.   And I appreciate that.

15           If it was just a 5150 with no medical condition

16  that needed monitoring or treatment, then he would have

17  gone to the psychiatric unit?

18      A.   Right.   So then his care would have been

19  transferred to our PES unit -- which we talked about

20  earlier, your first questions -- that we have a separate

21  unit in the hospital that just deals with the medically

22  stable PES patients.

23      Q.   Okay.   What was the medical condition that was

24  not stable?

25      A.   Oh, there was a lot.

1        Q.    Okay.  Could you just summarize them for me.

2        A.    Sure.  His vital signs were unstable, he was

3    tachycardic and hypertense.

4        Q.    Okay.

5        A.    He was altered.  He was acutely psychotic.

6    Clearly, that more than any others was probably the

7    issue.  But, I think in combination, an altered mental

8    status and altered vital signs made him unstable.  And

9    not only that, he was so unstable he went to the ICU.

10   He didn't go to the TCU or a med/surg bed.  So we

11   clearly thought there were medical issues here.

12       Q.    And what do you believe the medical issues were

13   or the potential medical issues that were the reason to

14   put him in the ICU?

15       A.    Well, in my note I clearly outlined the two.

16   One, I think he was acutely under the influence of

17   chemical stimulants, cocaine specifically, that was

18   causing a psychosis, paranoia, combativeness, agitation,

19   first and foremost.

20             And that same substance abuse was causing the

21   abnormal vital signs, the tachycardia and the

22   hypertension.  So in essence, it's the one -- it's the

23   one phenomena, the one drug abuse, that's causing the

24   multitude of symptoms that made him unstable.

25       Q.    Okay.  When you say "drug abuse," are you

Page 89

1    referring to a single incident where he took so much of

2    the drug that it was causing these symptoms?

3        A.   I do believe that.  I believe in his case, it

4    was probably an acute ingestion of these drugs.

5    Although, like I said -- I have read that the acute

6    psychosis with both stimulants, cocaine and

7    amphetamines -- the acute psychosis can be the result of

8    long-term use and it doesn't have to be the acute

9    setting.  You can have an acute change in mental status

10   after low-level usage over a long period of time.

11       Q.   Understood.

12       A.   So it can be either one, whether it's the acute

13   or long-term ingestion.

14       Q.   Or --

15       A.   My sense is, though, with the abnormal vital

16   signs, that it was more likely to be acute.

17       Q.   But you could be without -- just taking drugs

18   out of the equation, he could have an underlying dual

19   diagnosis, for example.  He could be, without the drugs,

20   be bipolar, for example, which could explain this

21   behavior.

22            MS. HYNES:   I'm just going to object; calls for

23   speculation, assumes fact not in evidence.

24            MR. SCOTT:   Q.   Go ahead.

25       A.   Okay.  That's a very interesting point, because

1    nature?

2        A.    I'm going off of recollections from two years

3    ago.  All I can do is refer to my notes that he was

4    uncooperative and agitated.  So that kind of combative

5    behavior that I've documented multiple times is very

6    threatening -- again, we see it quite often -- but I

7    have no recollection individually of this case.

8        Q.    Okay.  So this could be anywhere from

9    combative -- in terms of being in four-point restraints

10   and maybe moving his arms or trying to move his arms and

11   legs a little bit -- to be all the way to moving around

12   a lot and verbally threatening you and everything in

13   between?

14       A.    Absolutely.  You know, I don't see a lot of

15   notation for verbal threats, more, I think, physical

16   threats.  But I'll let you know that it's rare to have

17   to give chemical restraints and physical restraints to

18   someone.  Rare enough that, you know, though we do it a

19   lot, it's clearly that far end of the normal curve, that

20   far end of the spectrum that's scary to us.  I don't

21   pull that trigger very often, when I give those three

22   drugs, so I must have been worried.

23       Q.    Okay.  Well, would it be fair to say that when

24   you did your initial evaluation, you had some

25   information from the police that you included in your

Page 94

Emerick and Finch 800-331-9029

1    can find that.

2        Q.    Oh, look at page 40, that might be it.

3        A.    Okay.  So on the 16th at 3 p.m. the patient was

4    transferred out of the ICU.  No, no, no.  I don't quite

5    understand it.  Okay, I'll show you why.

6        Q.    All right.

7        A.    At 3 p.m. the patient was supposed to be

8    transferred to a med/surg bed, med/surg with no sitter.

9    Med/surg is the lowest level of care.  But then, an hour

10   later, there's a note that the patient's status was

11   changed to the TCU, meaning they weren't quite ready to

12   put the patient on the ground floor.  They still wanted

13   the patient on our cardiac monitor, which is what the

14   TCU is.

15            So they're still worried enough.  They must

16   have changed their mind that the patient wasn't quite

17   stable yet to go to a regular floor.

18       Q.    All right.  And can you tell from now looking

19   at page 41, does it indicate on the 17th he was

20   transferred to med/surg?

21       A.    That's true.  Okay, so the next day at almost

22   noon, the patient was then transferred to the lowest

23   level of care, and obviously still being admitted to --

24   which is the med/surg unit.

25            And then on the 18th at about the same time,

1       EMERICK & FINCH
        Certified Shorthand Reporters
2       18 Crow Canyon Court, Suite 210
        San Ramon, CA 94583
3       (925) 831-9029

4

5   Date: August 20th 2008

6   To:  ALAN GIANOTTI, M.D.
         Mills Health Center
7        100 So. San Mateo Drive
         San Mateo, California 94401
8

9   Re:  ALAN GIANOTTI, M.D.
         Case No. C07-04720 JL
10

    Date Taken:  Monday, August 11, 2008
11

    Dear Dr. Gianotti,
12

         Your deposition in the above matter is now
13  available at this office.  You may wish to discuss with
    your attorney whether he or she requires that it be
14  read, corrected, if necessary, and signed before it is
    filed with the court, if so ordered.
15       Since the original deposition may not be released
    from our custody, if you wish to sign it, please appear
16  at this office, 18 Crow Canyon Court, Suite 210, San
    Ramon, California, within the next 30 days on any
17  weekday between the hours of 9:00 a.m. and 4:00 p.m.
    You must bring this letter with you.
18       As an alternative, you may wish to read your
    attorney's copy of the deposition and notify this office
19  by letter of any changes you wish to be made.

20                          Very sincerely,

21                          EMERICK & FINCH

22

23                          DAWN E. HOWARD, CSR No. 13201

24

25  cc:  All Counsel

EMERICK & FINCH (925-831-9029)